Joyce W. Lindauer
State Bar No. 21555700
Kerry S. Alleyne
State Bar No. 24066090
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
ATTORNEYS FOR DEBTOR

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **FRISCO ACQUISITION, LLC,** | § | **CASE NO. 20-42257-btr** |
| | § | **Chapter 7** |
| Debtor. | § | |

**DEBTOR'S OBJECTION TO CLAIM OF**
**WPB HOSPITALITY, LLC (PROOF OF CLAIM 1)**

**ATTENTION: YOUR CLAIM MAY BE REDUCED, MODIFIED, OR
ELIMINATED. Accordingly, you should read this pleading carefully
and discuss it with your attorney, if you have one in this bankruptcy
case. If you do not wish for the Court to eliminate or change your claim,
you must file a written response opposing the claim objection, explaining
the factual and/or legal basis for that response.**

**No hearing will be conducted on this claim objection unless a written
response in opposition is filed with the Clerk of the United States
Bankruptcy Court and served upon the party filing this pleading
_WITHIN THIRTY (30) DAYS FROM THE DATE OF SERVICE_ listed in
the certificate of service unless the Court shortens or extends the time
for filing such response. If no response in opposition is timely served and
filed, this claim objection shall be deemed to be unopposed, and the
Court may enter an order sustaining the objection to your claim. If a
response in opposition is filed and served in a timely manner, the Court
will thereafter set a hearing with appropriate notice. If you fail to appear
at the hearing, your response in opposition may be stricken. The Court
reserves the right to set a hearing on any matter.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:**

Pursuant to Fed. R. Bankr. P. 3007, Frisco Acquisition, LLC (the "Debtor") hereby objects to the claim of WPB Hospitality, LLC (the "Creditor"), which was filed as Claim No. 1 on January 26, 2021 (the "Claim").

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.

2.    Venue in this Court is appropriate under 28 U.S.C. §§ 1408 and 1409.

3.    On November 6, 2020 (the "Petition Date"), Debtor filed with the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division (the "Court") a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), commencing the above-captioned Chapter 7 case.

4.    The bar date for filing non-government claims is February 16, 2021.

## II.    FACTS AND ARGUMENT

5.    WPB Hospitality, LLC ("WPB") claims to be the holder of a secured claim in the amount of $1,137,000.00 bearing interest at an annual rate of one hundred percent (100%) pursuant to its Proof of Claim No. 1.  A true and correct copy of the Claim is attached hereto as **Exhibit "1."**

6.    WPB's claim is based upon accusations brought in a legal action filed by Ms. Wanda Bertoia, managing member of WPB, against Debtor and others in the case styled as *Bertoia v. Payton, et al.* (Case No. 2019CV33523 filed in the District Court, Denver County, Colorado) (the "State Case").  The case involves a failed hotel project involving Bertoia and WPB.

7.    After the initial failure of the hotel project, Debtor became involved in December 2018 by purchasing mechanics liens and associated junior redemption rights in the hotel property.

8.      Debtor entered into the "*Contract to Buy and Sell Real Estate (Commercial)*" ("Contract") with Bertoia in February 2019. That Contract specifically stated "[it] must be approved by the Bankruptcy Court and will be deemed null and void if not approved within 30 Days of MEC [mutual execution of the contract]." That Contract required contemporaneous execution with an "*Agreement for Purchase and Sale of LLC Interest*" ("Agreement") which similarly required Bankruptcy Court Approval. That Agreement was drafted in March 2019.

9.      Later, on March 20, 2019, WPB filed for Bankruptcy Court approval to sell Debtor the hotel property. However, the Bankruptcy Court never granted the aforementioned requisite approval as to either the Contract or the Agreement, and both transactions consequently failed.

10.     On May 23, 2019, American Lending Center ("ALC"), an entity providing financing to Bertoia and WPB, foreclosed on the hotel property and purchased it at the public trustee sale for the full amount owed, thereby extinguishing Bertoia's interest in the hotel property.

11.     Bertoia in her individual capacity and on behalf of WPB filed a claim against Debtor in Colorado State Court for (1) an alleged breach of contract, (2) a bad faith breach of contract, and (3) breach of duty of good faith and fair dealing. Those claims provide the basis for WPB's Proof of Claim No. 1 filed in these proceedings. However, the Debtor objects to WPB's Proof of Claim because the Contract and Agreement on which the allegations are based were never approved by the court in WPB's bankruptcy case as required by the terms of those documents, thereby rendering both null and void. Without court approval, Debtor was unable to proceed with the purchase of the hotel property and Bertoia's interest in WPB. Without a valid and enforceable Contract and Agreement on which to base arguments for the offenses alleged *supra*, any claims for such purported offenses must necessarily fail.

12.     Debtor further objects to WPB's claim since it asserts that interest on amounts alleged owed compound at the grossly usurious annual rate of one hundred percent (100%).

13.     A true and correct copy of the Declaration of Payal Nanda is attached hereto as **Exhibit "2."**

14.     Pursuant to Section 502(a) of the Bankruptcy Code, a filed proof of claim is deemed allowed unless a party in interest objects thereto.  *See* 11 U.S.C. § 502(a).  Rule 3007 of the Bankruptcy Rules provides that an objection must be in writing and that the claimant must be provided notice of the hearing to be held in respect of such objection.  *See* FED. R. BANK. P.  3007.  This Objection serves to meet the requirements of both 11 U.S.C. 502(a) and FED. R. BANK. P. 3007.

15.     Debtor expressly reserves the right to amend, modify or supplement the objection asserted herein and to file additional objections to the Proof of Claim or any other claims (whether filed or scheduled or not) which may be asserted by Debtor.  Should one or more of the grounds for objection stated in this Objection be dismissed, Debtor hereby reserves its rights to object on any other grounds that Debtor has identified in this Objection.  In addition, Debtor reserves the right to seek further reduction or elimination of any claim to the extent such claim has been paid or waived.

### III.    PRAYER

WHEREFORE, PREMISES CONSIDERED the Debtor requests that the Court enter an Order (1) sustaining Debtor's objection to the claim of WPB Hospitality, LLC, (2) denying the claim in its entirety, and (3) for such other and further relief to which it may be justly entitled.

Dated: February 10, 2021.

Respectfully submitted,

_/s/ Joyce W. Lindauer_
Joyce W. Lindauer
State Bar No. 21555700
Kerry S. Alleyne
State Bar No. 24066090
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Email: joyce@joycelindauer.com
        guy@joycelindauer.com
        kerry@joycelindauer.com
ATTORNEYS FOR DEBTOR

### CERTIFICATE OF SERVICE

    This is to certify that on February 10, 2021, a true and correct copy of the foregoing document was served via email pursuant to the Court's ECF system upon the parties receiving electronic notice in this case as indicated below.  The Claimant was served by United States first class certified mail, return receipt requested, at the address listed below.

**VIA ECF**:

Joyce W. Lindauer on behalf of Debtor Frisco Acquisition LLC
joyce@joycelindauer.com, dian@joycelindauer.com;gina@joycelindauer.com

Christopher Moser
cmoser@qslwm.com,
cmoser@ecf.epiqsystems.com;kimhill@qslwm.com;cjm@trustesolutions.net

Christopher Moser on behalf of Trustee Christopher Moser
cmoser@qslwm.com,
cmoser@ecf.epiqsystems.com;kimhill@qslwm.com;cjm@trustesolutions.net

US Trustee
USTPRegion06.TY.ECF@USDOJ.GOV

**<u>VIA CERTIFIED MAIL</u>**
**<u>RETURN RECEIPT REQUESTED</u>:**

WPB Hospitality, LLC
c/o Arthur Lindquist-Kleissler
Lindquist-Kleissler & Company, LLC
950 South Cherry Street, Suite 418
Denver, CO 80246-2665


                                                   */s/ Joyce W. Lindauer*
                                                   Joyce W. Lindauer

**Fill in this information to identify the case:**

Debtor 1   Frisco Acquisition LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Eastern District of Texas**

Case number:  **20–42257**

FILED

**U.S. Bankruptcy Court**
**Eastern District of Texas**

1/26/2021

**Jason K. McDonald, Clerk**

Official Form 410
## Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

| | |
| --- | --- |
| 1. **Who is the current creditor?** | WPB Hospitality, LLC <br><br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor |
| 2. **Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes. From whom? |
| 3. **Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br> WPB Hospitality, LLC <br><br> Name <br> c/o Arthur Lindquist–Kleissler <br> Lindquist–Kleissler & Company, LLC <br> 950 South Cherry St., Suite 418 <br> Denver, CO 80246–2665 <br><br> Contact phone    303–691–9774 <br> Contact email    arthuralklaw@gmail.com <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one):     | **Where should payments to the creditor be sent?** (if different) <br> WPB Hospitality, LLC <br><br> Name <br> c/o Wanda Bertoia <br> 5466 S Hannibal Court <br><br> Aurora, CO 80015 <br><br> Contact phone <br> Contact email    arthuralklaw@gmail.com |
| 4. **Does this claim amend one already filed?** | ☑ No <br> ☐ Yes. Claim number on court claims registry (if known)      Filed on       MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes. Who made the earlier filing? |

# EXHIBIT "1"

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| | |
|---|---|
| **7. How much is the claim?** | $ 1137000.00      **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>     See attachments |

| | |
|---|---|
| **9. Is all or part of the claim secured?** | ☐ No<br>☑ Yes. The claim is secured by a lien on property.<br>     **Nature of property:**<br>     ☑ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*<br>     ☐ Motor vehicle<br>     ☑ Other. Describe:     See attachments<br><br>     **Basis for perfection:**     See attachments<br><br>     Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>     **Value of property:**     $   1137000.00<br>     **Amount of the claim that is secured:**     $   0.00<br>     **Amount of the claim that is unsecured:**     $   1137000.00     (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>     **Amount necessary to cure any default as of the date of the petition:**     $ _____<br><br>     **Annual Interest Rate** (when case was filed)    100   %<br>     ☑ Fixed<br>     ☐ Variable |

| | |
|---|---|
| **10. Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |

| | |
|---|---|
| **11. Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. *Check all that apply:* | | Amount entitled to priority |
|---|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies   $ _____

\* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   1/26/2021

MM / DD / YYYY

/s/ Arthur Lindquist–Kleissler

Signature

Print the name of the person who is completing and signing this claim:

Name   Arthur Lindquist–Kleissler

First name    Middle name    Last name

Title   Attorney

Company   Lindquist–Kleissler & Company, LLC

Identify the corporate servicer as the company if the authorized agent is a servicer

Address   950 South Cherry Street, Ste 418

Number   Street

DENVER, CO 80246

City   State   ZIP Code

Contact phone   3036919774       Email   arthuralklaw@gmail.com

**Fill in this information to identify the case:**

Debtor 1     Frisco Acquisition, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Eastern District of Texas

Case number   20-42257

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:   Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | WPB Hospitality, LLC |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes.  From whom? _____ |

3. Where should notices and payments to the creditor be sent?

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Lindquist-Kleissler & Company, LLC | WPB Hospitality, LLC c/o Wanda Bertoia |
| Name | Name |
| 950 South Cherry Street | 5466 S Hannibal Court |
| Number       Street | Number       Street |
| Denver            CO        80246 | Aurora            CO        80015 |
| City                State       ZIP Code | City                State       ZIP Code |
| Contact phone 303-691-9774 | Contact phone _____ |
| Contact email arthuralklaw@gmail.com | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

| | |
|---|---|
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____     Filed on _____ MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

**Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**    $ *_____ 1,137,000.00    **Does this amount include interest or other charges?**

*See attached

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Breach of contract plus Uniform Fraudulent Transfer Act claims

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

Nature of property:

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☑ Other. Describe:    See attachments

Basis for perfection:    See attachments

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:    $ Unknown

Amount of the claim that is secured:    $ Unknown

Amount of the claim that is unsecured:    $ Unknown    (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $_____

Annual Interest Rate (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410                    Proof of Claim                    page 2

**12.** Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

Amount entitled to priority

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.

$_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   1-26-2021
                   MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Arthur Lindquist-Kleissler |
| | First name    Middle name    Last name |
| Title | Attorney |
| Company | Lindquist-Kleissler & Company, LLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 950 South Cherry Street Ste. 418 |
| | Number    Street |
| | Denver                            CO        80246 |
| | City                              State     ZIP Code |
| Contact phone | (303) 691-9774        Email arthuralklaw@gmail.com |

ARTHUR LINDQUIST-KLEISSLER
Attorney at Law
950 S. CHERRY ST., SUITE 418
DENVER, CO  80246-2665

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS

IN RE:                                    ) Chapter 7
                                          ) Case No. 20-42257
FRISCO ACQUISITION, LLC                   )
                                          )
                                          )
                                          )
                                          )

---

## SUMMARY OF WPB HOSPITALITY, LLC PROOF OF CLAIM

---

WPB Hospitality, LLC ("WPB") has claims against Frisco Acquisition, LLC ("Frisco") pursuant to the breach of a real estate purchase agreement attached hereto as **Exhibit "A."** The base damages pursuant to that contract and those claims is $758,000.00. **Exhibit "A"** outlines pending litigation regarding WPB's claims and the underlying contract.

Additionally, WPB has recently learned that it has a claim against Frisco and/or its principals based upon the Uniform Fraudulent Transfer Act as enacted in Colorado and Texas. Pursuant to the Uniform Fraudulent Transfer Act damages are multiplied by a minimum 1.5 times. 1.5 times $758,000.00 is $1,137,000.00.

Additionally, WPB is entitled to its attorney fees, costs, and interest as provided by contract and/or law.

Additionally, pursuant to the Uniform Fraudulent Transfer Act, WPB may have a secured claim against the property fraudulently transferred, namely the hotel located at 16161 E 40th Avenue, Denver, Colorado 80329.

When filing the Proof of Claim with the Eastern District of Texas Bankruptcy Court, the system asks on page 2 question 9 what is the value of the property. The answer should be unknown as to the value of the property. The amount that is secured should also be listed as unknown. The amount that is unsecured should be listed as unknown.

Due to the Court's software, dollar amount figures needed to be included in the filing and we were unable to state Unknown as to value, secured or unsecured. Additionally, the interest rate should be listed blank and a figure needed to be used in order to file the claim. The percentage is incorrect and should be listed as unknown.

# EXHIBIT A

## TO MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT AND TO ADD A PARTY PLAINTIFF

### DENVER COUNTY DISTRICT COURT, STATE OF COLORADO

### CASE NO. 19CV33523

<table>
<tr><td>

DISTRICT COURT, DENVER COUNTY, COLORADO
1427 Bannock Street, Room 256
Denver, Colorado 80202

**Plaintiff:**

WANDA BERTOIA and WPB HOSPITALITY, LLC, a
Colorado limited liability company

v.

**Defendants:**

BRETT PAYTON; COAN, PAYTON & PAYNE, LLC;
ABBAS CONSULTING, INC.; and FRISCO ACQUISITION,
LLC.

</td><td></td></tr>
<tr><td>

*Attorneys for Plaintiff*
Richard B. Podoll, Atty. Reg. #8775
Robert A. Kitsmiller, Atty. Reg. #16927
Jacqueline E.M. Hill, Atty. Reg. #47789
PODOLL & PODOLL, P.C.
5619 DTC Parkway, Suite 1100
Greenwood Village, CO 80111
Tel: (303) 861-4000
Fax: (303) 861-4004
rich@podoll.net
bob@podoll.net
jacqui@podoll.net

</td><td>

▲COURT USE ONLY▲

Case No.: 19CV33523
Div:

</td></tr>
</table>

## SECOND AMENDED COMPLAINT

The Plaintiffs, Wanda Bertoia and WPB Hospitality, LLC, by and through their attorneys, Podoll & Podoll, P.C., for her Second Amended Complaint pursuant to C.R.C.P. 15(a), in the above matter, states and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Wanda S. Bertoia ("Bertoia") is an individual who resides at 5466 S. Hannibal Court, Centennial, CO 80015.

2.      Plaintiff WPB Hospitality, LLC ("WPB"), is a Colorado LLC

3.      Defendant Brett Payton ("Payton") is an individual who resides in Greeley, Colorado.

4.      Defendant, Coan, Payton & Payne LLC ("CPP") is a Colorado limited liability company with its principal address at 5586 W. 19th St., Ste. 2000, Greeley, CO 80634.

5.      Defendant Abbas Consulting, Inc. ("Abbas"), is a Texas corporation whose address is 203 Venice Court, Allen, Texas 75013.

6.      Defendant Frisco Acquisition, LLC ("Frisco"), is a Texas limited liability company whose address is 15035 Dallas Parkway, #700, Addison, Texas 75001.

7.      Venue is proper in Denver County pursuant to C.R.C.P. 98.

## GENERAL ALLEGATIONS

8.      WPB Hospitality, LLC ("WPB") is owned 100% by Bertoia, who is also the managing member.

9.      Bertoia is experienced in the management and operations of hotels and also owns Alpine Hospitality, Inc. ("Alpine"). Alpine owns a Ramada Inn located at 6210 Tower Road, Denver, Colorado.

10.     In 2015, WPB attempted to obtain financing to construct a hotel on a four-acre parcel located at 16161 East 40th Avenue, Denver, CO 80239 (the "Hotel Property").

## A.    The Construction Loan

11.     WPB entered into negotiations with Aileron Investment Management, LLC ("Aileron") which proposed to fund construction of the Hotel through a mixture of financing that included financing under the U.S. Citizenship and Immigration Services Immigrant Investor Program ("EB-5 Investment") financing through American Lending Center, LLC ("ALC").

12.     Bertoia was unfamiliar with Kumar as a construction manager and had never worked with Kumar before.

13.     It was clear to Bertoia that retaining Kumar to serve as general contractor and working with Kumar would help her secure financing.

14.     Accordingly, Bertoia retained Kumar to serve as general contractor.

15.     While Aileron had Kumar's financial statements, neither Aileron, nor Kumar, provided those financial statements to Bertoia.

16.     On December 31, 2015, WPB entered into a Construction Loan Agreement (the "Loan Agreement") with ALC for a $10.2 million loan (the "Loan") for construction of the hotel. (The Loan Agreement is attached hereto as Exhibit "A").

17.     Also on December 31, 2015, WPB executed a promissory note in the principal amount of $5.7 million and a second promissory note in the principal amount of $4.5 million.

18.     The first Promissory Note is payable to Aileron. The second Promissory Note is payable to ALC.

19.     The Promissory Notes were secured by a Deed of Trust encumbering the Hotel Property dated December 31, 2015, and recorded January 8, 2016, at Reception No. 2016002425 (the "Deed of Trust").

20.     Also on December 31, 2015, WPB entered into a Security Agreement with ALC (the "Security Agreement").

21.     At the time the loan was funded, the Security Agreement required that $215,554.75 of loan proceeds be deposited into an account at the Northeast Bank in Maine, to be released and disbursed in incremental construction draws approved by the Lender.

22.     Also on December 31, 2015, Bertoia and Alpine each executed a Commercial Guaranty.

## B.     Construction Issues with Kumar

23.     On December 21, 2015, WPB, Kumar, Aileron, and Tetra Tech entered into a "Funds Control and Inspection Services Agreement with Completion Commitment" (the "Tetra Tech Agreement", Exhibit B hereto).

24.     Under the Tetra Tech Agreement, in lieu of requiring Kumar to provide a performance and payment bond to WPB, Tetra Tech agreed to complete the project as the CM/GC should Kumar default on the contract or be terminated for cause.

25.     Between April 2016 and July 2017 Kumar submitted draw requests to Tetra Tech for payment for work and materials for the construction of the hotel. During this period of time Kumar contracted for work that had not been authorized by the construction plans, neglected the project, and failed to supervise work which was performed in a substandard manner.

26.     Tetra Tech approved draw requests without performing adequate inspections or verifying that the draws were proper, or the work was properly performed.

27.     In the summer of 2017, the City and County of Denver Planning Department (the "City") responded to Mechanical and Plumbing permit requests submitted by the project's

architect indicating that the "Project is Held Pending Resolution and Correction of nine correction comments on the plumbing plan and 16 correction comments on the Mechanical plan."

28.     Kumar failed to provide timely or satisfactory responses to the city and, on August 14, 2017, the City sent a second Architectural & Structural Plan Review Notice.

29.     The City advised Kumar and the Architect that 34 architectural and structural comments remained open, 15 of which advised that the City was concerned that the project plan review was not being addressed and that the City was considering issuing a notice to stop all work.

30.     Through December 2017, the City continued to advise Kumar and the architect of a growing number of comments that had not been addressed by either Kumar or the architect.

31.     At no time did Kumar or the architect correct any of the comments from the City.

32.     Kumar abandoned the project and WPB was notified of $269,282.06 in liens on the Property as a result of non-payment to subcontractors, vendors and suppliers who Kumar was supposed to be paying.

33.     Eventually, WPB retained a new architect who addressed the open comments by the City.

34.     However, by the time the new architect obtained approvals from the City in 2017, the project was severely behind schedule.

35.     Kumar defaulted on the contract.

36.     Kumar was also terminated for cause. Kumar's negligence and failure to complete the project in a timely manner triggered a non-monetary default under the construction loan agreement.

## C.    ALC Foreclosure

37.     In November of 2017 Bertoia and WPB hired Payton and CPP to address Kumar's default and to pursue a workout strategy with Aileron.

38.     Payton and CPP failed to pursue Tetra Tech or attempt to enforce Tetra Tech's completion commitment.

39.     On May 25, 2018 ALC filed a Motion for Order Authorizing Sale under C.R.C.P. 120 in Denver District Case No. 18CV31958 (the "Rule 120 Proceeding").

40.     Payton and CPP represented Bertoia and WPB in the foreclosure action, including the Rule 120 Proceeding.

41.    On July 26, 2018, based upon Payton's advice, WPB made payment to the Denver Public Trustee's Office of the $556,099.98 required to cure the default alleged in the foreclosure proceedings.

42.    Payton failed to understand that curing the monetary default would not stop the foreclosure proceeding in the case that the lender was able to rely upon a non-monetary default to proceed with the foreclosure.

43.    Kumar's failure to complete the hotel project in a timely manner was just such a non-monetary default.

44.    On July 27, 2018, at a hearing in the Rule 120 Proceeding, WPB and ALC agreed to delay the Public Trustee's sale so that WPB could close on refinancing. This agreement was entered into by Payton without Bertoia's knowledge or consent. Payton was trapped into entering into this agreement because of his failure to understand the law of foreclosure. The Agreement was oppressive to WPB and Bertoia.

45.    The parties could not agree to terms of a stipulation and the Rule 120 Proceeding recommenced.

46.    Though the monetary default had been cured, the Court found a non-monetary default had occurred for WPB's failure to timely complete the construction of the hotel.

47.    Upon information and belief, Payton negligently advised Bertoia that payment of $556,099.98 would cure the default and require the foreclosure proceedings to be terminated, notwithstanding the fact that ALC also asserted a non-monetary default.

48.    At all times relevant hereto, Payton and CPP remained as counsel for WPB and Bertoia in the foreclosure lawsuit.

**D.    Suit Against Kumar**

49.    On August 13, 2018, Payton and CPP, on behalf of WPB, filed a separate lawsuit against Kumar, ALC, Aileron and others in Denver District Court Case No. 18CV32991 (the "Construction Lawsuit").

50.    WPB asserted claims for Negligence, Fraud, Theft, Trust Fund Violations, and requested an Injunction of the Foreclosure Sale.

51.    The Court summarily denied WPB's request to enjoin the Foreclosure Sale based on the Order Authorizing Sale issued in the Rule 120 Action.

52.    Payton and CPP have continuously served as counsel for WPB and at all times relevant hereto and remained counsel for WPB.

**E.    Guarantor Lawsuit**

53.     On September 21, 2018, ALC filed suit against Bertoia and Alpine based on the Commercial Guaranties executed in conjunction with the Loan in Arapahoe District Court Case No. .18CV32245 (the "Guarantor Litigation").

54.     On September 24, 2018 Payton and CPP entered their appearance on behalf of Alpine and Bertoia, individually, in the Guarantor Litigation, and remained counsel of record, at all times relevant hereto.

## F.     **Bankruptcy**

55.     On October 3, 2018, WPB filed for Bankruptcy and the foreclosure and the Construction Lawsuit were stayed.

56.     Multiple subcontractors filed claims in the Bankruptcy based on unpaid liens against the Property.

57.     On October 18, 2018, ALC filed a Motion for Relief from Stay.

58.     On February 7, 2019, the Bankruptcy Court granted ALC's Motion for Relief from Stay but indicated that the stay would remain in place while WPB continued to make monthly interest payments to ALC under the Notes. The Court gave WPB until May 8, 2019 to sell or refinance the Property and to pay off amounts owed to ALC.

59.     WPB received four offers for the Property. After the first three offers (for $9 million, $9.425 million, and $7 million, respectively) each fell through, WPB received an offer from Frisco.

60.     Frisco had acquired several mechanic's liens on the Property during the course of the Bankruptcy.

61.     The Frisco contract provided for a purchase price of $6,068,132.97, required Frisco to pay WPB $100,000 in earnest money, and provided for Frisco to assume the ALC loan, the contract price term specified $5,310,330.26 was to assume the Aileron/ALC loan balance and $657,802.71 was to be paid in cash at closing. $507,802.71 of the cash payment was allocated to pay property taxes and liens. (*See* the WPB Contract, Exhibit C hereto.)

62.     Frisco and Abbas also entered into a separate and independent contract to acquire all of Bertoia's right, title and interest in WPB in exchange for $2.5 million. (*See* the Bertoia Contract, Exhibit D hereto.)

63.     On March 20, 2019, WPB filed a motion to approve sale of the Property to Frisco and Abbas. Frisco and Abbas represented they were ready, willing, and able to purchase Property subject to limited due diligence including obtaining a Property Condition Report in order to obtain subcontractor bids. The sale of the Property was subject to bankruptcy court approval and would have paid off ALC and all valid mechanics liens.

64.     The independent contract to acquire Bertoia's interest in WPB for $2.5 million was also subject to bankruptcy court approval. However, no approval was necessary or possible because neither Bertoia nor Abbas and Frisco were subject to the jurisdiction of the bankruptcy court. Therefore, the approval condition was immediately satisfied.

65.     The agreement between Bertoia and Abbas and Frisco also includes a severability provision that expressly provides that if a provision of the agreement is invalid or unenforceable, that shall not affect the validity or enforceability of the remaining terms and conditions. The provision requiring bankruptcy court approval was invalid, because since Bertoia, and Abbas, and Frisco were not parties to a bankruptcy court proceeding the bankruptcy court lacked jurisdiction to approve the agreement. The severability clause was a manifestation of the parties' intent that the contract and remaining provisions would remain in force in such a circumstance.

66.     The WPB and Bertoia Contracts are valid and enforceable contracts.

67.     The Bertoia Contract also provides for indemnification including reasonable attorney fees, should Abbas and Frisco fail to perform.

68.     Prior to May 8, 2019, Abbas and Frisco acted in a manner to defeat WPB's and Bertoia's expectations under their contract. They formulated a plan to secure the hotel properly without paying WPB, the unsecured creditors, or Bertoia. They made no arrangements to perform on the contracts. Abbas and Frisco's bad faith precluded WPB and Bertoia from pursuing other alternatives. Further, the Chapter 11 bankruptcy proceedings still continue, which has caused WPB and Bertoia to incur great expense.

69.     Abbas and Frisco failed or refused to perform their contract to purchase the Hotel Property and also failed or refused to perform their contract to purchase Bertoia's interest in WPB.

70.     Instead, Abbas and Frisco attempted to redeem the Property in the ALC foreclosure by virtue of the mechanic's liens they had purchased, thereby avoiding their contractual obligations under their contracts with WPB and Bertoia.

71.     On May 23, 2019, the Public Trustee sold the Hotel Property at foreclosure sale.

72.     ALC submitted a non-deficiency bid of approximately $5.5 million and ALC was the successful bidder.

73.     On June 5, 2019, Abbas and Frisco filed notices of intent to redeem the Property with the Public Trustee based on the mechanic's liens they had acquired in the Bankruptcy.

## G.     Redemption Litigation

74.     On June 10, 2019 ALC filed a civil action against Abbas, Frisco, and Debra Johnson in her capacity as the Public Trustee of Denver County in Denver District Court case number 19CV32262 (the "Redemption Litigation").

75.     ALC alleged that the mechanic lien claims of Abbas and Frisco expired and that they were not timely enforced and that the purported liens could not be used to redeem because they were not "junior" to ALC's lien.

76.     On June 17, 2019, Payton, Jordan Wiswell, Esq., and CPP entered their appearance on behalf of Abbas and Frisco in the Redemption Litigation.

77.     Remarkably, the month before, on May 8, 2019, Payton, in the course of his representation of Bertoia wrote an email to Bertoia in which he stated, "I know David [David Laird] wants "no more fancy tactics" but we should not be releasing in the event Frisco or ALC vaudeville this [sic] not to close. We need the ability to bring the hammer down hard, full up "kill 'em all and let God sort 'em out" if this deal does not close!"

78.     At some point during Payton's representation of WPB and Bertoia, before or after the May 8, 2019 email, Payton's resolve to represent WPB's and Bertoia's interests in a single-minded and zealous manner evaporated, and he in fact abandoned WPB's and Bertoia's interests completely.

79.     Instead of vigorously pursuing WPB's and Bertoia's interests as he represented he would do in his May 8, 2019 email, Payton turned his back on his clients, and championed the effort by Abbas and Frisco to secure the hotel property while avoiding their contractual obligation to pay WPB and Bertoia.

80.     Payton did not advise Bertoia of their alternatives after Abbas and Frisco did not perform their contract with them.

81.     Further, Payton did not advise WPB or Bertoia of his representation of Abbas and Frisco or his actual conflicts of interest, despite his ongoing attorney-client relationship with, and representation of WPB and Bertoia in the bankruptcy proceeding, the Guarantor Litigation, and his representation of WPB in the foreclosure litigation and the stayed Construction Litigation.

82.     The Court entered a Temporary Restraining Order on June 21, 2019 finding a sufficient showing had been made that Abbas and Frisco did not have proper junior lienor redemption rights. The Court therefore stayed the redemption process and periods in the foreclosure.

83.     The stay of the redemption process would have allowed Abbas and Frisco sufficient time to complete their acquisition of the Hotel Property from WPB and also to close on Bertoia's contract to sell WPB negotiated in the spring of 2019.

84.     Again, Abbas and Frisco failed or refused to perform their contracts with WPB and Bertoia.

85.     On July 19, 2019, ALC, Abbas and Frisco filed a Settlement Stipulation in the Redemption Litigation and requested a 60-day continuation of the Temporary Restraining Order.

86.     The Settlement Agreement provides that Frisco would obtain a new construction loan for up to $16 million.

87.     Under the terms of the settlement, Frisco agreed to execute a new promissory note to ALC in the amount of $7,030,827.53, which would increase the amounts owed to ALC by $2 million.

88.     At the closing of the new loan, Frisco agreed to pay ALC $500,000 in cash in addition to the new promissory note.

89.     Pursuant to the terms of the settlement agreement, Abbas and Frisco are paying an additional $2.5 million to ALC, which is the same amount as the equity that they contracted to pay to Bertoia for her interest in WPB. Abbas and Frisco also managed to avoid the additional $600,000 cash payment they had agreed to make which would have paid unsecured creditors and taxes in the Chapter 11 bankruptcy and permitted the bankruptcy to be dismissed.

90.     Payton negotiated the above-referenced settlement agreement on behalf of Abbas and Frisco while he was actively representing Bertoia in the Guarantor Litigation, the foreclosure litigation, the bankruptcy proceedings, and the stayed Construction Litigation, and while he was actively representing WPB in the foreclosure proceeding and the construction lawsuit.

91.     Three days after he filed the proposed settlement on behalf of Abbas and Frisco, Payton moved to vacate the jury trial and stay all deadlines in the Guarantor Litigation.

92.     As Bertoia's personal counsel in the Bankruptcy Litigation, Payton was aware of Abbas and Frisco's contractual obligation to pay Bertoia $2.5 million for her interest in WPB.

93.     Payton drafted the contract between Abbas and Frisco and Bertoia and WPB.

94.     In proper exercise of his fiduciary duties on behalf of WPB and Bertoia, Payton should have demanded that Abbas and Frisco perform on their contract with WPB to purchase the Hotel Property and pay unsecured creditors and to perform on their contract to pay Bertoia $2.5 million for her interest in WPB . Specifically, Payton owed a fiduciary duty of loyalty, good faith, and avoidance of conflicts of interest to WPB and to Bertoia. His representation of Abbas and Frisco was antithetical to these duties.

95.     Eschewing the fiduciary duties he owed to WPB and Bertoia, Payton represented Abbas and Frisco in their efforts to snatch the Property through redemption rights, while refusing to perform both the contract with Bertoia, and the contract to buy the Property with WPB. In so doing, Payton ignored his fiduciary duties to enforce WPB's and Bertoia's contractual rights against Abbas and Frisco, and instead represented Abbas and Frisco in their scheme to obtain the Hotel Property without paying WPB, the unsecured creditors, and Bertoia.

96.    Payton's conduct breached the fiduciary duties he owed to WPB and Bertoia, including, without limitation, of (1) avoidance of conflicts of interest; (2) honesty; (3) loyalty; (4) good faith; (5) candor; and (6) full disclosure of material facts.

97.    On information and belief at no time did Payton or CPP endeavor to evaluate any potential conflicts of interest between parties they opposed, advised and/or represented.

### FIRST CLAIM FOR RELIEF
#### (WPB and Bertoia Breach of Contract—Against Abbas and Frisco)

98.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

99.    Abbas and Frisco contracted with Bertoia to purchase her interest in WBP.

100.    Abbas and Frisco contracted with WPB to buy the Hotel Property.

101.    All conditions in the contract were satisfied, deemed satisfied, or waived.

102.    WPB and Bertoia were at all times ready, willing and able to perform the contracts.

103.    Abbas and Frisco failed or refused to perform the contracts.

104.    WPB and Bertoia made demand upon Abbas and Frisco for performance, but Abbas and Frisco refused to perform the contract.

105.    Abbas and Frisco breached their contract to purchase the interest of Bertoia in WBP, and breached the contract with WPB to purchase the Hotel Property.

106.    As a result of the breaches of contract, WPB and Bertoia were damaged in an amount to be proved at trial.

WHEREFORE, Plaintiffs WPB and Bertoia prays for judgment against Abbas and Frisco, jointly and severally together with her costs, expert witness fees, prejudgment interest, post judgment interest, and such other and further relief as this Court may deem just in the premises.

### SECOND CLAIM FOR RELIEF
#### (WPB and Bertoia Breach of Fiduciary Duty—Against Payton and CPP)

107.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

108.    Payton and CPP were representing WPB and Bertoia in her several legal matters, including the litigation matters described herein, the sale of the Property to Frisco, and the sale of the interest of Bertoia in WPB to Frisco and Abbas.

109.    Payton and CPP owed fiduciary duties to WPB and Bertoia arising out of their representation.

110.    Payton and CPP breached their fiduciary duties to WPB and Bertoia by engaging in a conflict of interest and division of loyalty by simultaneously representing Abbas and Frisco, parties adverse to WPB and Bertoia in their express contract.

111.    Payton and CPP breached their fiduciary duties to WPB and Bertoia by negotiating agreements between Abbas and Frisco on one hand and ALC on the other which facilitated the breach of Abbas and Frisco's contractual agreements with WPB and Bertoia.

112.    Payton and CPP breached their fiduciary duties to WPB and Bertoia by representing Abbas and Frisco in matters to the detriment of the interests of WPB and Bertoia.

113.    Payton and CPP breached their fiduciary duties to WPB and Bertoia by aiding Abbas and Frisco to obtain the benefits of their contracts with WPB and Bertoia while avoiding their obligations.

114.    Payton and CPP breached their fiduciary duties to WPB and Bertoia by failing to keep them advised of matters crucial to the subject of their representation.

115.    Payton and CPP breached their fiduciary duties to WPB and Bertoia by failing to advise them of the existence of the claims against Abbas, Frisco, Payton, and CPP.

116.    Payton and CPP breached their fiduciary duties to WPB and Bertoia by negotiating a settlement concerning the subject matter of their representation of WPB and Bertoia which resulted in ALC receiving the value or equity which were to be received by WPB and Bertoia under their contracts with Abbas and Frisco.

117.    WPB and Bertoia placed trust and confidence in Payton and CPP with respect to the services to be performed by Payton and CPP.

118.    WPB and Bertoia's trust and confidence was invited and accepted by Payton and CPP.

119.    The breaches of fiduciary duty by Payton and CPP was a cause of WPB and Bertoia's losses.

120.    As a result of the breaches of fiduciary duties, WPB and Bertoia have been damaged and suffered losses in an amount to be determined at trial.

121.    In addition to the actual damages, WPB and Bertoia are entitled to disgorgement of all fees that they and Abbas and Frisco paid to Payton and CPP.

WHEREFORE, Plaintiffs WPB and Bertoia pray for judgment against Payton and CPP, jointly and severally together with their costs, expert witness fees, prejudgment interest, post judgment interest, and such other and further relief as this Court may deem just in the premises.

### THIRD CLAIM FOR RELIEF
*(WPB and Bertoia Professional Negligence—Against Payton and CPP)*

122.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

123.    In undertaking to provide, and providing legal advice and representation, CPP and Payton owed duties to WPB and Bertoia, including duties of competence, diligence and due care.

124.    CPP and Payton were negligent in their representation of WPB and Bertoia in acting adversely to their interests, in failing to keep her apprised of matters crucial to the subject matter of their representation and in failing to act in their best interests.

125.    Payton and CPP, without limitation, were negligent in their handling of workout negotiations with ALC/Aileron, failing to pursue the completion commitment with Tetra Tech, and their handling of the ALC foreclosures.

126.    The negligence of Payton and CPP breached their duties to WPB and Bertoia.

127.    The negligence of Payton and CPP caused damages to WPB and Bertoia.

128.     CPP is s liable for the negligent acts of its employees and agents.

129.    Payton and CPP are liable to WPB and Bertoia for the damages caused by their negligence.

WHEREFORE, Plaintiffs WPB and pray for judgment against Payton and CPP, jointly and severally together with her costs, expert witness fees, prejudgment interest, post judgment interest, and such other and further relief as this Court may deem just in the premises.

### FOURTH CLAIM FOR RELIEF
### WPB AND BERTOIA -
*(Bad Faith Breach of Contract/Breach of Duty of Good Faith and Fair Dealing Frisco and Abbas)*

130.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

131.    Frisco and WPB entered into a contract for the sale of the Hotel Property.

132.    Abbas and Frisco entered into a contract with Bertoia for the sale of her interest in WPB.

133.    Abbas and Frisco had a duty of good faith and fair dealing in the performance of their contracts.

134.    Abbas and Frisco acted in bad faith by abandoning their contractual obligations in favor of attempting to obtain title to the Hotel Property in the redemption/injunction action.

135.    Abbas and Frisco acted in bad faith by failing to attempt to remove conditions to the contract.

136.    Abbas and Frisco acted in bad faith by transferring the contractual benefits to ALC.

137.    Abbas and Frisco breached their implied covenant of good faith and fair dealing in their actions and omissions towards Bertoia and WPB.

138.    Bertoia and WPB have been damaged as a result of the breaches of the covenants of good faith and fair dealing by Abbas and Frisco, in an amount to be determined at trial.

WHEREFORE, Plaintiff  WPB and Bertoia pray for judgment against Abbas and Frisco, jointly and severally, together with her costs, expert witness fees, prejudgment interest, post judgment interest, and such other and further relief as this Court may deem just in the premises.

### FIFTH CLAIM FOR RELIEF
### (WPB AND BERTOIA)
### (Punitive Damages Against Payton and CPP)

139.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

140.    Payton's blatant conflicts of interest, and abdication of his fiduciary duty of loyalty were attended by willful, wanton, and reckless disregard for WPB's and Bertoia's rights and property.

141.    WPB and Bertoia are entitled to recover punitive and exemplary damages

WHEREFORE, on their Fifth Claim for Relief Bertoia and WPB pray for judgment against Payton and CPP for punitive and exemplary damages and such other and further relief as the Court deems just in the premises.

Respectfully submitted November 25, 2019.

PODOLL & PODOLL, P.C.

By: */s/Richard B. Podoll*
        Richard B. Podoll, Atty. Reg. #8775
        Robert A. Kitsmiller, Atty. Reg. #16927
        Jacqueline E. Hill, Atty. Reg. #47789
        5619 DTC Pkwy, Ste 1100
        Greenwood Village, CO 80111
        Tel: (303) 861-4000
        Fax: (303) 861-4004

**Address of Plaintiff**

5466 S. Hannibal Court
Centennial, CO 80015

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 25, 2019, a true and correct copy of the foregoing was served electronically, via the Colorado Courts E-filing system upon the following:

**Attorneys for Defendants Brett Payton and Coan, Payton & Payne LLC:**
Ronald H. Nemirow, #15178
Nancy D. Miller, #6785
NEMIROW PEREZ P.C.
445 Union Blvd., Suite 209
Lakewood, CO 80228
Phone: (720) 638-1234
rnemirow@nemirowperez.com
nmiller@nemirowperez.com


**Attorneys for Defendants Abbas Consulting, Inc., and Frisco Acquisition, LLC:**
HOLLAND & HART, LLP
Teryl Gorrell #8989
Kevin Giles #45036
555 17th Street, Suite 3200
Denver, CO 80202
(303) 295-8000
trgorrell@hollandhart.com
kpgiles@hollandhart.com

By:  _s/Samantha J. McKinley_
          Samantha J. McKinley

# EXHIBIT A

## TO SECOND AMENDED COMPLAINT

### DENVER COUNTY DISTRICT COURT, STATE OF COLORADO

### CASE NO. 19CV33523

# CONSTRUCTION LOAN AGREEMENT

| Principal $10,200,000.00 | Loan Date 12-31-2015 | Maturity 01-01-2028 | Loan No 1016 | Call / Coll | Account | Officer 155 | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  WPB Hospitality, LLC, a Colorado limited liability
company
5466 S. Hannibal Court
Centennial, CO  80015

**Lender:**  American Lending Center, LLC, a California limited
liability company
1 World Trade Center
Suite 1180
Long Beach, CA  90831

---

**THIS CONSTRUCTION LOAN AGREEMENT** dated December 31, 2015, is made and executed between WPB Hospitality, LLC, a Colorado limited liability company ("Borrower") and American Lending Center, LLC, a California limited liability company ("Lender") on the following terms and conditions.  Borrower has applied to Lender for one or more loans for purposes of constructing the Improvements on the Real Property described below.  Lender is willing to lend the loan amount to Borrower solely under the terms and conditions specified in this Agreement and in the Related Documents, to each of which Borrower agrees.  Borrower understands and agrees that:  (A)  in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement, and  (B)  all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.**  This Agreement shall be effective as of December 31, 2015, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until January 1, 2028.

**LOAN.**  The Loan shall be in an amount not to exceed the principal sum of  U.S. $10,200,000.00 and shall bear interest on so much of the principal sum as shall be advanced pursuant to the terms of this Agreement and the Related Documents.  The Loan shall bear interest on each Advance from the date of the Advance in accordance with the terms of the Note.  Borrower shall use the Loan Funds solely for the payment of:  (A)  the costs of constructing the Improvements and equipping the Project in accordance with the Construction Contract;  (B)  other costs and expenses incurred or to be incurred in connection with the construction of the Improvements as Lender in its sole discretion shall approve; and  (C)  if permitted by Lender, interest due under the Note, including all expenses and all loan and commitment fees described in this Agreement.  The Loan amount shall be subject at all times to all maximum limits and conditions set forth in this Agreement or in any of the Related Documents, including without limitation, any limits relating to loan to value ratios and acquisition and Project costs.

**PROJECT DESCRIPTION.**  The word "Project" as used in this Agreement means the construction and completion of all Improvements contemplated by this Agreement, including without limitation the erection of the building or structure on the Real Property identified to this Agreement by Borrower and Lender, installation of equipment and fixtures, landscaping, and all other work necessary to make the Project usable and complete for the intended purposes.

The word "Property" as used in this Agreement means the Real Property together with all Improvements, all equipment, fixtures, and other articles of personal property now or subsequently attached or affixed to the Real Property, together with all accessions, parts, and additions to, all replacements of, and all substitutions for any of such property, together with all proceeds (including insurance proceeds and refunds of premiums) from any sale or other disposition of such property.  The real estate described below constitutes the Real Property as used in this Agreement.

The real estate legally described as:
A parcel of land being a portion of Plot 1, Block 1, Gateway Park IV - Denver Filing No. 7, being more particularly described as follows:
COMMENCING at the northwest corner of said Plot 1;
THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 295.63 feet to the true point of beginning;
THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 396.64 feet to the northeast corner of said Plot 1;
THENCE the following three (3) course along the East line of said Plot 1:
1. THENCE South 10 degrees 26 minutes 16 seconds West, a distance of 95.82 feet to a point of curve;
2. THENCE along the arc of a curve to the left, having a central angle of 10 degrees 34 minutes 10 seconds, a radius of 315.00 feet and an arc length of 58.11 feet;
3. THENCE South 00 degrees 07 minutes 54 seconds East, a distance of 307.25 feet to the southeast corner of said Plot 1;
THENCE the following four (4) courses along the South line of said Plot 1:
1. THENCE South 89 degrees 52 minutes 06 seconds West, a distance of 100.00 feet;
2. THENCE South 00 degrees 07 minutes 54 seconds East, a distance of 5.00 feet to a point on the North right-of-way line of 40th Avenue, as dedicated by 40th Avenue, Chambers Road - Pena Boulevard Subdivision, recorded May 6, 1997, at Reception Number 9700057406, said City and County of Denver Records;
3. THENCE South 89 degrees 52 minutes 06 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 250.09 feet;
4. THENCE South 89 degrees 52 minutes 04 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 23.63 feet;
THENCE North 00 degrees 07 minutes 54 seconds West, a distance of 464.23 feet to the true point of beginning, City and County of Denver, State of Colorado.
Its address is commonly known as:
Real Property located at 16161 E. 40th Avenue, Denver, CO  80239.

**FEES AND EXPENSES.**  Whether or not the Project shall be consummated, Borrower shall assume and pay upon demand all out-of-pocket expenses incurred by Lender in connection with the preparation of loan documents and the making of the Loan, including without limitation the following:  (A)  all closing costs, loan fees, and disbursements;  (B)  all expenses of Lender's legal counsel; and  (C)  all title examination fees, title insurance premiums, appraisal fees, survey costs, required fees, and filing and recording fees.

**NO CONSTRUCTION PRIOR TO RECORDING OF SECURITY DOCUMENT.**  Borrower will not permit any work or materials to be furnished in connection with the Project until  (A)  Borrower has signed the Related Documents;  (B)  Lender's mortgage or deed of trust and other Security Interests in the Property have been duly recorded and perfected;  (C)  Lender has been provided evidence, satisfactory to Lender, that Borrower has obtained all insurance required under this Agreement or any Related Documents and that Lender's liens on the Property and Improvements are valid perfected first liens, subject only to such exceptions, if any, acceptable to Lender.

**REPRESENTATIONS AND WARRANTIES.**  Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

| Loan No: 1016 | | Page 2 |
|---|---|---|

**Organization.** Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Colorado. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 5466 S. Hannibal Court, Centennial, CO 80015. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business:

| Borrower | Assumed Business Name | Filing Location | Date |
|---|---|---|---|
| WPB Hospitality, LLC, a Colorado limited liability company | Best Western Premier DIA | Colorado Secretary of State | 11-27-2015 |

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower, do not require the consent or approval of any other person, regulatory authority, or governmental body, and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties. Borrower has the power and authority to enter into the Note and the Related Documents and to grant collateral as security for the Loan. Borrower has the further power and authority to own and to hold all of Borrower's assets and properties, and to carry on Borrower's business as presently conducted.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

Loan No: 1016                                                                    Page 3

terms.

**Employee Benefit Plans.** Each employee benefit plan as to which Borrower may have any liability complies in all material respects with all applicable requirements of law and regulations, and (1) no Reportable Event nor Prohibited Transaction (as defined in ERISA) has occurred with respect to any such plan, (2) Borrower has not withdrawn from any such plan or initiated steps to do so, (3) no steps have been taken to terminate any such plan or to appoint a trustee to administer such a plan, and (4) there are no unfunded liabilities other than those previously disclosed to Lender in writing.

**Investment Company Act.** Borrower is not an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

**Public Utility Holding Company Act.** Borrower is not a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

**Regulations T and U.** Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System).

**Information.** All information previously furnished or which is now being furnished by Borrower to Lender for the purposes of or in connection with this Agreement or any transaction contemplated by this Agreement is, and all information furnished by or on behalf of Borrower to Lender in the future will be, true and accurate in every material respect on the date as of which such information is dated or certified; and no such information is or will be incomplete by omitting to state any material fact the omission of which would cause the information to be misleading.

**Claims and Defenses.** There are no defenses or counterclaims, offsets or other adverse claims, demands or actions of any kind, personal or otherwise, that Borrower, any Grantor, or any Guarantor could assert with respect to the Note, Loan, this Agreement, or the Related Documents.

**Title to Property.** Borrower has, or on the date of first disbursement of Loan proceeds will have, good and marketable title to the Collateral free and clear of all defects, liens, and encumbrances, excepting only liens for taxes, assessments, or governmental charges or levies not yet delinquent or payable without penalty or interest, and such liens and encumbrances as may be approved in writing by the Lender. The Collateral is contiguous to publicly dedicated streets, roads, or highways providing access to the Collateral.

**Project Costs.** The total cost for the Project shall not exceed $19,366,527.00. The Project costs are true and accurate estimates of the costs necessary to complete the Improvements in a good and workmanlike manner according to the Plans and Specifications presented by Borrower to Lender, and Borrower shall take all steps necessary to prevent the actual cost of the Improvements from exceeding the Project costs.

**Utility Services.** All utility services appropriate to the use of the Project after completion of construction are available at the boundaries of the Collateral.

**Assessment of Property.** The Collateral is and will continue to be assessed and taxed as an independent parcel by all governmental authorities.

**Compliance with Governing Authorities.** Borrower has examined and is familiar with all the easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements affecting the Project. The Project will at all times and in all respects conform to and comply with the requirements of such easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Special Conditions to Initial Advance.** Subject to receipt of and compliance with Tetra Tech Construction Completion Commitment. Tetra Tech to provide funds control and draw disbursements during construction.

**Equity Funds.** Borrower shall provide evidence of equity funds totaling $4,291,527.00 prior to the initial advance from the Loan Fund. Lender may, at Lender's option, require that the equity funds be deposited with Lender as a portion of the Loan Fund, which funds shall be disbursed prior to any Loan proceeds.

**Required Collateral.** (1) All Furniture, Fixtures and Equipment (as each term is defined in the UCC); whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing located on, used in connection with or otherwise associated with, the real property described herein which is commonly known as 16161 E. 40th Avenue, Denver, CO; (2) certain cash proceeds in the original amount of $215,554.75 and any interest derived therefrom held in a pledged account with Northeast Bank pursuant to an account pledge agreement executed in connection herewith.

**Approval of Contractors, Subcontractors, and Materialmen.** Lender shall have approved a list of all contractors employed in connection with the construction of the Improvements, showing the name, address, and telephone number of each contractor, a general description of the nature of the work to be done, the labor and materials to be supplied, the names of materialmen, if known, and the approximate dollar value of the labor, work, or materials with respect to each contractor or materialman. Lender shall have the right to communicate with any person to verify the facts disclosed by the list or by any application for any Advance, or for any other purpose.

**Plans, Specifications, and Permits.** Lender shall have received and accepted a complete set of written Plans and Specifications setting forth all Improvements for the Project, and Borrower shall have furnished to Lender copies of all permits and requisite approvals of any governmental body necessary for the construction and use of the Project.

**Architect's and Construction Contracts.** Borrower shall have furnished in form and substance satisfactory to Lender an executed copy of the Architect's Contract and an executed copy of the Construction Contract.

Exhibit 1

### CONSTRUCTION LOAN AGREEMENT
**Loan No: 1016**        **(Continued)**        **Page 4**

**Related and Support Documents.** Borrower shall provide to Lender in form satisfactory to Lender the following support documents for the Loan: Assignment of Architect's Contract, Assignment of Construction Contract and Completion Guaranty.

**Budget and Schedule of Estimated Advances.** Lender shall have approved detailed budget and cash flow projections of total Project costs and a schedule of the estimated amount and time of disbursements of each Advance.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the consummation of the Project and duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, in their sole discretion, may require.

**Bond.** If requested by Lender, Borrower shall have furnished a performance and payment bond in an amount equal to 100% of the amount of the Construction Contract, as well as a materialmen's and mechanics' payment bond, with such riders and supplements as Lender may require, each in form and substance satisfactory to Lender, naming the General Contractor as principal and Lender as an additional obligee.

**Appraisal.** If required by Lender, an appraisal shall be prepared for the Property, at Borrower's expense, which in form and substance shall be satisfactory to Lender, in Lender's sole discretion, including applicable regulatory requirements.

**Plans and Specifications.** If requested by Lender, Borrower shall have assigned to Lender on Lender's forms the Plans and Specifications for the Project.

**Environmental Report.** If requested by Lender, Borrower shall have furnished to Lender, at Borrower's expense, an environmental report and certificate on the Property in form and substance satisfactory to Lender, prepared by an engineer or other expert satisfactory to Lender stating that the Property complies with all applicable provisions and requirements of the "Hazardous Substances" paragraph set forth in this Agreement.

**Soil Report.** If requested by Lender, Borrower shall have furnished to Lender, at Borrower's expenses, a soil report for the Property in form and substance satisfactory to Lender, prepared by a registered engineer satisfactory to Lender stating that the Property is free from soil or other geological conditions that would preclude its use or development as contemplated without extra expense for precautionary, corrective or remedial measures.

**Survey.** If requested by Lender, Borrower shall have furnished to Lender a survey of recent date, prepared and certified by a qualified surveyor and providing that the Improvements, if constructed in accordance with the Plans and Specifications, shall lie wholly within the boundaries of the Collateral without encroachment or violation of any zoning ordinances, building codes or regulations, or setback requirements, together with such other information as Lender in its sole discretion may require.

**Zoning.** Borrower shall have furnished evidence satisfactory to Lender that the Collateral is duly and validly zoned for the construction, maintenance, and operation of the Project.

**Title Insurance.** Borrower shall have provided to Lender an ALTA Lender's extended coverage policy of title insurance with such endorsements as Lender may require, issued by a title insurance company acceptable to Lender and in a form, amount, and content satisfactory to Lender, insuring or agreeing to insure that Lender's security agreement or other security document on the Property is or will be upon recordation a valid first lien on the Property free and clear of all defects, liens, encumbrances, and exceptions except those as specifically accepted by Lender in writing. If requested by Lender, Borrower shall provide to Lender, at Borrower's expense, a foundation endorsement (CLTA 102.5 or its equivalent) to the title policy upon the completion of each foundation for the Improvements, showing no encroachments, and upon completion an endorsement which insures the lien-free completion of the Improvements (CLTA 101 series, as required by Lender). Specifically, Borrower shall provide to Lender the following title insurance endorsements: LP-10 Policy.

**Insurance.** Unless waived by Lender in writing, Borrower shall have delivered to Lender the following insurance policies or evidence thereof: (a) an all risks course of construction insurance policy (builder's risk), with extended coverage covering the Improvements issued in an amount and by a company acceptable to Lender, containing a loss payable or other endorsement satisfactory to Lender insuring Lender as mortgagee, together with such other endorsements as may be required by Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender; (b) owners and General Contractor general liability insurance, public liability and workmen's compensation insurance; (c) flood insurance if required by Lender or applicable law; and (d) all other insurance required by this Agreement or by the Related Documents.

**Workers' Compensation Coverage.** Provide to Lender proof of the General Contractor's compliance with all applicable workers' compensation laws and regulations with regard to all work performed on the Project.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Satisfactory Construction.** All work usually done at the stage of construction for which disbursement is requested shall have been done in a good and workmanlike manner and all materials and fixtures usually furnished and installed at that stage of construction shall have been furnished and installed, all in compliance with the Plans and Specifications. Borrower shall also have furnished to Lender such proofs as Lender may require to establish the progress of the work, compliance with applicable laws, freedom of the Property from liens, and the basis for the requested disbursement.

**Certification.** Borrower shall have furnished to Lender a certification by an engineer, architect, or other qualified inspector acceptable to Lender that the construction of the Improvements has complied and will continue to comply with all applicable statutes, ordinances, codes, regulations, and similar requirements.

**Lien Waivers.** Borrower shall have obtained and attached to each application for an Advance, including the Advance to cover final payment to the General Contractor, executed acknowledgments of payments of all sums due and releases of mechanic's and materialmen's liens, satisfactory to Lender, from any party having lien rights, which acknowledgments of payment and releases of liens shall cover all work, labor, equipment, materials done, supplied, performed, or furnished prior to such application for an Advance.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**DISBURSEMENT OF LOAN FUNDS.** The following provisions relate to the disbursement of funds from the Loan Fund.

**Application for Advances.** Borrower shall apply for Advances from the Loan Fund according to the following disbursement schedule: Whenever Borrower wishes to draw down an Advance, they shall:

**(1) comply with all requirements set forth in that certain Funds Control & Inspection Services Agreement With Completion Commitment issued by Tetra Tech, Inc. executed by Borrower in connection herewith, a copy of which is attached hereto as Exhibit "A" (the "Tetra Tech Agreement"); and**

Exhibit 1

**CONSTRUCTION LOAN AGREEMENT**
**(Continued)**

Loan No: 1016                                                                                                    Page 5

(2) give notice (a "Drawdown Notice") to Lender which, to be effective, must be in writing and must be received by Lender not later than 10:00 a.m. (Long Beach, California time) two (2) business days prior to the proposed date of drawdown (a "Drawdown Date").

**Each Drawdown Notice shall specify:**
    (a) the Drawdown Date which must be a business day in the State of California; and,
    (b) the proposed amount of the Advance.

**Drawdown Notices.** Each Drawdown Notice shall be accompanied by:
    (a) a progress certificate from a construction analyst or architect reasonably acceptable to Lender covering the amount of the Advance and describing both development and construction costs and costs of fixtures installed, consistent with the budgets shown in the Construction Contract and a cost breakdown. Advances under the Loan will not exceed the amount certified as having been spent on development or construction. In respect of architects fees, permit fees and other types of "soft costs", Lender will accept invoices covering budgeted expenses. In the event that any amount is requested which represents an additional payment to the contractor because of savings on construction costs, any such amount(s) shall be separately stated on the Drawdown Notice and accompanied by a certification from the construction analyst or architect using AIA Forms G702 and G703, or such other form acceptable to Lender, that the goods or services actually supplied by the construction company are acceptable to such construction analyst or architect;
    (b) evidence satisfactory to Lender reflecting that the proposed construction complies with all applicable zoning and building laws and regulations and that all licenses, permits and government approvals necessary for such use and construction have been obtained, also, that all environmental codes/regulations have been met and that the property is free from all contamination;
    (c) a title update if requested by Lender;
    (d) evidence of compliance with the EB-5 requirements attached to this Loan Agreement as Exhibit "B" if requested by Lender;
    (e) instructions regarding the disposition of the particular Advance; and
    (f) such other information regarding the Loan and the Project as Lender or its agent including but not limited to Tetra Tech may reasonably request.

Lender shall have no obligation to make any Advance under any such Drawdown Notice unless: (1) the documents, certificates of surveyors and engineers and opinions required by Lender in connection with the Advance have been received by Lender along with the relevant Drawdown Notice, and have been found by Lender to be satisfactory in its reasonable discretion; (2) at the time when the Drawdown Notice is received by Lender and on the day and time for making the Advance referred to therein, the representations and warranties made by Borrower in the Loan Documents are true and accurate at such times respectively as if repeated then; (3) at the time when a Drawdown Notice is received by Lender and on the day and time for making the Advance referred to therein, Borrower shall have provided to Lender specific partial releases from all subcontractors, material suppliers or laborers who have received payments from any prior Advances; (4) Borrower is in compliance with all terms and conditions of the Tetra Tech Agreement; (5) the contractors and subcontractors used by Borrower remain reasonably acceptable to Lender; (6) at such time, no event shall have occurred, and be then-uncured, which is an Event of Default or which, with the giving of notice or the lapse of time, would constitute an Event of Default hereunder; (7) the Loan Documents and all transactions contemplated by the Loan Documents shall be in form and substance satisfactory to Lender, the security intended to be conferred thereby shall have been duly perfected and Lender shall have received such other documents, authorizations, resolutions, consents, licenses or opinions as it may reasonably request in relation to the Loan Documents; (8) the un-advanced portion of the Loan shall be at all times equal to or greater than the sum of the estimated cost to complete the Project less the amount required to be retained, if any, under the Construction Contract, taking into account all funding provided by the SBA Authorization; and (9) the Loan is in compliance with all EB-5 requirements.

Each application shall be stated on a standard AIA payment request form or other form approved by Lender, executed by Borrower, and supported by such evidence as Lender shall reasonably require. Borrower shall apply only for disbursement with respect to work actually done by the General Contractor and for materials and equipment actually incorporated into the Project. Each application for an Advance shall be deemed a certification of Borrower that as of the date of such application, all representations and warranties contained in the Agreement are true and correct, and that Borrower is in compliance with all of the provisions of this Agreement.

Each application shall be stated on a standard AIA payment request form or other form approved by Lender, executed by Borrower, and supported by such evidence as Lender shall reasonably require. Borrower shall apply only for disbursement with respect to work actually done by the General Contractor and for materials and equipment actually incorporated into the Project. Each application for an Advance shall be deemed a certification of Borrower that as of the date of such application, all representations and warranties contained in the Agreement are true and correct, and that Borrower is in compliance with all of the provisions of this Agreement.

**Loan to Value.** Unless waived by Lender in writing, the ratio of the amount of the Loan to the Value of the Property as completed shall not exceed 52.670%.

**Payments.** At the sole option of Lender, Advances may be paid in the joint names of Borrower and the General Contractor, subcontractor(s), or supplier(s) in payment of sums due under the Construction Contract. At its sole option, Lender may directly pay the General Contractor and any subcontractors or other parties the sums due under the Construction Contract. Borrower appoints Lender as its attorney-in-fact to make such payments. This power shall be deemed coupled with an interest, shall be irrevocable, and shall survive an Event of Default under this Agreement.

**Projected Cost Overruns.** If Lender at any time determines in its sole discretion that the amount in the Loan Fund is insufficient, or will be insufficient, to complete fully and to pay for the Project, then within ten (10) days after receipt of a written request from Lender, Borrower shall deposit in the Loan Fund an amount equal to the deficiency as determined by Lender. The judgment and determination of Lender under this section shall be final and conclusive. Any such amounts deposited by Borrower shall be disbursed prior to any Loan proceeds.

**Final Payment to General Contractor.** Upon completion of the Project and fulfillment of the Construction Contract to the satisfaction of Lender and provided sufficient Loan Funds are available, Lender shall make an Advance to cover the final payment due to the General Contractor upon delivery to Lender of endorsements to the ALTA title insurance policy following the posting of the completion notice, as provided under applicable law. Construction shall not be deemed complete for purposes of final disbursement unless and until Lender shall have received all of the following:

    (1) Evidence satisfactory to Lender that all work under the Construction Contract requiring inspection by any governmental authority with jurisdiction has been duly inspected and approved by such authority, that a certificate of occupancy has been issued, and that all parties performing work have been paid, or will be paid, for such work;

    (2) A certification by an engineer, architect, or other qualified inspector acceptable to Lender that the Improvements have been completed substantially in accordance with the Plans and Specifications and the Construction Contract, that direct connection has been made to all utilities set forth in the Plans and Specifications, and that the Project is ready for occupancy; and

    (3) Acceptance of the completed Improvements by Lender and Borrower.

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

Loan No: 1016

Page 6

Notwithstanding any other provision of this Agreement to the contrary, Lender may retain up to 10.000% of the original Loan amount to be paid as the final payment to the General Contractor upon satisfaction of the conditions set forth above.

**Construction Default.** If Borrower fails in any respect to comply with the provisions of this Agreement or if construction ceases before completion regardless of the reason, Lender, at its option, may refuse to make further Advances, may accelerate the indebtedness under the terms of the Note, and without thereby impairing any of its rights, powers, or privileges, may enter into possession of the construction site and perform or cause to be performed any and all work and labor necessary to complete the improvements, substantially in accordance with the Plans and Specifications.

**Damage or Destruction.** If any of the Collateral or Improvements is damaged or destroyed by casualty of any nature, within sixty (60) days thereafter Borrower shall restore the Collateral and Improvements to the condition in which they were before such damage or destruction with funds other than those in the Loan Fund. Lender shall not be obligated to make disbursements under this Agreement until such restoration has been accomplished.

**Adequate Security.** When any event occurs that Lender determines may endanger completion of the Project or the fulfillment of any condition or covenant in this Agreement, Lender may require Borrower to furnish, within ten (10) days after delivery of a written request, adequate security to eliminate, reduce, or indemnify Lender against, such danger. In addition, upon such occurrence, Lender in its sole discretion may advance funds or agree to undertake to advance funds to any party to eliminate, reduce, or indemnify Lender against, such danger or to complete the Project. All sums paid by Lender pursuant to such agreements or undertakings shall be for Borrower's account and shall be without prejudice to Borrower's rights, if any, to receive such funds from the party to whom paid. All sums expended by Lender in the exercise of its option to complete the Project or protect Lender's interests shall be payable to Lender on demand together with interest from the date of the Advance at the rate applicable to the Loan. In addition, any Advance of funds under this Agreement, including without limitation direct disbursements to the General Contractor or other parties in payment of sums due under the Construction Contract, shall be deemed to have been expended by or on behalf of Borrower and to have been secured by Lender's Deed of Trust, if any, on the Collateral.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**LIMITATION OF RESPONSIBILITY.** The making of any Advance by Lender shall not constitute or be interpreted as either (A) an approval or acceptance by Lender of the work done through the date of the Advance, or (B) a representation or indemnity by Lender to any party against any deficiency or defect in the work or against any breach of any contract. Inspections and approvals of the Plans and Specifications, the Improvements, the workmanship and materials used in the Improvements, and the exercise of any other right of inspection, approval, or inquiry granted to Lender in this Agreement are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party. Neither Borrower nor any contractor, subcontractor, materialman, laborer, or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Advance. No disbursement or approval by Lender shall constitute a representation by Lender as to the nature of the Project, its construction, or its intended use for Borrower or for any other person, nor shall it constitute an indemnity by Lender to Borrower or to any other person against any deficiency or defects in the Project or against any breach of any contract.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Repayment.** Repay the Loan in accordance with its terms and the terms of this Agreement.

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor. In addition, Borrower shall provide Lender with written notice of the occurrence of any Event of Default, the occurrence of any Reportable Event under, or the institution of steps by Borrower to withdraw from, or the institution of any steps to terminate, any employee benefit plan as to which Borrower may have any liability.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than ninety (90) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, reviewed by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than ninety (90) days after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by a certified public accountant satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.

**Additional Requirements.** Borrower shall maintain a minimum debt service coverage ratio ("DSCR") for the Project of 1.15X by 12/31/2019 and 1.35X by 12/31/20. DSCR to be tested annually based on corporate tax returns. DSCR will be calculated as follows: Net Operating Income - (minus) Reserves for Replacement/Combined Annual payments on all Project Debt (1st & 2nd Loans).

Minimum Debt Yield of 9% for the Property by 12/31/19. Debt Yield to be tested annually based on corporate tax returns. The ratio will be calculated as follows: Net Operating Income - (minus) Reserves for Replacement/Total Project Debt.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
**(Continued)**

Loan No: 1016

Page 7

---

**Insurance.** Maintain fire and other risk insurance, hail, federal crop insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Alpine Hospitality, Inc., a Colorado corporation | Unlimited |
| Wanda S. Bertola, a Colorado resident | Unlimited |

**Loan Fees, Charges and Expenses.** Whether or not the Project is completed, Borrower also shall pay upon demand all out-of-pocket expenses incurred by Lender in connection with the preparation of loan documents and the making of the Loan, including, without limitation, all closing costs, fees, and disbursements, all expenses of Lender's legal counsel, and all title examination fees, title insurance premiums, appraisal fees, survey costs, required fees, and filing and recording fees.

**Loan Proceeds.** Use the Loan Funds solely for payment of bills and expenses directly related to the Project.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender, and in all other loan agreements now or in the future existing between Borrower and any other party. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local government authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Notice of Default, Litigation and ERISA Matters.** Forthwith upon learning of the occurrence of any of the following, Borrower shall provide Lender with written notice thereof, describing the same and the steps being taken by Borrower with respect thereto: (1) the occurrence of any Event of Default, or (2) the institution of, or any adverse determination in, any litigation, arbitration proceeding or governmental proceeding, or (3) the occurrence of a Reportable Event under, or the institution of steps by Borrower to withdraw from, or the institution of any steps to terminate, any employee benefit plan as to which Borrower may have any liability.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender within thirty (30) days after the end of each fiscal quarter, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Construction of the Project.** Commence construction of the Project no later than January 15, 2016, and cause the Improvements to be constructed and equipped in a diligent and orderly manner and in strict accordance with the Plans and Specifications approved by Lender, the Construction Contract, and all applicable laws, ordinances, codes, regulations, and rights of adjoining or concurrent property owners.

Exhibit 1

**CONSTRUCTION LOAN AGREEMENT**

| Loan No: 1016 | (Continued) | Page 8 |

---

Borrower agrees to complete the Project for purposes of final payment to the General Contractor on or before September 18, 2017, regardless of the reason for any delay.

**Defects.** Upon demand of Lender, promptly correct any defect in the Improvements or any departure from the Plans and Specifications not approved by Lender in writing before further work shall be done upon the portion of the Improvements affected.

**Project Claims and Litigation.** Promptly inform Lender of (1) all material adverse changes in the financial condition of the General Contractor; (2) any litigation and claims, actual or threatened, affecting the Project or the General Contractor, which could materially affect the successful completion of the Project or the ability of the General Contractor to complete the Project as agreed; and (3) any condition or event which constitutes a breach or default under any of the Related Documents or any contract related to the Project.

**Payment of Claims and Removal of Liens.** (1) Cause all claims for labor done and materials and services furnished in connection with the Improvements to be fully paid and discharged in a timely manner, (2) diligently file or procure the filing of a valid notice of completion of the Improvements, or such comparable document as may be permitted under applicable lien laws, (3) diligently file or procure the filing of a notice of cessation, or such comparable document as may be permitted under applicable lien laws, upon the happening of cessation of labor on the Improvements for a continuous period of thirty (30) days or more, and (4) take all reasonable steps necessary to remove all claims of liens against the Collateral, the Improvements or any part of the Collateral or Improvements, or any rights or interests appurtenant to the Collateral or Improvements. Upon Lender's request, Borrower shall make such demands or claims upon or against laborers, materialmen, subcontractors, or other persons who have furnished or claim to have furnished labor, services, or materials in connection with the Improvements, which demands or claims shall under the laws of the State of Colorado require diligent assertions of lien claims upon penalty of loss or waiver thereof. Borrower shall, within ten (10) days after the filing of any claim of lien that is disputed or contested by Borrower, provide Lender with a surety bond issued by a surety acceptable to Lender sufficient to release the claim of lien or deposit with Lender an amount satisfactory to Lender for the possibility that the contest will be unsuccessful. If Borrower fails to remove any lien on the Collateral or Improvements or provide a bond or deposit pursuant to this provision, Lender may pay such lien, or may contest the validity of the lien, and Borrower shall pay all costs and expenses of such contest, including Lender's reasonable attorneys' fees.

**Taxes and Claims.** Pay and discharge when due all of Borrower's indebtedness, obligations, and claims that, if unpaid, might become a lien or charge upon the Collateral or Improvements; provided, however, that Borrower shall not be required to pay and discharge any such indebtedness, obligation, or claim so long as (1) its legality shall be contested in good faith by appropriate proceedings, (2) the indebtedness, obligation, or claim does not become a lien or charge upon the Collateral or Improvements, and (3) Borrower shall have established on its books adequate reserves with respect to the amount contested in accordance with GAAP. If the indebtedness, obligation, or claim does become a lien or charge upon the Collateral or Improvements, Borrower shall remove the lien or charge as provided in the preceding paragraph.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests in the Collateral and Improvements.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Additional Financial Restrictions.** Borrower shall not make any distributions other than for taxes without Lender's written consent.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Modification of Contract.** Make or permit to be made any modification of the Construction Contract.

**Liens.** Create or allow to be created any lien or charge upon the Collateral or the Improvements.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**GENERAL PROJECT PROVISIONS.** The following provisions relate to the construction and completion of the Project:

**Change Orders.** All requests for changes in the Plans and Specifications, other than minor changes involving no extra cost, must be in writing, signed by Borrower and the architect, and delivered to Lender for its approval. Borrower will not permit the performance of any work pursuant to any change order or modification of the Construction Contract or any subcontract without the written approval of Lender. Borrower will obtain any required permits or authorizations from governmental authorities having jurisdiction before approving or requesting

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

Loan No: 1016                                                                                          Page 9

a new change order.

**Purchase of Materials; Conditional Sales Contracts.** No materials, equipment, fixtures, or articles of personal property placed in or incorporated into the Project shall be purchased or installed under any Security Agreement or other agreement whereby the seller reserves or purports to reserve title or the right of removal or repossession, or the right to consider such items as personal property after their incorporation into the Project, unless otherwise authorized by Lender in writing.

**Lender's Right of Entry and Inspection.** Lender and its agents shall have at all times the right of entry and free access to the Property and the right to inspect all work done, labor performed, and materials furnished with respect to the Project. Lender shall have unrestricted access to and the right to copy all records, accounting books, contracts, subcontracts, bills, statements, vouchers, and supporting documents of Borrower relating in any way to the Project.

**Lender's Right to Stop Work.** If Lender in good faith determines that any work or materials do not conform to the approved Plans and Specifications or sound building practices, or otherwise depart from any of the requirements of this Agreement, Lender may require the work to be stopped and withhold disbursements until the matter is corrected. In such event, Borrower will promptly correct the work to Lender's satisfaction. No such action by Lender will affect Borrower's obligation to complete the Improvements on or before the Completion Date. Lender is under no duty to supervise or inspect the construction or examine any books and records. Any inspection or examination by Lender is for the sole purpose of protecting Lender's security and preserving Lender's rights under this Agreement. No default of Borrower will be waived by any inspection by Lender. In no event will any inspection by Lender be a representation that there has been or will be compliance with the Plans and Specifications or that the construction is free from defective materials or workmanship.

**Indemnity.** Borrower shall indemnify, defend, and hold Lender harmless from any and all claims asserted against Lender or the Property by any person, entity, or governmental body, or arising out of or in connection with the Property, Improvements, or Project. Lender shall be entitled to appear in any proceedings to defend itself against such claims, and all costs and expenses attorneys' fees incurred by Lender in connection with such defense shall be paid by Borrower to Lender. Lender shall, in its sole discretion, be entitled to settle or compromise any asserted claims against it, and such settlement shall be binding upon Borrower for purposes of this indemnification. All amounts paid by Lender under this paragraph shall be secured by Lender's security agreement or Deed of Trust, if any, on the Property, shall be deemed an additional principal Advance under the Loan, payable upon demand, and shall bear interest at the rate applicable to the Loan.

**Publicity.** Lender may display a sign at the construction site informing the public that Lender is the construction lender for the Project. Lender may obtain other publicity in connection with the Project through press releases and participation in ground-breaking and opening ceremonies and similar events.

**Actions.** Lender shall have the right to commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement, or the disbursement of funds from the Loan Fund. In connection with this right, Lender may incur and pay reasonable costs, expenses and attorneys' fees. Borrower covenants to pay to Lender on demand all such expenses, together with interest from the date Lender incurs the expense at the rate specified in the Note, and Lender is authorized to disburse funds from the Loan Fund for such purposes.

**CONSTRUCTION LOAN COMMITMENT.** Lender has issued a construction loan commitment letter for the Loan to Borrower with an acceptance date of July 10, 2015 and with a closing date of December 31, 2015.

**RELATIONSHIP TO THIS AGREEMENT.** The terms and provisions of this Agreement, the Note and the Related Documents supersede any inconsistent terms and conditions of Lender's construction loan commitment letter to Borrower, provided that all obligations of Borrower under the commitment to pay any fees to Lender or any costs and expenses relating to the Loan or the commitment shall survive the execution and delivery of this Agreement, the Note and the Related Documents. Any failure of Borrower to perform any such obligation shall constitute a default under this Agreement.

**PERMANENT LOAN REQUIREMENTS.** Compliance with SBA Authorization Loan No. 80541250-05 Dated November 20, 2015 for Debenture Guaranty ("the "Debenture") issued in connection with the Project, including any amendments thereto ("SBA Authorization").

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Loan.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf, or made by Guarantor, under this Agreement or the Related Documents in connection with the obtaining of the Loan evidenced by the Note or any security document directly or indirectly securing repayment of the Note is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Execution; Attachment.** Any execution or attachment is levied against the Collateral, and such execution or attachment is not set aside, discharged or stayed within thirty (30) days after the same is levied.

**Change in Zoning or Public Restriction.** Any change in any zoning ordinance or regulation or any other public restriction is enacted, adopted or implemented, that limits or defines the uses which may be made of the Collateral such that the present or intended use of the Collateral,

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

**Loan No: 1016**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Page 10**

as specified in the Related Documents, would be in violation of such zoning ordinance or regulation or public restriction, as changed.

**Default Under Other Lien Documents.** A default occurs under any other mortgage, deed of trust or security agreement covering all or any portion of the Collateral.

**Judgment.** Unless adequately covered by insurance in the opinion of Lender, the entry of a final judgment for the payment of money involving more than ten thousand dollars ($10,000.00) against Borrower and the failure by Borrower to discharge the same, or cause it to be discharged, or bonded off to Lender's satisfaction, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered.

**Breach of Construction Contract.** The Improvements are not constructed in accordance with the Plans and Specifications or in accordance with the terms of the Construction Contract.

**Cessation of Construction.** Prior to the completion of construction of the Improvements and equipping of the Project, the construction of the Improvements or the equipping of the Project is abandoned or work thereon ceases for a period of more than ten (10) days for any reason, or the Improvements are not completed for purposes of final payment to the General Contractor prior to September 18, 2017, regardless of the reason for the delay.

**Transfer of Property.** Sale, transfer, hypothecation, assignment, or conveyance of the Property or the Improvements or any portion thereof or interest therein by Borrower or any Borrower without Lender's prior written consent.

**Condemnation.** All or any material portion of the Collateral is condemned, seized, or appropriated without compensation, and Borrower does not within thirty (30) days after such condemnation, seizure, or appropriation, initiate and diligently prosecute appropriate action to contest in good faith the validity of such condemnation, seizure, or appropriation.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT; REMEDIES.** Upon the occurrence of any Event of Default and at any time thereafter, Lender may, at its option, but without any obligation to do so, and in addition to any other right Lender without notice to Borrower may have, do any one or more of the following without notice to Borrower: (a) Cancel this Agreement; (b) Institute appropriate proceedings to enforce the performance of this Agreement; (c) Withhold further disbursement of Loan Funds; (d) Expend funds necessary to remedy the default; (e) Take possession of the Property and continue construction of the Project; (f) Accelerate maturity of the Note and/or Indebtedness and demand payment of all sums due under the Note and/or Indebtedness; (g) Bring an action on the Note and/or Indebtedness; (h) Foreclose Lender's security agreement or Deed of Trust, if any, on the Property in any manner available under law; and (i) Exercise any other right or remedy which it has under the Note or Related Documents, or which is otherwise available at law or in equity or by statute.

**COMPLETION OF IMPROVEMENTS BY LENDER.** If Lender takes possession of the Collateral, it may take any and all actions necessary in its judgment to complete construction of the Improvements, including but not limited to making changes in the Plans and Specifications, work, or materials and entering into, modifying or terminating any contractual arrangements, subject to Lender's right at any time to discontinue any work without liability. If Lender elects to complete the Improvements, it will not assume any liability to Borrower or to any other person for completing the Improvements or for the manner or quality of construction of the Improvements, and Borrower expressly waives any such liability. Borrower irrevocably appoints Lender as its attorney-in-fact, with full power of substitution, to complete the Improvements, at Lender's option, either in Borrower's name or in its own name. In any event, all sums expended by Lender in completing the construction of the Improvements will be considered to have been disbursed to Borrower and will be secured by the Collateral for the Loan. Any such sums that cause the principal amount of the Loan to exceed the face amount of the Note will be considered to be an additional Loan to Borrower, bearing interest at the Note rate and being secured by the Collateral. For these purposes, Borrower assigns to Lender all of its right, title and interest in and to the Project Documents; however Lender will not have any obligation under the Project Documents unless Lender expressly hereafter agrees to assume such obligations in writing. Lender will have the right to exercise any rights of Borrower under the Project Documents upon the occurrence of an Event of Default. Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently.

**ADDITIONAL DOCUMENTS.** Borrower shall provide Lender with the following additional documents:

**Articles of Organization and Company Resolutions.** Borrower has provided or will provide Lender with a certified copy of Borrower's Articles of Organization, together with a certified copy of resolutions properly adopted by the members of the company, under which the members authorized one or more designated members or employees to execute this Agreement, the Note and any and all Security Agreements directly or indirectly securing repayment of the same, and to consummate the borrowings and other transactions as contemplated under this Agreement, and to consent to the remedies following any default by Borrower as provided in this Agreement and in any Security Agreements.

**Opinion of Counsel.** When required by Lender, Borrower has provided or will provide Lender with an opinion of Borrower's counsel certifying to and that: (1) Borrower's Note, any Security Agreements and this Agreement constitute valid and binding obligations on Borrower's part that are enforceable in accordance with their respective terms; (2) Borrower is validly existing and in good standing; (3) Borrower has authority to enter into this Agreement and to consummate the transactions contemplated under this Agreement; and (4) such other matters as may have been requested by Lender or by Lender's counsel.

**AUTO DEBIT PROVISION. It is a requirement of Lender that Borrower pay Lender by ACH auto debt pursuant to the ACH payment instructions executed by Borrower in connection with this Note.**

**PROPERTY IMPROVEMENT COST RESERVE.** During Borrower's operation of the Project, Borrower may be required to perform certain property improvements including installation of upgrades, purchase of equipment or such other work that may be required by the franchisor associated with the Project (any such agreement or requirement, the "Property Improvement Plan"). Borrower shall maintain with Lender reserves for payment of Property Improvement Plan costs ("PIP Costs") which reserves shall be created by an initial deposit and either subsequent monthly payments, or payments at such other interval(s), including once per year, as Lender may require, of a sum estimated by Lender to be sufficient

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

| Loan No: 1016 | | Page 11 |
|---|---|---|

to pay total annual PIP Costs commencing upon completion of the Project as follows: 1% of the annual projected revenue in years 1 and 2, 2% in year three, and 2.5% from years 4 through 10. Funds shall be released upon proof of the need for replacement of FF&E within the Property, and/or PIP requirement from the Franchisor. The reserve fund shall be held by Lender as a general deposit from Borrower. Lender shall have the right to draw upon the reserve funds to pay PIP Costs in its reasonable discretion. If the reserve funds disclose a shortage or deficiency, Borrower shall pay such shortage or deficiency as required by Lender. All amounts held in the reserve account are hereby pledged to further secure the Loan and Lender is hereby authorized to withdraw and apply such amounts on the Loan upon the occurrence of an Event of Default. Lender shall not be required to pay any interest or earning on the reserve funds.

**EB-5 JOB CREATION REQUIREMENTS.** Borrower shall comply with all requirements, including job creation and reporting requirements, set forth on the EB-5 Job Creation Addendum attached hereto as Exhibit B.

**EB-5 PROJECT ACCOUNT PROVISION.** Notwithstanding anything to the contrary contained hereon, after satisfaction of all conditions precedent listed in this Loan Agreement on the closing date of the Loan, the Loan proceeds will be deposited into a dedicated project account entitled "ALC — Best Western Premier" which project account shall constitute a segregated account from which Borrower may draw down individual advances (each, an "Advance") under the remaining balance of the Loan in accordance with the terms hereof. So long as Borrower shall comply with the requirements of the Loan Documents, Lender shall have no right to remove said Loan proceeds or otherwise refuse to fund the Loan or remove the Loan funds from the project account - which funds shall be deemed "fully committed" as of the date hereof.

**REASONABLENESS STANDARD.** Notwithstanding anything to the contrary contained herein or in any of the Related Documents, in cases throughout this agreement and the Related Documents where Lender's discretion shall be required, including but not limited to the sections entitled "Sole Discretion of Lender" and "Lender's Right of Entry and Inspection", Lender's discretion shall be exercised in accordance with a "reasonable" standard. Further, in cases where Lender may be entitled to collect attorneys' fees hereunder or in any of the other Related Documents, such attorneys' fees shall be subject to a "reasonable" standard.

**COUNTERPARTS; TELECOPIED SIGNATURES.** This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature hereto.

**CO-LENDER SUPPLEMENTAL PROVISION.** Borrower acknowledges that a portion of that certain loan made to Borrower in the total amount of $10,200,000.00 (the "Loan") evidenced hereby was funded by Alleron Investment Management, LLC, having an address at 3401 W. Cypress Street, Suite 101, Tampa, Florida 33607 ("Alleron"), which interest is represented by that certain Note A dated as of the date hereof executed by Borrower in connection herewith in the amount of $5,700,000.00. Borrower acknowledges that Alleron has an undivided interest in the Loan and the rights granted to Lender herein. Borrower further acknowledges that Alleron is deemed to be a "Lender" under this agreement and the Related Documents executed in connection herewith and shall have all the rights associated therewith including the right to pursue collection of the Loan from Borrower and exercise the rights granted to Lender hereunder in its own name and to receive notices required hereunder at the above address.

Borrower's Initials  _WB_  .

**DEBT SERVICE RESERVE. Debt Service Reserve.** A "Debt Service Reserve" in the amount of $500,000.00 shall be deposited with Lender from the Loan Fund on the Closing Date in the form of an unused, single purpose reserve for debt service and contingency purposes and shall be used to pay Borrower's debt service on the Loan and any other loans made by Lender to Borrower pursuant to the SBA Authorization. Interest shall accrue only on that portion of the Debt Service Reserve actually drawn down and applied in accordance with this section.

**POST CLOSING LIQUIDITY.** Borrower shall maintain post closing liquidity of at least $500,000.00 until the Property has reached a DSCR (Debt Service Coverage Ratio) of 1.15X.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Authority to File Notices.** Borrower appoints and designates Lender as its attorney-in-fact to file for the record any notice that Lender deems necessary to protect its interest under this Agreement. This power shall be deemed coupled with an interest and shall be irrevocable while any sum or performance remains due and owing under any of the Related Documents.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Borrower Information.** Borrower consents to the release of information on or about Borrower by Lender in accordance with any court order, law or regulation and in response to credit inquiries concerning Borrower.

**Counterparts.** This Agreement may be executed in multiple counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts, taken together, shall constitute one and the same Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**Indemnification of Lender.** Borrower agrees to indemnify, to defend and to save and hold Lender harmless from any and all claims, suits, obligations, damages, losses, costs and expenses (including, without limitation, Lender's attorneys' fees, as well as Lender's architect's and engineering fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Lender, its officers, directors, employees, and agents arising out of, relating to, or in any manner occasioned by this Agreement and the exercise of the rights and remedies granted Lender under this, as well as by: (1) the ownership, use, operation, construction, renovation, demolition, preservation, management, repair, condition, or maintenance of any part of the Collateral; (2) the exercise of any of Borrower's rights collaterally assigned and pledged to Lender hereunder; (3) any failure of Borrower to perform any of its obligations

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
**Loan No: 1016**                                          (Continued)                                          Page 12

hereunder; and/or (4) any failure of Borrower to comply with the environmental and ERISA obligations, representations and warranties set forth herein. The foregoing indemnity provisions shall survive the cancellation of this Agreement as to all matters arising or accruing prior to such cancellation and the foregoing indemnity shall survive in the event that Lender elects to exercise any of the remedies as provided under this Agreement following default hereunder. Borrower's indemnity obligations under this section shall not in any way be affected by the presence or absence of covering insurance, or by the amount of such insurance or by the failure or refusal of any insurance carrier to perform any obligation on its part under any insurance policy or policies affecting the Collateral and/or Borrower's business activities. Should any claim, action or proceeding be made or brought against Lender by reason of any event as to which Borrower's indemnification obligations apply, then, upon Lender's demand, Borrower, at its sole cost and expense, shall defend such claim, action or proceeding in Borrower's name, if necessary, by the attorneys for Borrower's insurance carrier (if such claim, action or proceeding is covered by insurance), or otherwise by such attorneys as Lender shall approve. Lender may also engage its own attorneys at its reasonable discretion to defend Borrower and to assist in its defense and Borrower agrees to pay the fees and disbursements of such attorneys.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Non-Liability of Lender.** The relationship between Borrower and Lender created by this Agreement is strictly a debtor and creditor relationship and not fiduciary in nature, nor is the relationship to be construed as creating any partnership or joint venture between Lender and Borrower or any contractor. Lender is not an agent or representative of Borrower. This Agreement does not create a contractual relationship with and shall not be construed to benefit or bind Lender in any way or create any contractual duties by Lender to any contractor, subcontractor, materialman, laborer, or any other person. Borrower is exercising Borrower's own judgment with respect to Borrower's business. All information supplied to Lender is for Lender's protection only and no other party is entitled to rely on such information. There is no duty for Lender to review, inspect, supervise or inform Borrower of any matter with respect to Borrower's business. Lender and Borrower intend that Lender may reasonably rely on all information supplied by Borrower to Lender, together with all representations and warranties given by Borrower to Lender, without investigation or confirmation by Lender and that any investigation or failure to investigate will not diminish Lender's right to so rely.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Notice of Lender's Breach.** Borrower must notify Lender in writing of any breach of this Agreement or the Related Documents by Lender and any other claim, cause of action or offset against Lender within thirty (30) days after the occurrence of such breach or after the accrual of such claim, cause of action or offset. Borrower waives any claim, cause of action or offset for which notice is not given in accordance with this paragraph. Lender is entitled to rely on any failure to give such notice.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Sole Discretion of Lender.** Whenever Lender's consent or approval is required under this Agreement, the decision as to whether or not to consent or approve shall be in the sole and exclusive discretion of Lender and Lender's decision shall be final and conclusive.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

Exhibit 1

**CONSTRUCTION LOAN AGREEMENT**
(Continued)

Loan No: 1016                                                                                    Page 13

---

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Construction Loan Agreement, as this Construction Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Construction Loan Agreement from time to time.

**Architect's Contract.** The words "Architect's Contract" mean the architect's contract dated June 6, 2008 between Borrower and Associated Architects LTD, the architect for the Project.

**Borrower.** The word "Borrower" means WPB Hospitality, LLC, a Colorado limited liability company and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word "Collateral" includes without limitation all collateral described in the Required Collateral section of this Agreement.

**Completion Date.** The words "Completion Date" mean September 18, 2017.

**Construction Contract.** The words "Construction Contract" mean the contract dated May 5, 2015 between Borrower and Kumar Construction Management Inc., the general contractor for the Project, and any subcontracts with subcontractors, materialmen, laborers, or any other person or entity for performance of work on the Project or the delivery of materials to the Project.

**Contractor.** The word "Contractor" means Kumar Construction Management Inc., the general contractor for the Project.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**ERISA.** The word "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and including all regulations and published interpretations of the act.

**Event of Default.** The words "Event of Default" mean individually, collectively, and interchangeably any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan and any guarantor under a completion guaranty agreement, and, in each case, Borrower's successors, assigns, heirs, personal representatives, executors and administrators of any guarantor, surety, or accommodation party.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future buildings, structures, facilities, fixtures, additions, and similar construction on the Collateral.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means American Lending Center, LLC, a California limited liability company, its successors and assigns.

**Loan.** The word "Loan" means the loan or loans made to Borrower under this Agreement and the Related Documents as described.

**Loan Fund.** The words "Loan Fund" mean the undisbursed proceeds of the Loan under this Agreement together with any equity funds or other deposits required from Borrower under this Agreement.

**Note.** The word "Note" means the Notes dated as of the date herein, in the original amounts of $5,700,000.00 given to Aileron Investment Management, LLC and $4,500,000.00 given to American Lending Center, LLC (Promissory Notes A and Promissory Note B, respectively) in the total amount of $10,200,000.00 and executed by Borrower together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

Loan No: 1016                                                                    Page 14

paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Plans and Specifications.** The words "Plans and Specifications" mean the plans and specifications for the Project which have been submitted to and initialed by Lender, together with such changes and additions as may be approved by Lender in writing.

**Project.** The word "Project" means the construction project as described in the "Project Description" section of this Agreement.

**Project Documents.** The words "Project Documents" mean the Plans and Specifications, all studies, data and drawings relating to the Project, whether prepared by or for Borrower, the Construction Contract, the Architect's Contract, and all other contracts and agreements relating to the Project or the construction of the Improvements.

**Property.** The word "Property" means the property as described in the "Project Description" section of this Agreement.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in the "Project Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, individually, collectively, and interchangeably, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Value.** The word "Value" means such amount or worth as defined and determined by Lender in its sole discretion unless agreed to the contrary by Lender in writing.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS CONSTRUCTION LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS CONSTRUCTION LOAN AGREEMENT IS DATED DECEMBER 31, 2015.

BORROWER:

WPB HOSPITALITY, LLC, A COLORADO LIMITED LIABILITY COMPANY

By: _Wanda S. Bertoia_
Wanda S. Bertoia, the Sole Member of WPB
Hospitality, LLC, a Colorado limited liability company

LENDER:

AMERICAN LENDING CENTER, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

By: _Stella Sheng_
Authorized Officer

LaserPro, Ver. 15.1.10.038  Copr. D+H USA Corporation 1997, 2015.  All Rights Reserved.  - CA  C:\LASERPRO\LPCFILP\C11.FC  TR-33  PR-8

Exhibit 1

# Exhibit B

## To Second Amended Complaint

### Denver County District Court, State of Colorado

### Case No. 19CV33523

## FUNDS CONTROL & INSPECTION SERVICES AGREEMENT
### W/ COMPLETION COMMITMENT
Disbursement Agent: Tracey Benson
Project #: 34878

THIS AGREEMENT is made and entered into by and between <u>Tetra Tech, Inc.</u>, hereinafter referred to as "Tt, Inc.", <u>WPB Hospitality, LLC</u>, hereinafter referred to as "Owner", <u>Kumar Construction Management, Inc.</u>, hereinafter referred to as "Contractor", and <u>Aileron Investment Management, LLC</u>, hereinafter referred to as "Lender".

WHEREAS, Owner is the owner in fee simple of certain parcel(s) of land situated at <u>16161 E. 40th Avenue, Denver, CO 80239;</u> and

WHEREAS, owner desires construction of <u>Best Western Premier Denver</u> on the aforesaid real property, hereinafter referred to as "Project" and in connection therewith desires to borrow a certain sum from Lender, a portion of which is for the purpose of financing the construction cost of said Project; and

WHEREAS, Owner has selected and employed Contractor, who is licensed in accordance with the applicable state requirements, to construct said Project on said property in accordance with a (Construction Agreement) between the owner and the contractor (the "Construction Agreement") and the plans and specifications deposited or to be deposited with Lender, and further, Contractor has agreed to complete said construction in accordance with certain plans and specifications approved by the Owner, Contractor and Lender, and further, in compliance with the requirements of the building code(s) of the political subdivision having jurisdiction over said Project; and

WHEREAS, Lender has agreed to fund for construction costs the sum of approximately $9,900,000.00 to be used for said Project in accordance with the Construction Loan Agreement between Owner and Lender hereinafter referred to as the "Construction Loan Agreement".

WHEREAS, Lender desires to appoint Tt, Inc. as its agent under said Construction Loan Agreement for disbursement of payments according to the terms of the Construction Agreement and the Construction Loan Agreement and as outlined in the Tetra Tech Funds Control Procedures attached hereto.

Now, therefore, and in consideration of the premises and for and in consideration of the covenants and agreements hereinafter set forth by each of the parties hereto to be kept and performed, it is mutually understood and agreed as follows:

1. That Lender appoints Tt, Inc. its Agent for disbursement of payments according to the terms of the Construction Agreement and the Construction Loan Agreement. Funds shall be deposited on a per draw basis by the Lender in a segregated account maintained by Tt, Inc. and shall be hereinafter designated as the "Construction Fund" in this Agreement. The Construction Fund excludes a certain sum of the total loan proceeds, which although included in the loan to Owner, are not subject to this Agreement as said funds are for other purposes.

2. That Owner does hereby agree to instruct Contractor to deliver to Tt, Inc. each and every item required by Tt, Inc. for the performance of work as outlined herein, including but not limited to the Construction Agreement, cost breakdown as approved by Lender, subcontracts, working plans and specifications.

3. That Tt, Inc. shall maintain a segregated bank account for deposit of the Construction Fund. Any funds received from the Owner or Lender may be deposited in said segregated account. Accurate accounting records shall be kept of deposits and withdrawals from said account. Tt, Inc. shall not be obliged to pay interest on any funds deposited to the segregated account.

1

TetraTech_0028

4.    The Owner does hereby agree to comply with all terms and conditions of the Construction Loan Agreement, and consent to the appointment of Tt, Inc. as Agent.

5.    That Tt, Inc. does hereby agree to periodically determine the percentage of completion of the Project and promptly apply the Construction Fund to the payment of vouchers to be issued and signed by Contractor and/or Owner, of such costs as are properly allocated to the construction of said Project and such payments to be made in accordance with the terms and conditions of the Construction Agreement and the Construction Loan Agreement. Any percentage of the contract amount to be retained until the expiration of the period for the filing of mechanic's lien claims shall be retained by Lender and shall not be part of the Construction Fund. Percentage of retention held will be 10%.

6.    That Tt, Inc. shall maintain complete and adequate records of all sums received and disbursed by, through, or at its direction, and shall permit the inspection of said records by Contractor, Owner and Lender at all times during regular business hours.

7.    The services and inspections to be performed by Tt, Inc. are not the equivalent of, nor a substitute for, architectural supervision or inspections by Owner. Tt, Inc. does not contract or guarantee that the construction job will be completed, or built in accordance with said plans, specifications, and budgets, or in accordance with pertinent building codes, ordinances, or regulations. Tt, Inc.'s sole responsibility shall be to periodically determine the percentage of completion of the Project and deliver payments from the Construction Fund according to the terms of the Construction Agreement. (See Attachment B for an amendment for this paragraph).

8.    That Owner agrees to pay to Tt, Inc. a fee of $748.00 for Project Set-Up and $12,905.00 for Funds Control upon execution of this Agreement, and $2,600.00 for the Initial Project Review and $49,500.00 for the Completion Commitment. The total due is $65,753.00. Tt, Inc. shall not be required to perform services not covered by this Agreement unless mutually agreed between Tt, Inc. and Owner or Lender.

a.    The fee payable to Tt, Inc. hereunder will be deemed to have been earned at the time this Agreement is executed, and no refund will be made of any fee in the event this Agreement is terminated, or if the cost of construction is less than originally estimated.

b.    This Agreement is entered into on the basis of the parties' expectation that the Project will be constructed within a total construction period of 13 months. Disbursements and/or inspections will be provided based on 13 draws (12 draws/inspections and 1 retention draw). In the event construction extends beyond this period, Tt, Inc. will be paid a fee of $1,040.00 per additional inspection/disbursement, until such time as the Project is completed.

c.    Any additional services will be assessed a fee of $425.00 for a disbursement only, or $615.00 for an inspection only.

9.    All parties agree to and understand that Tt, Inc. may rely on, at its discretion, facsimiles in lieu of original documents on all required items.

10.    Execution of this Agreement and participation by Tt, Inc. hereunder is in no way to be construed as an endorsement or guarantee of performance of any party hereto, Architect, Builder, Owner, Subcontractor, or person(s) supplying materials or labor to any such persons or for the use of

2

said Project or any plans, specifications, or products. The obligations and services of Tt, Inc. are solely those of a disbursing agency with a financial accounting to the parties hereto.

11.     That when Contractor has completed its work on the Project and all funds under this Agreement have been disbursed in connection therewith, the obligation of Tt, Inc. shall cease.

12.     Owner and/or Contractor shall promptly deliver to Tt, Inc. any and all preliminary lien notices, intent to lien notices, and lien claims served on Owner and/or Contractor.

13.     That in the event any lien or liens shall be filed against the aforesaid real property by reason of the work or construction herein referred to, Contractor agrees forthwith to cause the same to be fully satisfied or otherwise secured and to hold Owner harmless therefrom. If, within a reasonable time, said liens are not satisfied and discharged, Tt, Inc. shall not disburse any funds to Contractor until said liens are satisfied and released of record.

14.     If more than one person executes this Agreement as Owner, the obligations of each such person hereunder shall be joint and several.

15.     Whenever the context of this Agreement requires, the singular shall include the plural and the masculine gender shall include the feminine and/or neuter.

16.     This Agreement is for the sole protection of the parties to this Agreement, their successors and assigns, and no other person, firm or corporation who is not a party to this Agreement, including but not limited to, Subcontractors and Materialmen, shall have any right of action against them.

17.     Tt, Inc. agrees to provide the required Form 1099's in compliance with Section 6041 of the Internal Revenue Code. Tt, Inc. agrees to the following:

a.     Obtain W-9's from all contractors, sub-contractors and material suppliers (paid in amount equal to or in excess of $600 for any particular project).

b.     Distribute Forms 1099-MISC at year end (by January 31 of the following calendar year) to all contractors, sub-contractors and material suppliers (paid in amount equal to or in excess of $600 for any particular project). Tt, Inc. agrees to file required 1099-MISC forms with the IRS by February 28 of the following calendar year (for the previous year). Tt, Inc. also assumes full responsibility for any back-up withholding (if required by IRS statutes) for 1099-MISC filing.

c.     Maintain all appropriate records as required by the IRS for 1099-MISC filing. If required by the IRS, Tt, Inc. will conduct all required research in providing appropriate 1099-MISC information to the IRS.

d.     Assume full responsibility for any penalties, interest or other fees imposed by the IRS due to the failure of Tt, Inc. to track and/or file appropriate 1099-MISC information. Tt, Inc. also agrees to reimburse Lender for any penalties, interests or other fees that may be imposed upon Lender as a result of a failure by Tt, Inc. to impose back-up withholding or to file 1099-MISC information as required.

3

TetraTech_002896

18.    SCOPE OF WORK: Tt, Inc. agrees to furnish all materials, labor, union benefits (when applicable), equipment, supplies, and all other facilities required for the prompt performance of the following scope of work:

     a.    Perform physical inspections on the Project as requested.

     b.    Conduct a review of the cost breakdown and plans of the Project for the purpose of determining at the scheduled inspection period what construction activity has been completed. This is not to be deemed the equivalent of, nor a substitute for architectural supervision or inspections by Owner or Lender.  Tt, Inc. does not contract or guarantee that the construction job will be built in accordance with said plans and specifications, or in accordance with pertinent building codes, ordinances, or regulations.

     c.    Provide Lender, within seven to ten (7-10) business days of receiving inspection request, a written report verifying:

        (1)    The Project's approximate overall percentage of completion; and a general description of the construction progress,

        (2)    The approximate percentage of completion of each line item as set forth upon the cost breakdown.

        (3)    Photographs of various phases of construction.

     All work done by Tt, Inc. and all materials furnished by Tt, Inc. shall be done in a professional, efficient and workmanlike manner.

19.    The above procedures supersede Contracts and/or written agreements between the Contractor and the Owner in regards to disbursement of payments for this project.

20.    CONTRACT PRICE AND EXTRAS: The contract price to be paid Tt, Inc. is hereby fixed in the sum of (see item 8), per inspection.  It is agreed that all labor and materials furnished by Tt, Inc. shall be deemed to be included and provided for under the contract price stated.  Extra compensation will not be allowed to Tt, Inc. unless Lender, in writing, has authorized further or additional work or materials, in which event, such authorized extra payment shall be made to Tt, Inc. in addition to the contract price.  The amount of said extra compensation shall be an amount agreed upon in writing between the parties hereto.

21.    INDEMNITY: THE LENDER, OWNER AND CONTRACTOR EACH AGREES, TO THE FULLEST EXTENT PERMITTED BY LAW, TO INDEMNIFY AND HOLD HARMLESS TETRA TECH, INC., ITS OFFICERS, DIRECTORS, EMPLOYEES AND SUB CONSULTANTS AGAINST ALL DAMAGES, LIABILITIES OR COSTS, INCLUDING REASONABLE ATTORNEYS' FEES AND DEFENSE COSTS, TO THE EXTENT CAUSED BY , RESPECTFULLY, THE LENDER'S, OWNER'S OR CONTRACTOR'S BREACH OF ITS OBLIGATIONS UNDER THIS AGREEMENT  AND THAT OF ITS SUB CONSULTANTS OR ANYONE FOR WHOM THE LENDER, OWNER OR CONTRACTOR IS LEGALLY LIABLE.

TETRA TECH, INC., AGREES, TO THE FULLEST EXTENT PERMITTED BY LAW TO INDEMNIFY AND HOLD HARMLESS THE LENDER, OWNER AND CONTRACTOR, THEIR OFFICERS, DIRECTORS, EMPLOYEES AND SUB CONSULTANTS AGAINST ALL DAMAGES, LIABILITIES OR COST,

4

TetraTech_002897

INCLUDING REASONABLE ATTORNEYS' FEES AND DEFENSE COSTS, TO THE EXTENT CAUSED BY TETRA TECH, INC.'S BREACH OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE ACTS OF ITS CONTRACTORS, SUBCONTRACTORS OR CONSULTANTS OR ANYONE FOR WHOM TETRA TECH, INC. IS LEGALLY LIABLE.

NEITHER TETRA TECH, INC., NOR THE LENDER, OWNER OR CONTRACTOR SHALL BE OBLIGATED TO INDEMNIFY THE OTHER PARTY IN ANY MANNER WHATSOEVER FOR THE OTHER PARTY'S OWN NEGLIGENCE OR WILLFUL MISCONDUCT.

22.    **RIGHT OF TERMINATION:** In the event Lender shall determine at any time during the course of performance of this Agreement that Tt, Inc. has failed to perform its obligations under this Agreement, whether by reason of poor workmanship, or any other reason of non-performance or delay in performance as determined by Lender, Lender may thereupon give notice in writing to Tt, Inc. of termination of this Agreement and such Agreement shall in all respects be thereupon terminated, except for Lender's obligations to indemnify Tt, Inc. and to pay Tt, Inc. for services performed up to and including the date Tt, Inc. received such notice of termination. In the event Tt, Inc. shall determine at any time during the course of this Agreement that its ability to perform hereunder is in any way impaired, either by nonperformance, delay in performance, or otherwise, then Tt, Inc. may thereupon give notice in writing to Lender of termination of this Agreement, and such Agreement shall in all respects be thereupon terminated except for Tt, Inc.'s right to indemnification and payment for services performed to date.

23.    **TERM OF PAYMENT:** Lender shall pay Tt, Inc.'s invoices within ten (10) days of receipt of same.

24.    **FACSIMILE AND COUNTERPART:** This document may be signed in any number of separate copies, each of which shall be effective as an original, but all of which taken together shall constitute a single document. An electronic transmission or other facsimile of this document or any related document shall be deemed an original and shall be admissible as evidence of the document and the signer's execution.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first written above.

OWNER: WPB Hospitality, LLC

By _____
   Wanda Bertoia
Date: 12-21-2015

CONTROL SERVICES: Tetra Tech, Inc.

By _____
   Angela Halvorsen, Operations Manager
Date: _____

CONTRACTOR: Kumar Construction Management, Inc.

By _____
   Neil Kumar Mudigonda
Date: 12/21/15

LENDER: Aileron Investment Management, LLC

By _____
   Joseph Bonora
Date: _____

ATTACHMENTS:    A – Amendment to Standard Agreement
                B – Modifications to Paragraph 7 – Standard Agreement
                C – Indemnification Addendum
                D – Exhibit of Contractor's Confirmation of Initial Project Review Requirements

5

TetraTech_002898

INCLUDING REASONABLE ATTORNEYS' FEES AND DEFENSE COSTS, TO THE EXTENT CAUSED BY TETRA TECH, INC.'S BREACH OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE ACTS OF ITS CONTRACTORS, SUBCONTRACTORS OR CONSULTANTS OR ANYONE FOR WHOM TETRA TECH, INC. IS LEGALLY LIABLE.

NEITHER TETRA TECH, INC., NOR THE LENDER, OWNER OR CONTRACTOR SHALL BE OBLIGATED TO INDEMNIFY THE OTHER PARTY IN ANY MANNER WHATSOEVER FOR THE OTHER PARTY'S OWN NEGLIGENCE OR WILLFUL MISCONDUCT.

22.    **RIGHT OF TERMINATION:** In the event Lender shall determine at any time during the course of performance of this Agreement that Tt, Inc. has failed to perform its obligations under this Agreement, whether by reason of poor workmanship, or any other reason of non-performance or delay in performance as determined by Lender, Lender may thereupon give notice in writing to Tt, Inc. of termination of this Agreement and such Agreement shall in all respects be thereupon terminated, except for Lender's obligations to indemnify Tt, Inc. and to pay Tt, Inc. for services performed up to and including the date Tt, Inc. received such notice of termination. In the event Tt, Inc. shall determine at any time during the course of this Agreement that its ability to perform hereunder is in any way impaired, either by nonperformance, delay in performance, or otherwise, then Tt, Inc. may thereupon give notice in writing to Lender of termination of this Agreement, and such Agreement shall in all respects be thereupon terminated except for Tt, Inc.'s right to indemnification and payment for services performed to date.

23.    **TERM OF PAYMENT:** Lender shall pay Tt, Inc.'s invoices within ten (10) days of receipt of same.

24.    **FACSIMILE AND COUNTERPART:** This document may be signed in any number of separate copies, each of which shall be effective as an original, but all of which taken together shall constitute a single document. An electronic transmission or other facsimile of this document or any related document shall be deemed an original and shall be admissible as evidence of the document and the signer's execution.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first written above.

OWNER: WPB Hospitality, LLC         CONTRACTOR: Kumar Construction Management, Inc.

By_____         By_____
    Wanda Bertoia                       Neil Kumar Mudigonda
Date:_____                      Date:_____

CONTROL SERVICES: Tetra Tech, Inc.     LENDER: Aileron Investment Management, LLC

By_____         By_____
   Angela Halvorsen, Operations Manager      Joseph Bonora
Date:_____                      Date: 12/21/15

ATTACHMENTS:       A – Amendment to Standard Agreement
                     B – Modifications to Paragraph 7 – Standard Agreement
                     C – Indemnification Addendum
                     D – Exhibit of Contractor's Confirmation of Initial Project Review Requirements

5

TetraTech_002899

## ATTACHMENT A
### FUNDS CONTROL & INSPECTION SERVICES AGREEMENT
### W/ COMPLETION COMMITMENT
LENDER – <u>Aileron Investment Management, LLC</u>
PROJECT – <u>Best Western Premier Denver</u>

This attachment A is an amendment to the Funds Control and Inspection Services Agreement entered into by <u>Aileron Investment Management, LLC</u>, <u>WPB Hospitality, LLC</u>, <u>Kumar Construction Management, Inc.</u> and <u>Tetra Tech, Inc.</u> (Tt, Inc.). The amendment is for the project known as <u>Best Western Premier Denver</u>.

It is acknowledged by all parties that in lieu of <u>Kumar Construction Management, Inc.</u> Contractors providing a Performance and Payment Bond to the Owner, <u>WPB Hospitality, LLC</u>, Tetra Tech, Inc. has agreed to commit to completing the project as the CM/GC should <u>Kumar Construction Management, Inc.</u> Contractors default on the contract or be terminated for cause. It is understood this will only be required in the action of default due to <u>Kumar Construction Management, Inc.</u> Contractors not having the financial capabilities to complete the project or for termination for cause as defined by AIA 201. This is not be interpreted as a commitment from Tetra Tech, Inc. to complete the project should the owner terminate for convenience. Tetra Tech, Inc.'s commitment to complete the Project shall not exceed the funds remaining in the loan provided by the Lender, the value of the contingency mentioned below and any amount withheld for payment to the general contractor or subcontractors and any amounts approved as Change Orders by the Owner.

The following items are required as part of this commitment from Tetra Tech, Inc:

All Items noted in the Initial Project Review must be clarified and rectified to the satisfaction of Tetra Tech, Inc. *Incorporated into this agreement by reference are Contractor's response to Initial Project Review requirements. A copy of Contractor's response is attached to this agreement.*

Tetra Tech, Inc. will have full funds control responsibility including the issuance of payments to the Sub-Contractors.

Owner and <u>Kumar Construction Management, Inc.</u> Contractors agree to provide all the required documentation on a monthly basis.

<u>Kumar Construction Management, Inc.</u> Contractors will make provisions within the sub-contracts to be able to assign the contracts to owner, lender or designated agents should it become necessary.

Lender will set a contingency of 10% aside within the loan funding over and above the construction contract amount.

Tetra Tech, Inc. will be advised and consulted before any of the contingencies is released and before any owner requested change orders are approved.

<u>Kumar Construction Management, Inc.</u> Contractors will immediately notify Owner, Lender and Tetra Tech, Inc. should any unforeseen conditions be brought forward that will require additional funds.

6

As part of the Schedule of Values, **Kumar Construction Management, Inc.** will provide a line item for overhead and profit that is agreeable to all parties. This line item will be disbursed on a monthly basis to conform to the overall completion for the subject month.

Tetra Tech, Inc. will have the right to review the Sub-contracts entered into by **Kumar Construction Management, Inc.** Contractors to compare with the Schedule of Value for the appropriate line item.

Tetra Tech, Inc. will not assume liability for any Liquid Damages incurred by the Contractor. Upon the assignment to Tetra Tech, Inc. the contract provisions for Liquidated Damages are null and void. Upon taking assignment and allowing 30 days for review, Tetra Tech, Inc. will provide the Owner / Lender with an up-dated schedule to attain Substantial Completion.

By the signatures below all parties agree to the above and acknowledge their full understanding and adherence to.

OWNER: *WPB Hospitality, LLC*

By _Wanda Bertoia_

Wanda Bertoia

Date: 12-21-2015

CONTRACTOR: Kumar Construction Management, Inc.

By _____

Neil Kumar Mudigonda

Date: 12/21/15

CONTROL SERVICES: Tetra Tech, Inc.

By _____

Angela Halvorsen, Operations Manager

Date: _____

LENDER: Aileron Investment Management, LLC

By _____

Joseph Bonora

Date: _____

7

TetraTech_002901

Project #34878

As part of the Schedule of Values, <u>Kumar Construction Management, Inc.</u> will provide a line item for overhead and profit that is agreeable to all parties. This line item will be disbursed on a monthly basis to conform to the overall completion for the subject month.

Tetra Tech, Inc. will have the right to review the Sub-contracts entered into by <u>Kumar Construction Management, Inc.</u> Contractors to compare with the Schedule of Value for the appropriate line item.

Tetra Tech, Inc. will not assume liability for any Liquid Damages incurred by the Contractor. Upon the assignment to Tetra Tech, Inc. the contract provisions for Liquidated Damages are null and void. Upon taking assignment and allowing 30 days for review, Tetra Tech, Inc. will provide the Owner/Lender with an up-dated schedule to attain Substantial Completion.

By the signatures below all parties agree to the above and acknowledge their full understanding and adherence to.

OWNER: WPB Hospitality, LLC

By_____
   Wanda Bertoia
Date: _____

CONTROL SERVICES: Tetra Tech, Inc.

By_____
   Angela Halvorsen, Operations Manager
Date: _____

CONTRACTOR: Kumar Construction Management, Inc.

By_____
   Neil Kumar Mudigonda
Date: _____

LENDER: Aileron Investment Management, LLC

By_____
   Joseph Bonora
Date: 12/21/15

7

TetraTech_002902

Project #34878

## ATTACHMENT B
### FUNDS CONTROL & INSPECTION SERVICES AGREEMENT
### W/ COMPLETION COMMITMENT
LENDER – Aileron Investment Management, LLC
PROJECT – Best Western Premier Denver

It is understood by all parties that Tetra Tech, Inc. (Tt, Inc.) has committed to Aileron Investment Management, LLC through Attachment A to act as the General Contractor for the Best Western Premier Denver project should Kumar Construction Management, Inc. not be able to complete the project. Attachment A details the requirements to be met as part of this commitment. The intent of Attachment B is to clarify Paragraph 7 of the Standard Funds Control and Inspection Agreement for this project. By the signatures noted below of all parties, this Attachment supercedes paragraph 7.

7. The inspections performed by Tt, Inc are not the equivalent of, nor a substitute for, architectural supervision or inspections by the owner. Tt, Inc. does not contract or guarantee that the construction as performed by Kumar Construction Management, Inc. is built in accordance with all the project approved plans and specifications or in accordance with pertinent building codes, ordinances and regulations. Tt, Inc.'s responsibility shall be to periodically determine the percentage of completion of the project and deliver payments from the Construction Fund in accordance to the terms of the Agreement. As part of this service, Tt, Inc. will confirm that the required inspections to be performed by the local jurisdiction and the inspections required by the contracts have been completed as required.

7a. Should Kumar Construction Management, Inc. default prior to completion of the project and in accordance with the requirements of Attachment A, Tt, Inc. will guarantee the completion of the project and said work performed by Tt, Inc. will be in accordance with the approved plans, specifications, pertinent building codes, ordinances and regulations and for the amount. Should it be encountered that work previously performed by Kumar Construction Management, Inc. did not meet said plans but has no impact on the issuance of the Certificate of Occupancy, Tt, Inc. will notify both the Owner and Aileron Investment Management, LLC for a decision to correct. Should the work be such that the Certificate of Occupancy is withheld, Tt, Inc. will notify the Owner and Aileron Investment Management, LLC and provide a cost to correct.

OWNER: WPB Hospitality, LLC

By _Wanda Bertin_
  Wanda Bertoia
Date: _12-21-2015_

CONTRACTOR: Kumar Construction Management, Inc.

By _____
  Neil Kumar Mudigonda
Date: _12/21/15_

CONTROL SERVICES: Tetra Tech, Inc.

By _____
  Angela Halvorsen, Operations Manager
Date: _____

LENDER: Aileron Investment Management, LLC

By _____
  Joseph Bonora
Date: _____

8

TetraTech_002903

Project #34878

### ATTACHMENT B
### FUNDS CONTROL & INSPECTION SERVICES AGREEMENT
### W/ COMPLETION COMMITMENT
LENDER – <u>Aileron Investment Management, LLC</u>
PROJECT – <u>Best Western Premier Denver</u>

It is understood by all parties that Tetra Tech, Inc. (Tt. Inc.) has committed to <u>Aileron Investment Management, LLC</u> through Attachment A to act as the General Contractor for the <u>Best Western Premier Denver</u> project should <u>Kumar Construction Management, Inc.</u> not be able to complete the project. Attachment A details the requirements to be met as part of this commitment. The intent of Attachment B is to clarify Paragraph 7 of the Standard Funds Control and Inspection Agreement for this project. By the signatures noted below of all parties, this Attachment supercedes paragraph 7.

7. The inspections performed by Tt, Inc. are not the equivalent of, nor a substitute for, architectural supervision or inspections by the owner. Tt, Inc. does not contract or guarantee that the construction as performed by <u>Kumar Construction Management, Inc.</u> is built in accordance with all the project approved plans and specifications or in accordance with pertinent building codes, ordinances and regulations. Tt, Inc.'s responsibility shall be to periodically determine the percentage of completion of the project and deliver payments from the Construction Fund in accordance to the terms of the Agreement. As part of this service, Tt, Inc. will confirm that the required inspections to be performed by the local jurisdiction and the inspections required by the contracts have been completed as required.

7a. Should <u>Kumar Construction Management, Inc.</u> default prior to completion of the project and in accordance with the requirements of Attachment A, Tt, Inc. will guarantee the completion of the project and said work performed by Tt, Inc. will be in accordance with the approved plans, specifications, pertinent building codes, ordinances and regulations and for the amount. Should it be encountered that work previously performed by <u>Kumar Construction Management, Inc.</u> did not meet said plans but has no impact on the issuance of the Certificate of Occupancy, Tt, Inc. will notify both the Owner and <u>Aileron Investment Management, LLC</u> for a decision to correct. Should the work be such that the Certificate of Occupancy is withheld, Tt, Inc. will notify the Owner and <u>Aileron Investment Management, LLC</u> and provide a cost to correct.

OWNER: WPB Hospitality, LLC

By_____
  Wanda Bertoin
Date:_____

CONTRACTOR: Kumar Construction Management, Inc.

By_____
  Neil Kumar Mudigonda
Date:_____

CONTROL SERVICES: Tetra Tech, Inc.

By_____
  Angela Halvorsen, Operations Manager
Date:_____

LENDER: Aileron Investment Management, LLC

By_____
  Joseph Bonora
Date: _12/21/15_

8

**ATTACHMENT C**
**FUNDS CONTROL & INSPECTION SERVICES AGREEMENT**
**W/ COMPLETION COMMITMENT**
LENDER – Aileron Investment Management, LLC
PROJECT – Best Western Premier Denver

**INDEMNITY:** THE LENDER, OWNER AND CONTRACTOR EACH AGREES, TO THE FULLEST EXTENT PERMITTED BY LAW, TO INDEMNIFY AND HOLD HARMLESS TETRA TECH, INC., ITS OFFICERS, DIRECTORS, EMPLOYEES AND SUB CONSULTANTS AGAINST ALL DAMAGES, LIABILITIES OR COSTS, INCLUDING REASONABLE ATTORNEYS' FEES AND DEFENSE COSTS, TO THE EXTENT CAUSED BY , RESPECTFULLY, THE LENDER'S, OWNER'S OR CONTRACTOR'S BREACH OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THAT OF ITS SUB CONSULTANTS OR ANYONE FOR WHOM THE LENDER, OWNER OR CONTRACTOR IS LEGALLY LIABLE.

TETRA TECH, INC., AGREES, TO THE FULLEST EXTENT PERMITTED BY LAW TO INDEMNIFY AND HOLD HARMLESS THE LENDER, OWNER AND CONTRACTOR, THEIR OFFICERS, DIRECTORS, EMPLOYEES AND SUB CONSULTANTS AGAINST ALL DAMAGES, LIABILITIES OR COST, INCLUDING REASONABLE ATTORNEYS' FEES AND DEFENSE COSTS, TO THE EXTENT CAUSED BY TETRA TECH, INC.'S BREACH OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE ACTS OF ITS CONTRACTORS, SUBCONTRACTORS OR CONSULTANTS OR ANYONE FOR WHOM TETRA TECH, INC. IS LEGALLY LIABLE.

NEITHER TETRA TECH, INC., NOR THE LENDER, OWNER OR CONTRACTOR SHALL BE OBLIGATED TO INDEMNIFY THE OTHER PARTY IN ANY MANNER WHATSOEVER FOR THE OTHER PARTY'S OWN NEGLIGENCE OR WILLFUL MISCONDUCT.

OWNER: **WPB Hospitality, LLC**          CONTRACTOR: Kumar Construction Management, Inc.

By _Wanda Bertoia_                     By _____
   Wanda Bertoia                         Neil Kumar Mudigonda
Date: 12-21-2015                       Date: 12/21/15


CONTROL SERVICES:  Tetra Tech, Inc.    LENDER: Aileron Investment Management, LLC

By _____            By _____
   Angela Halvorsen, Operations Manager     Joseph Bonora
Date: _____                        Date: _____

9

Project #34878

## ATTACHMENT C
### FUNDS CONTROL & INSPECTION SERVICES AGREEMENT
### W/ COMPLETION COMMITMENT
LENDER – <u>Aileron Investment Management, LLC</u>
PROJECT – <u>Best Western Premier Denver</u>

**INDEMNITY:** THE LENDER, OWNER AND CONTRACTOR EACH AGREES, TO THE FULLEST EXTENT PERMITTED BY LAW, TO INDEMNIFY AND HOLD HARMLESS TETRA TECH, INC., ITS OFFICERS, DIRECTORS, EMPLOYEES AND SUB CONSULTANTS AGAINST ALL DAMAGES, LIABILITIES OR COSTS, INCLUDING REASONABLE ATTORNEYS' FEES AND DEFENSE COSTS, TO THE EXTENT CAUSED BY , RESPECTFULLY, THE LENDER'S, OWNER'S OR CONTRACTOR'S BREACH OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THAT OF ITS SUB CONSULTANTS OR ANYONE FOR WHOM THE LENDER, OWNER OR CONTRACTOR IS LEGALLY LIABLE.

TETRA TECH, INC., AGREES, TO THE FULLEST EXTENT PERMITTED BY LAW TO INDEMNIFY AND HOLD HARMLESS THE LENDER, OWNER AND CONTRACTOR, THEIR OFFICERS, DIRECTORS, EMPLOYEES AND SUB CONSULTANTS AGAINST ALL DAMAGES, LIABILITIES OR COST, INCLUDING REASONABLE ATTORNEYS' FEES AND DEFENSE COSTS, TO THE EXTENT CAUSED BY TETRA TECH, INC.'S BREACH OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE ACTS OF ITS CONTRACTORS, SUBCONTRACTORS OR CONSULTANTS OR ANYONE FOR WHOM TETRA TECH, INC. IS LEGALLY LIABLE.

NEITHER TETRA TECH, INC., NOR THE LENDER, OWNER OR CONTRACTOR SHALL BE OBLIGATED TO INDEMNIFY THE OTHER PARTY IN ANY MANNER WHATSOEVER FOR THE OTHER PARTY'S OWN NEGLIGENCE OR WILLFUL MISCONDUCT.

OWNER: WPB Hospitality, LLC                    CONTRACTOR: Kumar Construction Management, Inc.

By_____                    By_____
  Wanda Bertoia                                     Neil Kumar Mudigonda
Date: _____                                Date: _____

CONTROL SERVICES:  Tetra Tech, Inc.            LENDER: Aileron Investment Management, LLC

By_____                    By_____
  Angela Halvorsen, Operations Manager             Joseph Bonora
Date: _____                                Date: _12/24/15_

9

TetraTech_002906

ATTACHMENT D
FUNDS CONTROL & INSPECTION SERVICES
AGREEMENT W/ COMPLETION COMMITMENT
LENDER – _Aileron Investment Management, LLC_
PROJECT – _Best Western Premier Denver_

Project #34878

 **TETRA TECH**

September 29, 2015

Joe Bonora
Reid Jaeger
Aileron
5510 W. La Salle St., 3rd Floor
Tampa, FL 33607

Subject:     34878 – Best Western Premier Denver, Denver, Colorado – Initial Project Review
             Report

Dear Mr. Bonora & Mr. Jaeger:

Tetra Tech Inc. is pleased to present an Initial Project Review Report for the ground up project
known as Best Western Premier Denver, located in Denver, Colorado. The report is based on
our review of documents provided by Aileron and/or their clients or agents.

The Completion Commitment Program (CCP) may be issued for the project. In order to qualify
for the program, comments and requirements noted in our Initial Project Review must be
satisfactorily addressed.

The Funds Control Agreement (FCA) identifies additional requirements that the Contractor (and
Owner) are responsible for as part of the Completion Commitment. These include, but are not
limited to:     Agreed

- The Contractor will need to include an assignment clause in all subcontract agreements.
  The subcontract agreements will be assigned to the Owner, Lender or designated
  agents in the event of a Contractor default or termination.

- Tetra Tech will be advised and consulted before any contingency is released and before
  change orders are approved.

- All payments to subcontractors, suppliers and vendors will be made following Tetra
  Tech's funds control procedures.

- Provide a copy of the drawings approved by the Authority Having Jurisdiction for our
  record and file.

- Copies of any of the proposals/subcontracts need to be provided to Tetra Tech if
  requested.

The construction contract is an industry standard form of agreement from the AIA family of
construction documents. A number of revisions and clarifications are required in order to
comply with Completion Commitment requirements.

Construction Management Division
56835 Venture Ln. Suite 204; Sunriver, OR  97707
Tel 541-593-3600 Fax 541-593-3604 www.tetratech.com

TetraTech_002907

Project No. 34878                    Best Western Premier Denver              September 29, 2015

Joe Bonora
Reid Jaeger
Alleron
Page 2 of 2

Project scope is defined by well developed drawings and specifications, which will be more clearly enumerated in the construction contract.  Permit records and hotel franchise plan review comments were not received, and could impact scope.  We recommend design professionals of record verify utility availability and required capacities.  Soil bearing properties, existing conditions, and building mass present some challenges, and we recommend the geotechnical and structural engineers remain involved with the project during construction phase activities. Site development and foundation work may encounter winter conditions, which appear to be considered in General Conditions, but could still impact scope.

Proposed project costs are below our total projection, but within a standard deviation.  Unit costs are somewhat below average, and margin costs constitute ten percent (10%) of total costs, which is at the lower end of a typical range.  Contractor will provide additional line item detail and cost estimate backup as outlined in our report.  Agreed.

Duration is reasonable with good management and favorable weather.  Contract includes liquidated damages.  We recommend that duration details on the Tetra Tech bid sheet, contract, and Contractor's schedule be reconciled.

Mr. Bonora & Mr. Jaeger, Tetra Tech Inc. appreciates the opportunity to provide you this report. We recommend you provide a copy of this report to the Owner so that it is discussed with the Contractor.  If you have any questions or wish to discuss this report further, please feel free to contact our office at (541) 593-3600.

Sincerely,

Aaron Bartel – Construction Analyst

C:      Tracey Benson, Disbursement Agent – Tracey.benson@tetratech.com

A. Project Information:

Alleron – J. Bonora & R. Jaeger                                                                          2

TetraTech_002908

Project No. 34878                Best Western Premier Denver                September 29, 2015

**Owner:**
WPB Hospitality, LLC
16161 E. 40th Ave.
Denver, CO 80239
Contact: Wanda Bertoia
Tel.: 303-371-5696
Email: oneda@netzero.net

**General Contractor:**
Kumar Construction Management
444 Roosevelt Rd., Suite 33
Lombard, IL 60148
Contact: Neil Kumar Mudigonda
Tel.: 469-404-6958
Email: kumar@kumarcm.com

**Project:**
Best Western Premier Denver
16161 E. 40th Ave.
Denver, CO 80239

**Architect:**
Will Rogers/ Associated Architects
4155 E Jewell Suite 814
Denver CO 80222
Tel.:
Email:

**Description:**

Scope to be completed under construction agreement terms will be a 88,691 square foot hospitality project and associated site improvements. The project will consist of two separate, compartmentalized buildings that share a common area separation wall. Building A will be light metal frame with 14,352 square feet containing a conference center, pool, exercise room and lobby / media area. Building B will be 74,339 square feet, with six floors containing 144 guest rooms. Building B will be mass concrete and unit masonry, with some light metal and glass block masonry infill. Access to upper floors will be provided by two elevators. Egress will be via stair towers located at opposite ends of a central corridor. Exterior cladding will consist of cement stucco and brick masonry. Guestroom windows will be vinyl frame. Common area windows and doors will be aluminum frame storefront. Guest rooms will be conditioned by through wall units. Most common areas will be served by central HVAC. The building will be protected by a built-up roof on tapered insulation over metal decking or concrete planks. Structural elements will incorporate fire resistive construction, and the entire building(s) will be sprinkled.

**B. Project Documents:**

1. **AIA Document A101-2007 Standard Form of Agreement Between Owner and Contractor** *where the basis of payment is a Stipulated Sum.* Contract is dated May 5, 2015 and is signed by both parties. Contract is between the Owner, WPB Hospitality, 5466 S Hannibal Ct., Centennial, CO 80015, and the Contractor, Kumar Construction

Aileron – J. Bonora & R. Jaeger                                                                  3

TetraTech_002909

Project No. 34878                    Best Western Premier Denver                    September 29, 2015

Management Inc, 3108 S Rte 59 Ste 124-116, Naperville IL 60585, for the project Best Western Premier – Denver Airport, 16161 E 40th Ave, Denver CO. The Architect is Will Rogers, Associated Architects, 4155 E Jewell Suite 814, Denver, CO 80222. Contract value is a stipulated sum of eleven million four hundred thousand dollars ($11,400,000.00). We revised the Contract to 9,900,00.00 to include only the Construction Portion of work. (FFE is pulled out of the contract)

2. **Contract Documents**

   ▪ **AIA Document A101-2007 Standard Form of Agreement Between Owner and Contractor** Nine (9) pages.

   ▪ **AIA Document A201-2007 General Conditions of the Contract for Construction (Not Received).**

   ▪ **Exhibit A**

   ▪ **Drawings By AA & Specifications By AA** All Architectural, Structural, MEP, Civil Drawing and Specs By Associated Architects Dated March 2015. 200 pages.

3. **Project Drawings**

   ▪ **Architectural Drawings.** Forty five (45) pages presented on Associated Architects title block with Best Western dated April 28, 2014. Drawings are titled A New 144 RM Best Western for Alpine Hospitality, Inc., Denver, Colorado and do not exhibit Professional Engineer's seal or signature.

   ▪ **Civil Drawings.** Two (2) pages presented on Associated Architects title block with Best Western dated April 28, 2014. These drawings are titled A New 144 RM Best Western for Alpine Hospitality, Inc. and do not exhibit seal or signature.

   Fifteen (15) pages presented on Vermillion Peak Engineering title block dated July 31, 2014. Drawings are titled Best Western – Gateway Park and are stamped by a Professional Engineer.

   Three (3) pages presented on Associated Architects title block dated July 22, 2014. Drawings are titled Bestwestern – Gateway Park and are stamped by a Professional Engineer.

   ▪ **Fire Protection Drawing.** One (1) page presented on Associated Architects title block with Best Western dated April 28, 2014. Drawings are titled A New 144 RM Best Western for Alpine Hospitality, Inc. and do not exhibit seal or signature.

   ▪ **Fire Suppression Drawings.** Five (5) pages presented on Tundra Design Group title block with a latest revision date of July 14, 2014. Drawings are titled Best Western – DIA and do not exhibit seal and/or signature.

   ▪ **Landscape Plans & Details.** Two (2) pages presented on Associated Architects title block with Michael L Stahl, Inc. and Best Western dated April 28, 2014. Drawings are titled A New 144 RM Best Western for Alpine Hospitality, Inc. and do not exhibit seal or signature.

   ▪ **Kitchen Details / Drawings.** Five (5) pages presented on CaptiveAire title block dated June 9, 2014. Drawings are titled Best Western DIA, Denver, CO and do not exhibit seal and/or signature.

   Five (5) pages presented on Tundra Restaurant Planning, Design & Project Management title block with a most recent revision date of July 14, 2014. Drawings are titled Best Western – DIA and do not exhibit seal and/or signature.

Aileron – J. Bonora & R. Jaeger                                                    4

- **Electrical Drawings.** Thirty three (33) pages presented on Associated Architects title block with JCAA Consulting Engineers, LLC and Best Western dated April 28, 2014. Drawings are titled A New 144 RM Best Western for Alpine Hospitality, Inc. and do not exhibit seal and/or signature.

- **Mechanical Drawings.** Sixteen (16) pages presented on Associated Architects title block with JCAA Consulting Engineers, LLC and Best Western dated April 28, 2014. Drawings are titled A New 144 RM Best Western for Alpine Hospitality, Inc and do not exhibit seal and/or signature.

- **Plumbing Drawings.** Twenty two (22) pages presented on Associated Architects title block with JCAA Consulting Engineers, LLC and Best Western dated April 28, 2014. Drawings are titled A New 144 RM Best Western for Alpine Hospitality, Inc and do not exhibit seal and/or signature.

- **Structural Drawings.** Fourteen (14) pages presented on Associated Architects title block with Astra Engineering and Best Western with a most recent revision date of May 22, 2014. Drawings are titled A New 144 RM Best Western for Alpine Hospitality, Inc. and do not exhibit seal and/or signature.

  Three (3) pages presented on Associated Architects title block with Astra Engineering and Best Western with a most recent revision date of January 3, 2015. Drawings are titled A New 144 RM Best Western for Alpine Hospitality, Inc. and exhibit seal and signature of Professional Engineer.

4. **Schedule of Values**

- **Kumar Construction Management, Inc Construction Cost Breakdown** One (1) page dated August 27, 2015. Schedule contains thirty seven (37) line items including profit and insurance. Total value is $9,900,000.00, which matches the Tetra Tech bid sheet but does not match the construction contract value.

5. **Geotechnical Report**   We revised the Contract to
   9,900,00.00 to include only the

- **Subsurface Exploration Program Geotechnical and Pavement Recommendations** (Forty nine (49) pages dated March 13, 2008. Prepared by Ground Engineering Consultants Inc. for Ms. Wanda Bertoia at Alpine Hospitality regarding the project Best Western at DIA, East 40th Avenue and Memphis Court, Denver, Colorado.

- **Ground Engineering Consultants, Inc.** Memo to Ms. Wanda Bertoia, Alpine Hospitality. One (1) page dated January 13, 2015. Stamped and signed by Amy Crandall, Professional Engineer.

- **Ground Engineering Consultants, Inc.** Memo to Ms. Wanda Bertoia, Alpine Hospitality. Two (2) pages dated March 27, 2015. Stamped and signed by Amy Crandall, Professional Engineer.

6. **Other Documents**

- **Kitchen Equipment Details** One hundred (100) pages.

- **Tundra Specialties Design Group Specifications** Nineteen (19) pages dated July 14, 2014.

- **U.S. Cooler Quotation** Restaurant Supply Three (3) pages dated July 30, 2014.

- **Russell Low Profile Unit Cooler** Eight (8) pages informational flyer

Alleron – J. Bonora & R. Jaeger                                                                                          5

- **Russell Extra Low Profile Unit Cooler** Four (4) pages informational flyer
- **U.S. Cooler Walk-In Cooler and Freezer Manual** Sixteen (16) pages
- **Project Manual Including Specifications for construction of A New 144 Room Best Western Alpine Hospitality, Inc.** Seven hundred two (702) pages dated September 24, 2008.
- **Food and/ or Beverage Uses Questionnaire** One (1) page.
- **Sample Menu** Two (2) pages.
- **Sewer Use and Drainage Permit Application** One (1) page.
- **Swimming Pool Information Sheet** One (1) page.
- **Excel Sheet** Hard Costs and FF&E Budget.
- **Excel Sheet** Best Western Denver Airport – Preliminary Schedule
- **A305** *Contractor's Qualification Statement*
- **Kumar Construction Management, Inc. Financial Statements dated December 31, 2014.** Four (4) pages.
- **Kumar Construction Management, Inc. Financial Statements dated August 31, 2015.** Four (4) pages.
- **Kumar Construction Management, Inc. Flyer** Two (2) pages.
- **Neil Kumar Mudigonda Resume** Five (5) pages.
- **Phase I Environmental Site Assessment** Two hundred seventy (270) pages dated July 31, 2015. Prepared by Metropolitan Solutions for Aileron Investment US Employment regarding the Commercial Building at 16161 East 40th Avenue, Denver, CO 80231.

C. **Recommendations & Comments:**

1. **AIA Document A101-2007 Standard Form of Agreement Between Owner and Contractor** *where the basis of payment is a Stipulated Sum* is a recognized industry standard form of agreement from the AIA family of documents. The agreement reviewed appears to be a reproduction – AIA crest and footer text are grayscale, and changes do not exhibit tracking marks. We did not receive an Additions and Deletions Report, or Certificate of Authenticity. The agreement has been executed by both parties.

   a. Names and address shown on the Tetra Tech bid sheet will be used for Funds Control agreement(s) and correspondence. We noted a discrepancy between the contract and bid sheet in Owner and Contractor addresses, which will be reconciled.

   b. AIA A201-2007 General Conditions of the Contract for Construction is a referenced contract document. A project specific copy of the General Conditions will be distributed to the parties for reference during construction.

   c. Article 3 states that commencement will be the day on which work on Foundations shall start. We recommend that work not begin until permits and funding are secured and that a written notice to proceed be issued by Owner. Please provide a copy of the written notice or affidavit of commencement for our files. *Agreed*

Aileron – J. Bonora & R. Jaeger                                                                                6

Project No. 34878                    Best Western Premier Denver                    September 29, 2015

   d.  Substantial completion date is set for 460 days, which is a little over fifteen (15)
        months, and does not match the Tetra Tech bid sheet.  The contractor has issued
        and will regularly update a project schedule, which shows a slightly shorter duration.
        Liquidated damages are included in the contract.  In the event Tetra Tech is required
        to complete the project, the liquidated damage clause shall not apply.
                    *PLease Plan on the Project to run 15 months*
   e.  The Tetra Tech bid sheet lists thirteen (13) month duration with thirteen (13) draws
        and twelve (12) inspections.  We recommend that bid sheet and contract duration be
        reconciled.  Draws and inspections can be added during construction as required.  *13 draws OK*

   f.   The contract value is a stipulated sum of $11,400,000.00.  Contract value does not
        match the Tetra Tech bid sheet or the schedule of values due to FF&E costs
        included in the contract sum.  No unit prices are listed.  Several alternates are stated
        as allowances, and Exhibit A is cited in Article 4.4.  We recommend that Contractor's
        monthly General Conditions cost be listed in Article 4.3.  *Contract Value is 9.9 Million. The rest is agreed.*

   g.  Article 5 states that progress payments will be submitted on the 25th of each month,
        for payment by the 10th of the following month.  Contractor will submit a draft
        payment application and continuation sheet for review.  *Agreed*

        Tetra Tech will typically process complete and accurate Applications for Payment
        within 7-10 business days.  A conference call will be held to review Application for
        Payment procedures, policies, documentation and timing that are required by the
        Lender.  A packet of information will be provided from Tetra Tech Inc. to all parties
        prior to the call.  Each line item is reviewed on a percent complete basis.  Final
        Payment provisions will be discussed during the conference call with the
        Disbursement Agent.  *Agreed. But MAterials only Suppliers typically do not agree to retainages.*

        Payment processing period will be measured from the date a complete and
        compliant draw package is received by Tetra Tech.  *Agreed*

   h.  The term Architect has been replaced with Owner / Bank in Article 5 Payments.
        Removal of the Architect's role in payment application review may have other
        important contract administration impacts, and could conflict with other Contract or
        General Conditions requirements.  *This will remain the same. Architect shall not Sign any Draws.*

   i.   Article 5.1.6 calls for ten percent (10%) retainage on labor and materials, which
        matches Completion Commitment requirements.  Article 5.1.8 states that material
        suppliers will not be subject to retention requirements.  In order to comply with this
        contract provision, contractor and subcontractors will need to present labor and
        material invoices separately.  Lender approval of full material payments will also be
        required.  *We are only concerned about Direct Suppliers such as Windows, Doors, Marble, Etc..*

   j.   Article 5.2 Final Payment will be amended to require that the project receive a *Final
        Occupancy Certificate*.  We recommend that the Owner not take possession of any
        improvements until the Final Certificate of Occupancy has been issued.
        *Typically, Franchise and City take their time to give Final Ocupancy, this will impact Opening of Hotel.*
   k.  Article 6.1 Initial Decision Maker form field is marked TBD.  Prior to commencement,
        the parties will agree upon an Initial Decision Maker, who will be the Architect, or a
        neutral individual not party to the construction agreement.  Binding dispute
        resolution, temporary suspension, and termination terms are included in the contract.*Agreed*

   l.   Article 8.6 and/or AIA A201 Article 7 shall be amended to require Lender and Tetra
        Tech approval of any change to project scope or contract value.  *Agreed*

   m.  Reference to project drawings will be expanded.  Each drawing will be enumerated
        by sheet number, sheet title, and latest revision date.  Specifications will be listed by

Alleron – J. Bonora & R. Jaeger                                                                    7

TetraTech_002913

cover sheet title, cover sheet date, and each division title / number. We suggest this be accomplished by creation of a tabular exhibit that is referenced in Article 9.

n.  Article 10 lists General Liability insurance requirements.  Lender will verify that Contractor maintains worker's compensation insurance as required by law, and collect project specific insurance certificates. Work will be covered by a Builder's Risk policy that includes all project scope, including any Owner provided FF&E.  Agreed

o.  Article 13 of the Contract General Conditions allows the Owner to assign the contract to the Lender without the Contractor's consent. All subcontractor agreements shall include a clause that assigns the subcontract to the Owner in the event of Contractor default or termination.  Contractor will provide a sample agreement.  Termination without cause or with prejudice not included.

2.  Project scope is defined by well developed construction drawings and written specifications.  Drawings do not exhibit professional seal, and permit records have not been received.  We received a project specific geotechnical report, environmental review, and Contractor qualification statement.  Utility verifications and hotel plan plan review were not received.  Plan review comments, permit requirements, or additional design development could impact scope.  We recommend the Owner and Contractor review final permit approved drawings prior to commencement, and update pricing as required.  Utility Verification is on Site Plans. Permits are ready to be picked up pending fee payments.

a.  Architectural drawings define basic project scope and include provisions typical of a commercial or hospitality plan set, including project data, code and occupancy review, layouts, sections, elevations, finishes, and details.  We recommend the Lender verify that the Hotel Brand has reviewed and approved drawings.  Franchise is in the loop for several

b.  Mechanical, Electrical, and Plumbing (MEP) drawings appear to have been prepared under a single consulting engineer, and should be fairly well coordinated. Agreed years.

c.  Project geotechnical report has been supplemented with two addenda, which were issued prior to the Contractor's final schedule of values.  The addenda discuss recommendations for a six foot lens of structural fill under building footings, which are fairly large due to a comparatively low allowable soil bearing pressure.  The hotel tower structure is massive due to construction type, and will impose significant loads on bearing soils.  Some degree of differential movement and/or settlement should be anticipated.  We recommend that the Contractor verify that over-excavation and structural fill requirements have been considered.  Owner should review settlement and differential movement expectations with the Architect of Record, and discuss potential impacts on building structure, exterior veneer, service life, and maintenance / repair requirements.  We also recommend that the geotechnical engineer review final permit approved foundation designs, as well as observe site development and foundation excavations.  Unforeseen soil conditions or poor weather could impact site development and foundation scope.  Will get back on this. I believe this has been part of Bid Docs with Subs.

d.  Civil drawings define site work scope, and include paving as well as utility designs.  Utility verifications were not received.  Civil drawings include existing wet utility locations and connections.  However other utilities such as natural gas, power, phone, and cable service are not shown on drawings.  We recommend the Civil and MEP engineers of record review existing system capacities, and verify that project requirements can be met without significant infrastructure development.  We also recommend the Owner verify that utilities not shown on Civil drawings will be placed by service providers.  All utilies are on site. Surrounding streets are fully developed.

TetraTech_002914

Project No. 34878                    Best Western Premier Denver                    September 29, 2015

   e.  We recommend that the Owner and Contractor jointly produce a matrix that defines FF&E responsibilities, including purchase, delivery, storage, and installation. We also recommend the Lender verify Owner has access to additional funds for work and materials outside contract scope.

   f.  Roofing system shown on project drawings appears to be a modified built up roof, while specifications call for a ballasted single ply. We recommend the Contractor clarify which system is included, and that the Owner review with Architect of Record. *TPO 80 Mil Or EPDM*

   g.  Project drawings and specifications call for three-coat cement stucco veneer. Contractor's Schedule of Values includes a line for Exterior Insulation and Finish System (EIFS). Detail drawings graphically illustrate EIFS. The specified system (stucco) carries a higher unit cost. We recommend the Contractor clarify cladding system scope, and that Owner review Contractor's response with Architect of Record. *EIFS is better than Stucco. Without any Doubt.*

   h.  Project duration will take work through winter conditions. Contractor has included heat and winter conditions in the General Conditions line. However, inclement or abnormal weather could impact scope and costs. *We are ok with Gen Conditions.*

3.  Contractor's proposed project budget is within ten percent (10%) of our overall projection. Square foot and room count costs are at the lower end of a range we typically encounter for mid-rise tower hospitality development. The Contractor will submit a draft payment application and continuation sheet with additional breakdown detail, as well as cost estimate backup for lines highlighted light gray on our cost review worksheet. *Agreed.*

   a.  Contractor's profit and insurance costs are below an average percentage of overall project value. Margin costs, which include General Conditions, Overhead & Profit (O&P), Insurance, and Taxes typically account for seven to fifteen percent (7-15%) of total project costs, and General Conditions are usually balanced with O&P. In this case, Contractor's Profit constitutes only four percent (4%) of project costs, and is two percent (2%) below General Conditions. Total margin costs account for ten percent (10%) of overall project costs.

   b.  Contractor will provide a more detailed breakdown of General Conditions costs for reference should the project continue beyond scheduled duration due to conditions outside the Contractor's control. *Agreed*

   c.  General Conditions appear to include a contingency. We recommend against contingencies under Stipulated Sum contract formats. Should the Lender elect to allow the contingency, we recommend any use of these funds require Lender approval. We also recommend that contingency funds only be used for contract scope, and be reallocated as necessary, as opposed to allowing the Contractor to draw on contingency directly. *This is a Typo on the Spreadsheet. What was meant was a general fund for Misc Labor.*

   d.  Contractor's Sitework line will be broken down to include distinct tasks and scope. For instance, each site utility will be carried on a separate line. Site concrete such as flatwork, curbs, and gutters will also be separated. Rough Grading and Mass Excavation will be defined, and Paving will be carried as a separate line. Any additional detail that can be provided will be of benefit to the Contractor during Funds Control Inspections. *Agreed. But We have a Single Subcontractor for all Underground Sitework.*

   e.  Three allowances are declared on the Contractor's schedule of values, however two of these values – Light Fixtures and Plumbing Fixtures are lumped into Electrical and

Alteron – J. Bonora & R. Jaeger                                                                                  9

Plumbing lines. All Allowances will be carried as separate lines to allow tracking of percentage used.  Agreed

f.  Contractor will separate PTAC units from ducted HVAC, and provide cost estimate backup for both lines.  Agreed

g.  Cost estimate back-up may consist of signed, lump sum subcontractor agreements, close dated cost proposals, material supplier quotes, or cost estimating worksheets for self-performed work.  Agreed

## D. Summary

Best Western Premier Denver, located in Denver, Colorado, will be a 88,691 square foot hospitality project and associated site improvements to be completed under terms of an industry standard AIA construction agreement.

Owner and Contractor addresses will be reconciled between the Contract and Tetra Tech bid sheet. A project specific copy of Contract General Conditions will be generated and provided to all parties. Commencement and duration are defined in the agreement; provide a copy of Owner's notice to proceed. Duration is reasonable with good management and supervision; we recommend Tetra Tech bid sheet duration be reconciled with the Contract. Contract value is a stipulated sum that needs to be reconciled with the Tetra Tech bid sheet, and Lender's request for Tetra Tech FF&E funds control services clarified. Payment Application requirements should be compatible with Tetra Tech Funds Control Protocols, which shall govern. Contract terms will be modified to require the project receive a Final Occupancy Certificate or Permit prior to Final Payment, and an Initial Decision Maker will be selected prior to commencement. Contract will require Lender and Tetra Tech approval of changes in scope or costs. Lender will verify Contractor's insurance, and the project will be covered by a Builder's Risk policy.

Scope is defined by well developed drawings and specifications that are typical of other mid-rise hospitality projects we have reviewed. Drawings do not exhibit professional seal, and permit records have not been received. Agency or hotel brand plan review comments or additional design development could impact scope. We recommend that the Geotechnical Engineer of Record review final foundation and site development drawings, as well as observe sitework and foundation excavations. Soil engineering properties are challenging and the tower building is massive, which could lead to settlement and differential movement. Significant mass excavation and fill placement will be required, which could be impacted by weather. We recommend that Civil and MEP Engineers review utility availability and system capacities, and verify that project requirements can be met. We recommend the Owner and Contractor define FF&E responsibilities. We noted inconsistencies between drawings, specifications, and Contractor's line item titles, and we recommend that veneer and roofing scope be clarified.

Project budget is below our overall projection, but within a standard ten percent (10%) deviation. Unit costs are somewhat below average, and margin costs at the lower end of a typical range. Contractor will break down several lines and provide cost estimate backup. General Conditions appear to include a contract value contingency, which we recommend against. All allowances will be declared and carried as distinct lines. Costs are lower since, our overhead is lower and also that some of our subs are traveling

The Contractor and Owner will agree upon Overhead, Profit, and General Conditions costs to for us from Dalls,Texas  we have a much better pricing than most other Contractors be applied to changes in the work, as well as terms for extended general conditions should the project continue beyond programmed duration.

Finally, we recommend that the Owner and Contractor agree on general conditions, overhead, and profit margins for any changes to the scope of work, as well as terms for extended general conditions should the project continue beyond the programmed duration.

TetraTech_002916

Cost Review

![Tetra Tech logo] **TETRA TECH**

Contractor's Cost per Room   $48,250.00
Projected Cost per Room   $71,203.58

[ALLOW]   = lump sum includes Allowance
ALLOW   = Allowance

| Lender | Alheron |
|---|---|
| Borrower | WP8 Hospitality, LLC |
| Project No. | 14372 |
| Project | Bell Westin/Premier Denver |
| Contractor | Kienit Construction Management |
| Analyst | Aaron Bartel |
| Agent | Tracey Jepson |
| Date | 9.23.2015 |

| Item | Description of Work | SF | | Area | Unit | Cost/Area | Average Cost | Estimated Cost | SF |
|---|---|---|---|---|---|---|---|---|---|
| 01 | Financing | TBD | $50,000.00 | 1.00 | LS | $50,000 | $50,000 | $50,000.00 | 50% |
| 02 | Supervision/Man Labor | TBD | $373,000.00 | 1.00 | LS | $373,570 | $373,570 | $373,570.00 | 30% |
| | Legal & Medical | TBD | | 1.00 | LS | | $25,000 | $25,500.00 | |
| | Video Taping | TBD | | 1.00 | LS | | $50,000 | $35,500.00 | |
| | Site Insurance | TBD | | 1.00 | LS | | $75,000 | $35,000.00 | |
| | Commission/Fees | TBD | | 1.00 | LS | | $45,000 | $25,000.00 | |
| | Total | TBD | | 1.00 | LS | | $50,000 | $155,000.00 | |
| | Contingency | | | | | | | | |
| | General Conditions Total | 10% | $534,000.00 | | | | | $442,000.00 | |
| 03 | Foundations and Slab | 6% | $750,000.00 | 86693.00 | SQ FT | $750,000.00 | $825,278.00 | $875,278.00 | 100% |
| 04 | Elevator | 6% | $540,000.00 | 1.00 | LS | $540,000.00 | $632,400.00 | $632,400.00 | 100% |
| 05 | Plumbing | 8% | $750,000.00 | 86693.00 | SQ FT | $8.66 | $9.23 | $800,791.35 | 100% |
| 06 | Electrical | 8% | $750,000.00 | 86693.00 | [ALLOW] | $8.66 | $9.23 | $800,791.35 | 100% |
| 08 | Mechanical | 6% | $330,000.00 | 86693.00 | [ALLOW] | $3.81 | $3.61 | $313,146.00 | 100% |
| 10 | Masonry | 2% | $280,000.00 | 86693.00 | SQ FT | $2.89 | $3.25 | $308,432.85 | 96% |
| 11 | Precast Slabs | 6% | $550,000.00 | 1.00 | LS | $550,000.00 | $332,328.00 | $332,328.00 | 97% |
| 12 | Steel/Studs/Rough Carpentry | 6% | $800,000.00 | 86693.00 | SQ FT | $18.56 | $15.93 | $800,432.35 | 100% |
| | Fire Alarms | 3% | $340,000.00 | 86693.00 | SQ FT | $6.30 | $40,000.00 | $320,577.00 | 100% |
| 13 | Insulation | 1% | $90,000.00 | 86693.00 | SQ FT | $90,000.00 | $110,162.35 | $110,162.35 | 100% |
| 15 | Drywall | 6% | $390,000.00 | 86693.00 | SQ FT | $4.15 | $4.50 | $399,105.30 | 101% |
| 16 | Painting/Wall Paper Labor Only | 1% | $370,000.00 | 86693.00 | SQ FT | $3.35 | $3.45 | $370,603.95 | 100% |
| 17 | Lightweight Concrete | 1% | $390,000.00 | 86693.00 | SQ FT | $3.94 | $3.99 | $373,075.56 | 100% |
| 18 | Roofing | 2% | $380,000.00 | 42065.00 | SQ FT | $4.38 | $4.83 | $393,603.29 | 100% |
| 19 | Structural Steel | 6% | $550,000.00 | 86693.00 | SQ FT | $6.20 | $6.50 | $520,146.00 | 97% |
| 20 | Elevator [ALLOW] | 6% | $340,000.00 | 86693.00 | SQ FT | $18,333.33 | $395,000.00 | $346,000.00 | 100% |
| 21 | Windows | 1% | $35,000.00 | 150.00 | EA | $433.33 | $650.00 | $97,500.00 | 100% |
| | Glazing | 1% | $333,000.00 | 1.00 | LS | $333,000.00 | $328,448.00 | $328,448.00 | 93% |
| 23 | Light Steel | 1% | $370,000.00 | 1.00 | LS | $135,000.00 | $135,000.00 | $135,000.00 | 103% |
| 24 | Doors | 1% | $210,000.00 | 1.00 | LS | $210,000.00 | $214,300.00 | $214,300.00 | 102% |
| 25 | Vinyl Labor Only | 1% | $75,000.00 | 1.00 | LS | $75,000.00 | $75,000.00 | $75,000.00 | 100% |
| 26 | Carpet Labor Only | 1% | $75,000.00 | 1.00 | LS | $75,000.00 | $75,000.00 | $75,000.00 | 100% |
| 27 | Finish Carpentry | 3% | $700,000.00 | 86693.00 | SQ FT | $8.26 | $8.26 | $895,954.75 | 100% |
| 28 | Counter Tops | 1% | $75,000.00 | 1.00 | LS | $75,000.00 | $82,500.00 | $82,500.00 | 110% |
| 29 | Surrounds | 1% | $45,000.00 | 144.00 | SQ FT | $431.39 | $450.00 | $64,800.00 | 100% |
| 30 | Cabinets | 1% | $65,000.00 | 1.00 | ALLOW | $65,000.00 | $65,000.00 | $65,000.00 | 100% |
| 31 | Tubs | 1% | $60,000.00 | 1.00 | LS | $60,000.00 | $67,125.00 | $67,725.00 | 104% |
| 32 | FF&E | 9% | $450,000.00 | 23971.00 | SQ FT | $17.32 | $18.00 | $467,530.00 | 104% |
| 33 | Food and First Floor Specialties | 1% | $92,000.00 | 1.00 | LS | $92,000.00 | $92,000.00 | $92,000.00 | 104% |
| 34 | Misc Metal on Building | 1% | $32,000.00 | 1.00 | LS | $32,000.00 | $32,000.00 | $32,000.00 | 100% |
| 35 | Patio Cabana | 1% | $45,000.00 | 1.00 | LF | $45,000.00 | $45,000.00 | $45,000.00 | 100% |
| 36 | Misc Hardware | 1% | $70,000.00 | 1.00 | LF | $70,000.00 | $75,000.00 | $73,600.00 | 100% |
| | Labor & Materials | 90% | $8,945,000.00 | | | | | $9,557,415.54 | 100% |
| | Cost Less Insurance | 4% | $372,000.00 | | | | | $372,000.00 | |
| | Overhead, Fee, Overhead & Profit | 4% | $372,000.00 | | | | | $472,000.00 | |
| | Contract Total | 100% | $9,600,000.00 | 86693.00 | SQ FT | $110.73 | | $10,524,415.54 | 100% |
| | | | | | | $110.85 | | | |

# EXHIBIT C

## TO SECOND AMENDED COMPLAINT

### DENVER COUNTY DISTRICT COURT, STATE OF COLORADO

### CASE NO. 19CV33523

Case:18-18636-EEB   Doc#:184-2   Filed:03/20/19   Entered:03/20/19 11:31:55   Page1 of 21

The printed portions of this form, except differentiated additions, have been approved by the Colorado Real Estate Commission.
(CBS3-6-18) (Mandatory 1-19)

THIS FORM HAS IMPORTANT LEGAL CONSEQUENCES AND THE PARTIES SHOULD CONSULT LEGAL AND TAX OR
OTHER COUNSEL BEFORE SIGNING.

DATE FILED: November 6, 2019 2:28 PM
FILING ID: 2FD65BC2BB2E4

# CONTRACT TO BUY AND SELL REAL ESTATE
## (COMMERCIAL)
(☑ Property with No Residences)
( ☐ Property with Residences-Residential Addendum Attached)

Date: February 27, 2019

<div align="center">

**AGREEMENT**

</div>

1.   **AGREEMENT.** Buyer agrees to buy and Seller agrees to sell the Property described below on the terms and conditions set forth in this contract (Contract).

2.   **PARTIES AND PROPERTY.**

    2.1.   **Buyer.** Frisco Acquisition, LLC _____ (Buyer) will take title to the Property described below as ☐ **Joint Tenants** ☐ **Tenants In Common** ☐ **Other** _____

    2.2.   **No Assignability.** This Contract **IS NOT** assignable by Buyer unless otherwise specified in **Additional Provisions**.

    2.3.   **Seller.** WPB Hospitality, LLC, a Colorado Limited Liability Company _____ (Seller) is the current owner of the Property described below.

    2.4.   **Property.** The Property is the following legally described real estate in the County of Denver _____, Colorado:

**as fully defined in Exhibit A attached hereto, and incorporated by reference as if set forth in full,**

known as No. 16161 E. 40th Avenue _____ Denver _____ Colorado _____ 80329 _____.
    Street Address               City          State         Zip

together with the interests, easements, rights, benefits, improvements and attached fixtures appurtenant thereto and all interest of Seller in vacated streets and alleys adjacent thereto, except as herein excluded (Property).

    2.5.   **Inclusions.** The Purchase Price includes the following items (Inclusions):

        2.5.1.   **Inclusions - Attached.** If attached to the Property on the date of this Contract, the following items are included unless excluded under **Exclusions**: lighting, heating, plumbing, ventilating and air conditioning units, TV antennas, inside telephone, network and coaxial (cable) wiring and connecting blocks/jacks, plants, mirrors, floor coverings, intercom systems, built-in kitchen appliances, sprinkler systems and controls, built-in vacuum systems (including accessories), garage door openers (including _____ remote controls). If checked, the following are owned by the Seller and included (leased items should be listed under **Due Diligence Documents**): ☑ **None** ☐ **Solar Panels** ☐ **Water Softeners** ☐ **Security Systems** ☐ **Satellite Systems** (including satellite dishes). If any additional items are attached to the Property after the date of this Contract, such additional items are also included in the Purchase Price.

        2.5.2.   **Inclusions – Not Attached.** If on the Property, whether attached or not, on the date of this Contract, the following items are included unless excluded under **Exclusions**: storm windows, storm doors, window and porch shades, awnings, blinds, screens, window coverings and treatments, curtain rods, drapery rods, fireplace inserts, fireplace screens, fireplace grates, heating stoves, storage sheds, carbon monoxide alarms, smoke/fire detectors and all keys.

        2.5.3.   **Personal Property - Conveyance.** Any personal property must be conveyed at Closing by Seller free and clear of all taxes (except personal property taxes for the year of Closing), liens and encumbrances, except _____. Conveyance of all personal property will be by bill of sale or other applicable legal instrument.

        2.5.4.   **Other Inclusions.** The following items, whether fixtures or personal property, are also included in the Purchase Price:

Exhibit A - 0001

Motion to Dismiss Ex. C-000001

54      **2.5.5.  Parking and Storage Facilities.**  The use or ownership of the following parking facilities:
55  _____; and the use or ownership of the following storage facilities: _____.
56  Note to Buyer:  If exact rights to the parking and storage facilities is a concern to Buyer, Buyer should investigate.
57      **2.5.6.  Trade Fixtures.**  With respect to trade fixtures, Seller and Buyer agree as follows:
58
59
60
61      The trade fixtures to be conveyed at Closing will be conveyed by Seller free and clear of all taxes (except personal
62  property taxes for the year of Closing), liens and encumbrances, except _____. Conveyance
63  will be by bill of sale or other applicable legal instrument.
64    **2.6.  Exclusions.**  The following items are excluded (Exclusions):
65
66
67
68    ~~**2.7.  Water Rights/Well Rights.**~~
69      ~~**2.7.1.  Deeded Water Rights.**  The following legally described water rights:~~
70
71
72
73      ~~Any deeded water rights will be conveyed by a good and sufficient _____ deed at Closing.~~
74      ~~**2.7.2.  Other Rights Relating to Water.**  The following rights relating to water not included in §§ 2.7.1, 2.7.3 and~~
75  ~~2.7.4, will be transferred to Buyer at Closing:~~
76
77
78      ~~**2.7.3.  Well Rights.**  Seller agrees to supply required information to Buyer about the well. Buyer understands that~~
79  ~~if the well to be transferred is a "Small Capacity Well" or a "Domestic Exempt Water Well" used for ordinary household purposes,~~
80  ~~Buyer must, prior to or at Closing, complete a Change in Ownership form for the well. If an existing well has not been registered~~
81  ~~with the Colorado Division of Water Resources in the Department of Natural Resources (Division), Buyer must complete a~~
82  ~~registration of existing well form for the well and pay the cost of registration. If no person will be providing a closing service in~~
83  ~~connection with the transaction, Buyer must file the form with the Division within sixty days after Closing. The Well Permit # is~~
84  ~~_____.~~
85      ~~**2.7.4.  Water Stock Certificates.**  The water stock certificates to be transferred at Closing are as follows:~~
86
87
88
89      ~~**2.7.5.  Conveyance.**  If Buyer is to receive any rights to water pursuant to § 2.7.2 (Other Rights Relating to Water),~~
90  ~~§ 2.7.3 (Well Rights), or § 2.7.4 (Water Stock Certificates), Seller agrees to convey such rights to Buyer by executing the~~
91  ~~applicable legal instrument at Closing.~~

92  **3.  DATES, DEADLINES AND APPLICABILITY.**
93    **3.1.  Dates and Deadlines.**

| Item No. | Reference | Event | Date or Deadline |
|---|---|---|---|
| 1 | § 4.3 | Alternative Earnest Money Deadline | MEC + 5 Days |
| | | **Title** | |
| 2 | § 8.1, 8.4 | Record Title Deadline | MEC + 3 Days |
| 3 | § 8.2, 8.4 | Record Title Objection Deadline | MEC + 10 Days |
| 4 | § 8.3 | Off-Record Title Deadline | MEC + 3 Days |
| 5 | § 8.3 | Off-Record Title Objection Deadline | MEC + 10 Days |
| 6 | § 8.5 | Title Resolution Deadline | MEC + 20 Days |
| 7 | § 8.6 | Right of First Refusal Deadline | N/A |
| | | **Owners' Association** | |
| 8 | § 7.2 | Association Documents Deadline | MEC + 5 Days |
| 9 | § 7.4 | Association Documents Termination Deadline | MEC + 10 Days |
| | | **Seller's Disclosures** | |
| 10 | § 10.1 | Seller's Property Disclosure Deadline | MEC + 5 Days |
| 11 | § 10.10 | Lead-Based Paint Disclosure Deadline (if Residential Addendum attached) | N/A |

Exhibit A - 0002

Motion to Dismiss Ex. C-000002

| | | Loan and Credit | |
|---|---|---|---|
| | | **Loan and Credit** | |
| 12 | § 5.1 | New Loan Application Deadline | N/A |
| 13 | § 5.2 | New Loan Termination Deadline | N/A |
| 14 | § 5.3 | Buyer's Credit Information Deadline | N/A |
| 15 | § 5.3 | Disapproval of Buyer's Credit Information Deadline | N/A |
| 16 | § 5.4 | Existing Loan Deadline | MEC + 5 Days |
| 17 | § 5.4 | Existing Loan Termination Deadline | MEC + 10 Days |
| 18 | § 5.4 | Loan Transfer Approval Deadline | MEC + 30 Days |
| 19 | § 4.7 | Seller or Private Financing Deadline | N/A |
| | | **Appraisal** | |
| 20 | § 6.2 | Appraisal Deadline | N/A |
| 21 | § 6.2 | Appraisal Objection Deadline | N/A |
| 22 | § 6.2 | Appraisal Resolution Deadline | N/A |
| | | **Survey** | |
| 23 | § 9.1 | New ILC or New Survey Deadline | N/A |
| 24 | § 9.3 | New ILC or New Survey Objection Deadline | N/A |
| 25 | § 9.3 | New ILC or New Survey Resolution Deadline | N/A |
| | | **Inspection and Due Diligence** | |
| 26 | § 10.3 | Inspection Objection Deadline | MEC + 21 days |
| 27 | § 10.3 | Inspection Termination Deadline | MEC + 28 days |
| 28 | § 10.3 | Inspection Resolution Deadline | MEC + 28 days |
| 29 | § 10.5 | Property Insurance Termination Deadline | MEC + 28 days |
| 30 | § 10.6 | Due Diligence Documents Delivery Deadline | MEC + 5 days |
| 31 | § 10.6 | Due Diligence Documents Objection Deadline | MEC + 21 days |
| 32 | § 10.6 | Due Diligence Documents Resolution Deadline | MEC + 28 days |
| 33 | § 10.6 | Environmental Inspection Termination Deadline | MEC + 28 days |
| 34 | § 10.6 | ADA Evaluation Termination Deadline | N/A |
| 35 | § 10.7 | Conditional Sale Deadline | N/A |
| 36 | § 10.10 | Lead-Based Paint Termination Deadline (if Residential Addendum attached) | N/A |
| 37 | § 11.1, 11.2 | Estoppel Statements Deadline | N/A |
| 38 | § 11.3 | Estoppel Statements Termination Deadline | N/A |
| | | **Closing and Possession** | |
| 39 | § 12.3 | Closing Date | See § 30 and Original Addendum |
| 40 | § 17 | Possession Date | Day of Closing |
| 41 | § 17 | Possession Time | At Closing |
| 42 | § 28 | **Acceptance Deadline Date** | |
| 43 | § 28 | **Acceptance Deadline Time** | |
| | | | |
| | | | |

94    **3.2.    Applicability of Terms.** Any box checked in this Contract means the corresponding provision applies. If any
95  deadline blank in § 3.1 (Dates and Deadlines) is left blank or completed with the abbreviation "N/A", or the word "Deleted," such
96  deadline is not applicable and the corresponding provision containing the deadline is deleted. If no box is checked in a provision
97  that contains a selection of "None," such provision means that "None" applies.

98  The abbreviation "MEC" (mutual execution of this Contract) means the date upon which both parties have signed this Contract.

99  **4.    PURCHASE PRICE AND TERMS.**
100    **4.1.    Price and Terms.** The Purchase Price set forth below is payable in U.S. Dollars by Buyer as follows:

| Item No. | Reference | Item | Amount | Amount |
|---|---|---|---|---|
| 1 | § 4.1 | Purchase Price | $ 6,068,132.97 | |
| 2 | § 4.3 | Earnest Money | | $ 100,000.00 |
| 3 | § 4.5 | New Loan | | $ |
| 4 | § 4.6 | Assumption Balance | | $ 5,310,330.26 |
| 5 | § 4.7 | Private Financing | | $ |
| 6 | § 4.7 | Seller Financing | | $ |

Exhibit A - 0003

Motion to Dismiss Ex. C-000003

| 7 | | | | |
|---|---|---|---|---|
| 8 | | | | |
| 9 | § 4.4 | Cash at Closing | | $657,802.71 |
| 10 | | **TOTAL** | $6,068,132.97 | $6,068,132.97 |

101    **4.2.**   **Seller Concession.** At Closing, Seller will credit to Buyer $ NONE_____ (Seller Concession). The Seller
102 Concession may be used for any Buyer fee, cost, charge or expenditure to the extent the amount is allowed by the Buyer's lender
103 and is included in the Closing Statement or Closing Disclosure at Closing.  Examples of allowable items to be paid for by the
104 Seller Concession include, but are not limited to: Buyer's closing costs, loan discount points, loan origination fees, prepaid items
105 and any other fee, cost, charge, expense or expenditure. Seller Concession is in addition to any sum Seller has agreed to pay or
106 credit Buyer elsewhere in this Contract.

107    **4.3.**   **Earnest Money.** The Earnest Money set forth in this Section, in the form of a cash, eft, or cashier's check_____, will be
108 payable to and held by First American Title_____ (Earnest Money Holder), in its trust account, on behalf of
109 both Seller and Buyer. The Earnest Money deposit must be tendered, by Buyer, with this Contract unless the parties mutually
110 agree to an **Alternative Earnest Money Deadline** for its payment. The parties authorize delivery of the Earnest Money deposit to
111 the company conducting the Closing (Closing Company), if any, at or before Closing.  In the event Earnest Money Holder has
112 agreed to have interest on Earnest Money deposits transferred to a fund established for the purpose of providing affordable housing
113 to Colorado residents, Seller and Buyer acknowledge and agree that any interest accruing on the Earnest Money deposited with the
114 Earnest Money Holder in this transaction will be transferred to such fund.

115      **4.3.1.**   **Alternative Earnest Money Deadline.** The deadline for delivering the Earnest Money, if other than at the
116 time of tender of this Contract, is as set forth as the **Alternative Earnest Money Deadline**.

117      **4.3.2.**   **Return of Earnest Money.** If Buyer has a Right to Terminate and timely terminates, Buyer is entitled to
118 the return of Earnest Money as provided in this Contract. If this Contract is terminated as set forth in § 25 and, except as provided
119 in § 24 (Earnest Money Dispute), if the Earnest Money has not already been returned following receipt of a Notice to Terminate,
120 Seller agrees to execute and return to Buyer or Broker working with Buyer, written mutual instructions (e.g., Earnest Money
121 Release form), within three days of Seller's receipt of such form.

122    **4.4.**   **Form of Funds; Time of Payment; Available Funds.**

123      **4.4.1.**   **Good Funds.** All amounts payable by the parties at Closing, including any loan proceeds, Cash at Closing
124 and closing costs, must be in funds that comply with all applicable Colorado laws, including electronic transfer funds, certified
125 check, savings and loan teller's check and cashier's check (Good Funds).

126      **4.4.2.**   **Time of Payment; Available Funds.** All funds, including the Purchase Price to be paid by Buyer, must be
127 paid before or at Closing or as otherwise agreed in writing between the parties to allow disbursement by Closing Company at
128 Closing **OR SUCH NONPAYING PARTY WILL BE IN DEFAULT.** Buyer represents that Buyer, as of the date of this
129 Contract, ☐ Does ☑ **Does Not** have funds that are immediately verifiable and available in an amount not less than the amount
130 stated as Cash at Closing in § 4.1.

131    ~~**4.5.**   **New Loan.**~~

132      ~~**4.5.1.**   **Buyer to Pay Loan Costs.** Buyer, except as otherwise permitted in § 4.2 (Seller Concession), if applicable,~~
133 ~~must timely pay Buyer's loan costs, loan discount points, prepaid items and loan origination fees as required by lender.~~

134      ~~**4.5.2.**   **Buyer May Select Financing.** Buyer may pay in cash or select financing appropriate and acceptable to~~
135 ~~Buyer, including a different loan than initially sought, except as restricted in § 4.5.3 (Loan Limitations) or § 30 (Additional~~
136 ~~Provisions).~~

137      ~~**4.5.3.**   **Loan Limitations.** Buyer may purchase the Property using any of the following types of loans:~~
138 ~~☐ **Conventional** ☐ **Other** _____.~~

139    **4.6.**   **Assumption.** Buyer agrees to assume and pay an existing loan in the approximate amount of the Assumption
140 Balance set forth in § 4.1 (Price and Terms), ~~presently payable at $_____ per_____ including principal~~
141 ~~and interest presently at the rate of_____% per annum and also including escrow for the following as indicated:~~ ☐ **Real**
142 **Estate Taxes** ☐ **Property Insurance Premium** and _____.
143 ~~Buyer agrees to pay a loan transfer fee not to exceed $_____. At the time of assumption, the new interest rate will~~
144 ~~not exceed_____% per annum and the new payment will not exceed $_____ per_____ principal and~~
145 ~~interest, plus escrow, if any. If the actual principal balance of the existing loan at Closing is less than the Assumption Balance,~~
146 ~~which causes the amount of cash required from Buyer at Closing to be increased by more than $_____, or if any other~~
147 terms or provisions of the loan change, Buyer has the Right to Terminate under § 25.1 on or before **Closing Date**.
148 ~~Seller~~ ☐ **Will** ☐ **Will Not** ~~be released from liability on said loan. If applicable, compliance with the requirements for~~
149 ~~release from liability will be evidenced by delivery~~ ☐ ~~on or before **Loan Transfer Approval Deadline**~~ ☐ ~~at **Closing** of an~~
150 ~~appropriate letter of commitment from lender. Any cost payable for release of liability will be paid by_____ in an amount~~
151 ~~not to exceed $_____.~~

152    ~~**4.7.**   **Seller or Private Financing.**~~
153 ~~**WARNING:** Unless the transaction is exempt, federal and state laws impose licensing, other requirements and restrictions on~~
154 ~~sellers and private financiers. Contract provisions on financing and financing documents, unless exempt, should be prepared by a~~

Exhibit A - 0004

155 ~~licensed Colorado attorney or licensed mortgage loan originator. Brokers should not prepare or advise the parties on the specifics~~
156 ~~of financing, including whether or not a party is exempt from the law.~~
157     **4.7.1.    Seller Financing.** ~~If Buyer is to pay all or any portion of the Purchase Price with Seller financing,~~
158 ☐ **Buyer** ☐ **Seller** ~~will deliver the proposed Seller financing documents to the other party on or before _____ days before~~
159 ~~**Seller or Private Financing Deadline.**~~
160         **4.7.1.1.    Seller May Terminate.** ~~If Seller is to provide Seller financing, this Contract is conditional upon~~
161 ~~Seller determining whether such financing is satisfactory to Seller, including its payments, interest rate, terms, conditions, cost and~~
162 ~~compliance with the law. Seller has the Right to Terminate under § 25.1, on or before **Seller or Private Financing Deadline**, if~~
163 ~~such Seller financing is not satisfactory to Seller, in Seller's sole subjective discretion.~~
164         **4.7.2.    Buyer May Terminate.** ~~If Buyer is to pay all or any portion of the Purchase Price with Seller or private~~
165 ~~financing, this Contract is conditional upon Buyer determining whether such financing is satisfactory to Buyer, including its~~
166 ~~availability, payments, interest rate, terms, conditions and cost. Buyer has the Right to Terminate under § 25.1, on or before **Seller**~~
167 ~~**or Private Financing Deadline**, if such Seller or private financing is not satisfactory to Buyer, in Buyer's sole subjective~~
168 ~~discretion.~~

169
<div style="text-align:center">

**TRANSACTION PROVISIONS**

</div>

170 **5.    FINANCING CONDITIONS AND OBLIGATIONS.**
171     **5.1.    New Loan Application.** If Buyer is to pay all or part of the Purchase Price by obtaining one or more new loans
172 (New Loan), or if an existing loan is not to be released at Closing, Buyer, if required by such lender, must make an application
173 verifiable by such lender, on or before **New Loan Application Deadline** and exercise reasonable efforts to obtain such loan or
174 approval.
175     **5.2.    New Loan Review.** If Buyer is to pay all or part of the Purchase with a New Loan, this Contract is conditional
176 upon Buyer determining, in Buyer's sole subjective discretion, whether the New Loan is satisfactory to Buyer, including its
177 availability, payments, interest rate, terms, conditions and cost of such New Loan. This condition is for the sole benefit of Buyer.
178 Buyer has the Right to Terminate under § 25.1, on or before **New Loan Termination Deadline**, if the New Loan is not satisfactory
179 to Buyer, in Buyer's sole subjective discretion. Buyer does not have a Right to Terminate based on the New Loan if the objection is
180 based on the Appraised Value (defined below) or the Lender Requirements (defined below). **IF SELLER IS NOT IN DEFAULT**
181 **AND DOES NOT TIMELY RECEIVE BUYER'S WRITTEN NOTICE TO TERMINATE, BUYER'S EARNEST MONEY**
182 **WILL BE NONREFUNDABLE,** except as otherwise provided in this Contract (e.g., Appraisal, Title, Survey).
183     **5.3.    Credit Information.** If an existing loan is not to be released at Closing, this Contract is conditional (for the sole
184 benefit of Seller) upon Seller's approval of Buyer's financial ability and creditworthiness, which approval will be in Seller's sole
185 subjective discretion. Accordingly: (1) Buyer must supply to Seller by **Buyer's Credit Information Deadline**, at Buyer's
186 expense, information and documents (including a current credit report) concerning Buyer's financial, employment and credit
187 condition; (2) Buyer consents that Seller may verify Buyer's financial ability and creditworthiness; and (3) any such information
188 and documents received by Seller must be held by Seller in confidence and not released to others except to protect Seller's interest
189 in this transaction. If the Cash at Closing is less than as set forth in § 4.1 of this Contract, Seller has the Right to Terminate under
190 § 25.1, on or before Closing. If Seller disapproves of Buyer's financial ability or creditworthiness, in Seller's sole subjective
191 discretion, Seller has the Right to Terminate under § 25.1, on or before **Disapproval of Buyer's Credit Information Deadline**.
192     **5.4.    Existing Loan Review.** If an existing loan is not to be released at Closing, Seller must deliver copies of the loan
193 documents (including note, deed of trust and any modifications) to Buyer by **Existing Loan Deadline**. For the sole benefit of
194 Buyer, this Contract is conditional upon Buyer's review and approval of the provisions of such loan documents. Buyer has the
195 Right to Terminate under § 25.1, on or before **Existing Loan Termination Deadline**, based on any unsatisfactory provision of
196 such loan documents, in Buyer's sole subjective discretion. If the lender's approval of a transfer of the Property is required, this
197 Contract is conditional upon Buyer obtaining such approval without change in the terms of such loan, except as set forth in § 4.6.
198 If lender's approval is not obtained by **Loan Transfer Approval Deadline**, this Contract will terminate on such deadline. Seller
199 has the Right to Terminate under § 25.1, on or before Closing, in Seller's sole subjective discretion, if Seller is to be released from
200 liability under such existing loan and Buyer does not obtain such compliance as set forth in § 4.6.

201 **6.    APPRAISAL PROVISIONS.**
202     **6.1.    Appraisal Definition.** An "Appraisal" is an opinion of value prepared by a licensed or certified appraiser, engaged
203 on behalf of Buyer or Buyer's lender, to determine the Property's market value (Appraised Value). The Appraisal may also set
204 forth certain lender requirements, replacements, removals or repairs necessary on or to the Property as a condition for the Property
205 to be valued at the Appraised Value.
206     **6.2.    Appraisal Condition.** The applicable appraisal provision set forth below applies to the respective loan type set forth
207 in § 4.5.3, or if a cash transaction (i.e. no financing), § 6.2.1 applies.

<div style="text-align:center">

**Exhibit A - 0005**

</div>

208       **6.2.1.**   **Conventional/Other.** Buyer has the right to obtain an Appraisal. If the Appraised Value is less than the
209 Purchase Price, or if the Appraisal is not received by Buyer on or before **Appraisal Deadline** Buyer may, on or before **Appraisal**
210 **Objection Deadline**, notwithstanding § 8.3 or § 13:
211       **6.2.1.1.**   **Notice to Terminate.** Notify Seller in writing, pursuant to § 25.1, that this Contract is terminated;
212 or
213       **6.2.1.2.**   **Appraisal Objection.** Deliver to Seller a written objection accompanied by either a copy of the
214 Appraisal or written notice from lender that confirms the Appraised Value is less than the Purchase Price (Lender Verification).
215       **6.2.1.3.**   **Appraisal Resolution.** If an Appraisal Objection is received by Seller, on or before **Appraisal**
216 **Objection Deadline** and if Buyer and Seller have not agreed in writing to a settlement thereof on or before **Appraisal Resolution**
217 **Deadline**, this Contract will terminate on the **Appraisal Resolution Deadline**, unless Seller receives Buyer's written withdrawal
218 of the Appraisal Objection before such termination, i.e., on or before expiration of **Appraisal Resolution Deadline**.
219     **6.3.**   **Lender Property Requirements.** If the lender imposes any written requirements, replacements, removals or repairs,
220 including any specified in the Appraisal (Lender Requirements) to be made to the Property (e.g., roof repair, repainting), beyond
221 those matters already agreed to by Seller in this Contract, this Contract terminates on the earlier of three days following Seller's
222 receipt of the Lender Requirements, or Closing, unless prior to termination: (1) the parties enter into a written agreement to satisfy
223 the Lender Requirements; (2) the Lender Requirements have been completed; or (3) the satisfaction of the Lender Requirements is
224 waived in writing by Buyer.
225     **6.4.**   **Cost of Appraisal.** Cost of the Appraisal to be obtained after the date of this Contract must be timely paid by
226 ☑ **Buyer** ☐ **Seller**. The cost of the Appraisal may include any and all fees paid to the appraiser, appraisal management company,
227 lender's agent or all three.

228     **7.**   **OWNERS' ASSOCIATION.** This Section is applicable if the Property is located within a Common Interest Community
229 and subject to the declaration (Association).
230     **7.1.**   **Common Interest Community Disclosure. THE PROPERTY IS LOCATED WITHIN A COMMON**
231 **INTEREST COMMUNITY AND IS SUBJECT TO THE DECLARATION FOR THE COMMUNITY. THE OWNER OF**
232 **THE PROPERTY WILL BE REQUIRED TO BE A MEMBER OF THE OWNERS' ASSOCIATION FOR THE**
233 **COMMUNITY AND WILL BE SUBJECT TO THE BYLAWS AND RULES AND REGULATIONS OF THE**
234 **ASSOCIATION. THE DECLARATION, BYLAWS AND RULES AND REGULATIONS WILL IMPOSE FINANCIAL**
235 **OBLIGATIONS UPON THE OWNER OF THE PROPERTY, INCLUDING AN OBLIGATION TO PAY**
236 **ASSESSMENTS OF THE ASSOCIATION. IF THE OWNER DOES NOT PAY THESE ASSESSMENTS, THE**
237 **ASSOCIATION COULD PLACE A LIEN ON THE PROPERTY AND POSSIBLY SELL IT TO PAY THE DEBT. THE**
238 **DECLARATION, BYLAWS AND RULES AND REGULATIONS OF THE COMMUNITY MAY PROHIBIT THE**
239 **OWNER FROM MAKING CHANGES TO THE PROPERTY WITHOUT AN ARCHITECTURAL REVIEW BY THE**
240 **ASSOCIATION (OR A COMMITTEE OF THE ASSOCIATION) AND THE APPROVAL OF THE ASSOCIATION.**
241 **PURCHASERS OF PROPERTY WITHIN THE COMMON INTEREST COMMUNITY SHOULD INVESTIGATE THE**
242 **FINANCIAL OBLIGATIONS OF MEMBERS OF THE ASSOCIATION. PURCHASERS SHOULD CAREFULLY**
243 **READ THE DECLARATION FOR THE COMMUNITY AND THE BYLAWS AND RULES AND REGULATIONS OF**
244 **THE ASSOCIATION.**
245     **7.2.**   **Association Documents to Buyer.** Seller is obligated to provide to Buyer the Association Documents (defined
246 below), at Seller's expense, on or before **Association Documents Deadline**. Seller authorizes the Association to provide the
247 Association Documents to Buyer, at Seller's expense. Seller's obligation to provide the Association Documents is fulfilled upon
248 Buyer's receipt of the Association Documents, regardless of who provides such documents.
249     **7.3.**   **Association Documents.** Association documents (Association Documents) consist of the following:
250       **7.3.1.**   All Association declarations, articles of incorporation, bylaws, articles of organization, operating
251 agreements, rules and regulations, party wall agreements and the Association's responsible governance policies adopted under
252 § 38-33.3-209.5, C.R.S.;
253       **7.3.2.**   Minutes of: (1) the annual owners' or members' meeting and (2) any executive boards' or managers'
254 meetings; such minutes include those provided under the most current annual disclosure required under § 38-33.3-209.4, C.R.S.
255 (Annual Disclosure) and minutes of meetings, if any, subsequent to the minutes disclosed in the Annual Disclosure. If none of the
256 preceding minutes exist, then the most recent minutes, if any (§§ 7.3.1 and 7.3.2, collectively, Governing Documents); and
257       **7.3.3.**   List of all Association insurance policies as provided in the Association's last Annual Disclosure, including,
258 but not limited to, property, general liability, association director and officer professional liability and fidelity policies. The list
259 must include the company names, policy limits, policy deductibles, additional named insureds and expiration dates of the policies
260 listed (Association Insurance Documents);
261       **7.3.4.**   A list by unit type of the Association's assessments, including both regular and special assessments as
262 disclosed in the Association's last Annual Disclosure;
263       **7.3.5.**   The Association's most recent financial documents which consist of: (1) the Association's operating budget
264 for the current fiscal year, (2) the Association's most recent annual financial statements, including any amounts held in reserve for
265 the fiscal year immediately preceding the Association's most recent Annual Disclosure, (3) the results of the Association's most recent

Exhibit A - 0006
Motion to Dismiss Ex. C-000006

266 available financial audit or review, (4) list of the fees and charges (regardless of name of title of such fees or charges) that the
267 Association's community association manager or Association will charge in connection with the Closing including, but not limited
268 to, any fee incident to the issuance of the Association's statement of assessments (Status Letter), any rush or update fee charged for
269 the Status Letter, any record change fee or ownership record transfer fees (Record Change Fee), fees to access documents, (5) list
270 of all assessments required to be paid in advance, reserves or working capital due at Closing and (6) reserve study, if any (§§ 7.3.4
271 and 7.3.5, collectively, Financial Documents);

272       **7.3.6.**   Any written notice from the Association to Seller of a "construction defect action" under § 38-33.3-303.5,
273 C.R.S. within the past six months and the result of whether the Association approved or disapproved such action (Construction
274 Defect Documents). Nothing in this Section limits the Seller's obligation to disclose adverse material facts as required under §
275 10.2 (Disclosure of Adverse Material Facts; Subsequent Disclosure; Present Condition) including any problems or defects in the
276 common elements or limited common elements of the Association property.

277      **7.4.**   **Conditional on Buyer's Review.** Buyer has the right to review the Association Documents. Buyer has the Right to
278 Terminate under § 25.1, on or before **Association Documents Termination Deadline**, based on any unsatisfactory provision in
279 any of the Association Documents, in Buyer's sole subjective discretion. Should Buyer receive the Association Documents after
280 **Association Documents Deadline**, Buyer, at Buyer's option, has the Right to Terminate under § 25.1 by Buyer's Notice to
281 Terminate received by Seller on or before ten days after Buyer's receipt of the Association Documents. If Buyer does not receive
282 the Association Documents, or if Buyer's Notice to Terminate would otherwise be required to be received by Seller after **Closing
283 Date**, Buyer's Notice to Terminate must be received by Seller on or before Closing. If Seller does not receive Buyer's Notice to
284 Terminate within such time, Buyer accepts the provisions of the Association Documents as satisfactory and Buyer waives any
285 Right to Terminate under this provision, notwithstanding the provisions of § 8.6 (Right of First Refusal or Contract Approval).

286 **8.**   **TITLE INSURANCE, RECORD TITLE AND OFF-RECORD TITLE.**
287     **8.1.**   **Evidence of Record Title.**
288 [✓]      **8.1.1.**   **Seller Selects Title Insurance Company.** If this box is checked, Seller will select the title insurance
289 company to furnish the owner's title insurance policy at Seller's expense. On or before **Record Title Deadline**, Seller must furnish
290 to Buyer, a current commitment for an owner's title insurance policy (Title Commitment), in an amount equal to the Purchase
291 Price, or if this box is checked, [ ] an Abstract of Title certified to a current date. Seller will cause the title insurance policy to be
292 issued and delivered to Buyer as soon as practicable at or after Closing.
293 [ ]      **8.1.2.**   **Buyer Selects Title Insurance Company.** If this box is checked, Buyer will select the title insurance
294 company to furnish the owner's title insurance policy at Buyer's expense. On or before **Record Title Deadline**, Buyer must furnish to
295 Seller, a current commitment for owner's title insurance policy (Title Commitment), in an amount equal to the Purchase Price.
296 If neither box in § 8.1.1 or § 8.1.2 is checked, § 8.1.1 applies.
297      **8.1.3.**   **Owner's Extended Coverage (OEC).** The Title Commitment [ ] **Will** [✓] **Will Not** contain Owner's
298 Extended Coverage (OEC). If the Title Commitment is to contain OEC, it will commit to delete or insure over the standard
299 exceptions which relate to: (1) parties in possession, (2) unrecorded easements, (3) survey matters, (4) unrecorded mechanics'
300 liens, (5) gap period (period between the effective date and time of commitment to the date and time the deed is recorded) and (6)
301 unpaid taxes, assessments and unredeemed tax sales prior to the year of Closing. Any additional premium expense to obtain OEC
302 will be paid by [✓] **Buyer** [ ] **Seller** [ ] **One-Half by Buyer and One-Half by Seller** [ ] **Other**_____
303 Regardless of whether the Contract requires OEC, the Title Insurance Company may not provide OEC or delete or insure over
304 any or all of the standard exceptions for OEC. The Title Insurance Company may require a New Survey or New ILC, defined
305 below, among other requirements for OEC. If the Title Insurance Commitment is not satisfactory to Buyer, Buyer has a right to
306 object under § 8.5 (Right to Object to Title, Resolution).
307      **8.1.4.**   **Title Documents.** Title Documents consist of the following: (1) copies of any plats, declarations,
308 covenants, conditions and restrictions burdening the Property and (2) copies of any other documents (or, if illegible, summaries of
309 such documents) listed in the schedule of exceptions (Exceptions) in the Title Commitment furnished to Buyer (collectively, Title
310 Documents).
311      **8.1.5.**   **Copies of Title Documents.** Buyer must receive, on or before **Record Title Deadline**, copies of all Title
312 Documents. This requirement pertains only to documents as shown of record in the office of the clerk and recorder in the county
313 where the Property is located. The cost of furnishing copies of the documents required in this Section will be at the expense of the
314 party or parties obligated to pay for the owner's title insurance policy.
315      **8.1.6.**   **Existing Abstracts of Title.** Seller must deliver to Buyer copies of any abstracts of title covering all or any
316 portion of the Property (Abstract of Title) in Seller's possession on or before **Record Title Deadline**.
317     **8.2.**   **Record Title.** Buyer has the right to review and object to the Abstract of Title or Title Commitment and any of the
318 Title Documents as set forth in § 8.5 (Right to Object to Title, Resolution) on or before **Record Title Objection Deadline**.
319 Buyer's objection may be based on any unsatisfactory form or content of Title Commitment or Abstract of Title, notwithstanding
320 § 13, or any other unsatisfactory title condition, in Buyer's sole subjective discretion. If the Abstract of Title, Title Commitment or
321 Title Documents are not received by Buyer on or before the **Record Title Deadline**, or if there is an endorsement to the Title
322 Commitment that adds a new Exception to title, a copy of the new Exception to title and the modified Title Commitment will be
323 delivered to Buyer. Buyer has until the earlier of Closing or ten days after receipt of such documents by Buyer to review and object

Exhibit A - 0007
Motion to Dismiss Ex. C-000007

324 to: (1) any required Title Document not timely received by Buyer, (2) any change to the Abstract of Title, Title Commitment or
325 Title Documents, or (3) any endorsement to the Title Commitment. If Seller receives Buyer's Notice to Terminate or Notice of
326 Title Objection, pursuant to this § 8.2 (Record Title), any title objection by Buyer is governed by the provisions set forth in § 8.5
327 (Right to Object to Title, Resolution). If Seller has fulfilled all Seller's obligations, if any, to deliver to Buyer all documents
328 required by § 8.1 (Evidence of Record Title) and Seller does not receive Buyer's Notice to Terminate or Notice of Title Objection
329 by the applicable deadline specified above, Buyer accepts the condition of title as disclosed by the Abstract of Title, Title
330 Commitment and Title Documents as satisfactory.

331     **8.3.    Off-Record Title.** Seller must deliver to Buyer, on or before **Off-Record Title Deadline**, true copies of all existing
332 surveys in Seller's possession pertaining to the Property and must disclose to Buyer all easements, liens (including, without
333 limitation, governmental improvements approved, but not yet installed) or other title matters (including, without limitation, rights
334 of first refusal and options) not shown by public records, of which Seller has actual knowledge (Off-Record Matters). This Section
335 excludes any **New ILC** or **New Survey** governed under § 9 (New ILC, New Survey).  Buyer has the right to inspect the Property
336 to investigate if any third party has any right in the Property not shown by public records (e.g., unrecorded easement, boundary
337 line discrepancy or water rights). Buyer's Notice to Terminate or Notice of Title Objection of any unsatisfactory condition
338 (whether disclosed by Seller or revealed by such inspection, notwithstanding § 8.2 (Record Title) and § 13 (Transfer of Title)), in
339 Buyer's sole subjective discretion, must be received by Seller on or before **Off-Record Title Objection Deadline**. If an Off-
340 Record Matter is received by Buyer after the **Off-Record Title Deadline**, Buyer has until the earlier of Closing or ten days after
341 receipt by Buyer to review and object to such Off-Record Matter. If Seller receives Buyer's Notice to Terminate or Notice of Title
342 Objection pursuant to this § 8.3 (Off-Record Title), any title objection by Buyer is governed by the provisions set forth in § 8.5
343 (Right to Object to Title, Resolution). If Seller does not receive Buyer's Notice to Terminate or Notice of Title Objection by the
344 applicable deadline specified above, Buyer accepts title subject to such Off-Record Matters and rights, if any, of third parties not
345 shown by public records of which Buyer has actual knowledge.

346     **8.4.    Special Taxing Districts. SPECIAL TAXING DISTRICTS MAY BE SUBJECT TO GENERAL OBLIGATION
347 INDEBTEDNESS THAT IS PAID BY REVENUES PRODUCED FROM ANNUAL TAX LEVIES ON THE TAXABLE
348 PROPERTY WITHIN SUCH DISTRICTS. PROPERTY OWNERS IN SUCH DISTRICTS MAY BE PLACED AT RISK
349 FOR INCREASED MILL LEVIES AND TAX TO SUPPORT THE SERVICING OF SUCH DEBT WHERE
350 CIRCUMSTANCES ARISE RESULTING IN THE INABILITY OF SUCH A DISTRICT TO DISCHARGE SUCH
351 INDEBTEDNESS WITHOUT SUCH AN INCREASE IN MILL LEVIES. BUYERS SHOULD INVESTIGATE THE
352 SPECIAL TAXING DISTRICTS IN WHICH THE PROPERTY IS LOCATED BY CONTACTING THE COUNTY
353 TREASURER, BY REVIEWING THE CERTIFICATE OF TAXES DUE FOR THE PROPERTY AND BY OBTAINING
354 FURTHER INFORMATION FROM THE BOARD OF COUNTY COMMISSIONERS, THE COUNTY CLERK AND
355 RECORDER, OR THE COUNTY ASSESSOR.**

356     A tax certificate from the respective county treasurer listing any special taxing districts that effect the Property (Tax
357 Certificate) must be delivered to Buyer on or before **Record Title Deadline**. If the Property is located within a special taxing
358 district and such inclusion is unsatisfactory to Buyer, in Buyer's sole subjective discretion, Buyer may object, on or before **Record
359 Title Objection Deadline**.  If the Tax Certificate shows that the Property is included in a special taxing district and is received by
360 Buyer after the **Record Title Deadline**, Buyer has until the earlier of Closing or ten days after receipt by Buyer to review and
361 object to the Property's inclusion in a special taxing district as unsatisfactory to Buyer.

362     **8.5.    Right to Object to Title, Resolution.** Buyer's right to object, in Buyer's sole subjective discretion, to any title
363 matters includes those matters set forth in § 8.2 (Record Title), § 8.3 (Off-Record Title), § 8.4 (Special Taxing District) and § 13
364 (Transfer of Title). If Buyer objects to any title matter, on or before the applicable deadline, Buyer has the following options:

365     **8.5.1.    Title Objection, Resolution.** If Seller receives Buyer's written notice objecting to any title matter (Notice
366 of Title Objection) on or before the applicable deadline and if Buyer and Seller have not agreed to a written settlement thereof on
367 or before **Title Resolution Deadline**, this Contract will terminate on the expiration of **Title Resolution Deadline**, unless Seller
368 receives Buyer's written withdrawal of Buyer's Notice of Title Objection (i.e., Buyer's written notice to waive objection to such
369 items and waives the Right to Terminate for that reason), on or before expiration of **Title Resolution Deadline**. If either the
370 Record Title Deadline or the Off-Record Title Deadline, or both, are extended pursuant to § 8.2 (Record Title), § 8.3 (Off-Record
371 Title) or § 8.4 (Special Taxing Districts), the Title Resolution Deadline also will be automatically extended to the earlier of
372 Closing or fifteen days after Buyer's receipt of the applicable documents; or

373     **8.5.2.    Title Objection, Right to Terminate.** Buyer may exercise the Right to Terminate under § 25.1, on or
374 before the applicable deadline, based on any title matter unsatisfactory to Buyer, in Buyer's sole subjective discretion.

375     **8.6.    Right of First Refusal or Contract Approval.** If there is a right of first refusal on the Property or a right to approve
376 this Contract, Seller must promptly submit this Contract according to the terms and conditions of such right. If the holder of the
377 right of first refusal exercises such right or the holder of a right to approve disapproves this Contract, this Contract will terminate.
378 If the right of first refusal is waived explicitly or expires, or the Contract is approved, this Contract will remain in full force and
379 effect. Seller must promptly notify Buyer in writing of the foregoing. If expiration or waiver of the right of first refusal or approval
380 of this Contract has not occurred on or before **Right of First Refusal Deadline**, this Contract will then terminate.

381     **8.7.    Title Advisory.** The Title Documents affect the title, ownership and use of the Property and should be reviewed
382 carefully. Additionally, other matters not reflected in the Title Documents may affect the title, ownership and use of the Property,

Exhibit A - 0008

Motion to Dismiss Ex. C-000008

383  including, without limitation, boundary lines and encroachments, set-back requirements, area, zoning, building code violations,
384  unrecorded easements and claims of easements, leases and other unrecorded agreements, water on or under the Property and
385  various laws and governmental regulations concerning land use, development and environmental matters.
386       **8.7.1.  OIL, GAS, WATER AND MINERAL DISCLOSURE.  THE SURFACE ESTATE OF THE**
387  **PROPERTY MAY BE OWNED SEPARATELY FROM THE UNDERLYING MINERAL ESTATE AND TRANSFER**
388  **OF THE SURFACE ESTATE MAY NOT NECESSARILY INCLUDE TRANSFER OF THE MINERAL ESTATE OR**
389  **WATER RIGHTS. THIRD PARTIES MAY OWN OR LEASE INTERESTS IN OIL, GAS, OTHER MINERALS,**
390  **GEOTHERMAL ENERGY OR WATER ON OR UNDER THE SURFACE OF THE PROPERTY, WHICH INTERESTS**
391  **MAY GIVE THEM RIGHTS TO ENTER AND USE THE SURFACE OF THE PROPERTY TO ACCESS THE**
392  **MINERAL ESTATE, OIL, GAS OR WATER.**
393       **8.7.2.  SURFACE USE AGREEMENT. THE USE OF THE SURFACE ESTATE OF THE PROPERTY TO**
394  **ACCESS THE OIL, GAS OR MINERALS MAY BE GOVERNED BY A SURFACE USE AGREEMENT, A**
395  **MEMORANDUM OR OTHER NOTICE OF WHICH MAY BE RECORDED WITH THE COUNTY CLERK AND**
396  **RECORDER.**
397       **8.7.3.  OIL AND GAS ACTIVITY. OIL AND GAS ACTIVITY THAT MAY OCCUR ON OR ADJACENT**
398  **TO THE PROPERTY MAY INCLUDE, BUT IS NOT LIMITED TO, SURVEYING, DRILLING, WELL COMPLETION**
399  **OPERATIONS, STORAGE, OIL AND GAS, OR PRODUCTION FACILITIES, PRODUCING WELLS, REWORKING**
400  **OF CURRENT WELLS AND GAS GATHERING AND PROCESSING FACILITIES.**
401       **8.7.4.  ADDITIONAL INFORMATION. BUYER IS ENCOURAGED TO SEEK ADDITIONAL**
402  **INFORMATION REGARDING OIL AND GAS ACTIVITY ON OR ADJACENT TO THE PROPERTY, INCLUDING**
403  **DRILLING PERMIT APPLICATIONS. THIS INFORMATION MAY BE AVAILABLE FROM THE COLORADO OIL**
404  **AND GAS CONSERVATION COMMISSION.**
405       **8.7.5.  Title Insurance Exclusions.** Matters set forth in this Section and others, may be excepted, excluded from,
406  or not covered by the owner's title insurance policy.
407       **8.8.  Consult an Attorney.** Buyer is advised to timely consult legal counsel with respect to all such matters as there are
408  strict time limits provided in this Contract (e.g., **Record Title Objection Deadline** and **Off-Record Title Objection Deadline**).

409  **9.  NEW ILC, NEW SURVEY.**
410       **9.1.  New ILC or New Survey.** If the box is checked, a: 1) ☐ **New Improvement Location Certificate (New ILC);** or,
411  2) ☐ **New Survey** in the form of _____; is required and the following will apply:
412       **9.1.1.  Ordering of New ILC or New Survey.** ☐ **Seller** ☐ **Buyer** will order the New ILC or New Survey. The
413  New ILC or New Survey may also be a previous ILC or survey that is in the above-required form, certified and updated as of a
414  date after the date of this Contract.
415       **9.1.2.  Payment for New ILC or New Survey.** The cost of the New ILC or New Survey will be paid, on or
416  before Closing, by: ☐ **Seller** ☐ **Buyer** or:
417
418
419
420       **9.1.3.  Delivery of New ILC or New Survey.** Buyer, Seller, the issuer of the Title Commitment (or the provider
421  of the opinion of title if an Abstract of Title) and _____ will receive a New ILC or New Survey on or before
422  **New ILC or New Survey Deadline**.
423       **9.1.4.  Certification of New ILC or New Survey.** The New ILC or New Survey will be certified by the surveyor
424  to all those who are to receive the New ILC or New Survey.
425       **9.2.  Buyer's Right to Waive or Change New ILC or New Survey Selection.** Buyer may select a New ILC or New
426  Survey different than initially specified in this Contract if there is no additional cost to Seller or change to the **New ILC or New**
427  **Survey Objection Deadline**. Buyer may, in Buyer's sole subjective discretion, waive a New ILC or New Survey if done prior to
428  Seller incurring any cost for the same.
429       **9.3.  New ILC or New Survey Objection.** Buyer has the right to review and object to the New ILC or New Survey. If
430  the New ILC or New Survey is not timely received by Buyer or is unsatisfactory to Buyer, in Buyer's sole subjective discretion,
431  Buyer may, on or before **New ILC or New Survey Objection Deadline**, notwithstanding § 8.3 or § 13:
432       **9.3.1.  Notice to Terminate.** Notify Seller in writing, pursuant to § 25.1, that this Contract is terminated; or
433       **9.3.2.  New ILC or New Survey Objection.** Deliver to Seller a written description of any matter that was to be
434  shown or is shown in the New ILC or New Survey that is unsatisfactory and that Buyer requires Seller to correct.
435       **9.3.3.  New ILC or New Survey Resolution.** If a **New ILC or New Survey Objection** is received by Seller, on
436  or before **New ILC or New Survey Objection Deadline** and if Buyer and Seller have not agreed in writing to a settlement thereof
437  on or before **New ILC or New Survey Resolution Deadline**, this Contract will terminate on expiration of the **New ILC or New**
438  **Survey Resolution Deadline**, unless Seller receives Buyer's written withdrawal of the New ILC or New Survey Objection before
439  such termination, i.e., on or before expiration of **New ILC or New Survey Resolution Deadline**.

440

| DISCLOSURE, INSPECTION AND DUE DILIGENCE |
|---|

441  **10.  PROPERTY DISCLOSURE, INSPECTION, INDEMNITY, INSURABILITY AND DUE DILIGENCE.**

442  **10.1.  Seller's Property Disclosure.** On or before **Seller's Property Disclosure Deadline**, Seller agrees to deliver to
443  Buyer the most current version of the applicable Colorado Real Estate Commission's Seller's Property Disclosure form completed
444  by Seller to Seller's actual knowledge and current as of the date of this Contract.

445  **10.2.  Disclosure of Adverse Material Facts; Subsequent Disclosure; Present Condition.** Seller must disclose to Buyer
446  any adverse material facts actually known by Seller as of the date of this Contract. Seller agrees that disclosure of adverse material
447  facts will be in writing. In the event Seller discovers an adverse material fact after the date of this Contract, Seller must timely
448  disclose such adverse fact to Buyer. Buyer has the Right to Terminate based on the Seller's new disclosure on the earlier of
449  Closing or five days after Buyer's receipt of the new disclosure. Except as otherwise provided in this Contract, Buyer
450  acknowledges that Seller is conveying the Property to Buyer in an **"As Is"** condition, **"Where Is"** and **"With All Faults."**

451  **10.3.  Inspection.** Unless otherwise provided in this Contract, Buyer, acting in good faith, has the right to have inspections
452  (by one or more third parties, personally or both) of the Property and Inclusions (Inspection), at Buyer's expense. If (1) the
453  physical condition of the Property, including, but not limited to, the roof, walls, structural integrity of the Property, the electrical,
454  plumbing, HVAC and other mechanical systems of the Property, (2) the physical condition of the Inclusions, (3) service to the
455  Property (including utilities and communication services), systems and components of the Property (e.g., heating and plumbing),
456  (4) any proposed or existing transportation project, road, street or highway, or (5) any other activity, odor or noise (whether on or
457  off the Property) and its effect or expected effect on the Property or its occupants is unsatisfactory, in Buyer's sole subjective
458  discretion, Buyer may:

459  **10.3.1.  Inspection Objection.** On or before the **Inspection Objection Deadline**, deliver to Seller a written
460  description of any unsatisfactory condition that Buyer requires Seller to correct; or

461  **10.3.2.  Terminate.** On or before the **Inspection Termination Deadline**, notify Seller in writing, pursuant to §
462  25.1, that this Contract is terminated due to any unsatisfactory condition. **Inspection Termination Deadline will be on the**
463  **earlier of Inspection Resolution Deadline or the date specified in § 3.1 for Inspection Termination Deadline.**

464  **10.3.3.  Inspection Resolution.** If an Inspection Objection is received by Seller, on or before **Inspection Objection**
465  **Deadline** and if Buyer and Seller have not agreed in writing to a settlement thereof on or before **Inspection Resolution Deadline**,
466  this Contract will terminate on **Inspection Resolution Deadline** unless Seller receives Buyer's written withdrawal of the
467  Inspection Objection before such termination, i.e., on or before expiration of **Inspection Resolution Deadline**.

468  **10.4.  Damage, Liens and Indemnity.** Buyer, except as otherwise provided in this Contract or other written agreement
469  between the parties, is responsible for payment for all inspections, tests, surveys, engineering reports, or other reports performed at
470  Buyer's request (Work) and must pay for any damage that occurs to the Property and Inclusions as a result of such Work. Buyer
471  must not permit claims or liens of any kind against the Property for Work performed on the Property. Buyer agrees to indemnify,
472  protect and hold Seller harmless from and against any liability, damage, cost or expense incurred by Seller and caused by any such
473  Work, claim, or lien. This indemnity includes Seller's right to recover all costs and expenses incurred by Seller to defend against
474  any such liability, damage, cost or expense, or to enforce this Section, including Seller's reasonable attorney fees, legal fees and
475  expenses. The provisions of this Section survive the termination of this Contract. This § 10.4 does not apply to items performed
476  pursuant to an Inspection Resolution.

477  **10.5.  Insurability.** Buyer has the right to review and object to the availability, terms and conditions of and premium for
478  property insurance (Property Insurance). Buyer has the Right to Terminate under § 25.1, on or before **Property Insurance**
479  **Termination Deadline**, based on any unsatisfactory provision of the Property Insurance, in Buyer's sole subjective discretion.

480  **10.6.  Due Diligence.**

481  **10.6.1.  Due Diligence Documents.** If the respective box is checked, Seller agrees to deliver copies of the following
482  documents and information pertaining to the Property (Due Diligence Documents) to Buyer on or before **Due Diligence**
483  **Documents Delivery Deadline:**

484  [✓]   **10.6.1.1.**  All contracts relating to the operation, maintenance and management of the Property;

485  [ ]   **10.6.1.2.**  Property tax bills for the last _____ years;

486  [✓]   **10.6.1.3.**  As-built construction plans to the Property and the tenant improvements, including architectural,
487  electrical, mechanical and structural systems; engineering reports; and permanent Certificates of Occupancy, to the extent now
488  available;

489  [ ]   **10.6.1.4.**  A list of all Inclusions to be conveyed to Buyer;

490  [ ]   **10.6.1.5.**  Operating statements for the past _____ years;

491  [ ]   **10.6.1.6.**  A rent roll accurate and correct to the date of this Contract;

492  [ ]   **10.6.1.7.**  All current leases, including any amendments or other occupancy agreements, pertaining to the
493  Property. Those leases or other occupancy agreements pertaining to the Property that survive Closing are as follows (Leases):

494

495

**Exhibit A - 0010**

Motion to Dismiss Ex. C-000010

496 ☑      **10.6.1.8.** A schedule of any tenant improvement work Seller is obligated to complete but has not yet
497 completed and capital improvement work either scheduled or in process on the date of this Contract;

498 ☑      **10.6.1.9.** All insurance policies pertaining to the Property and copies of any claims which have been made
499 for the past four_____ years;

500 ☑      **10.6.1.10.** Soils reports, surveys and engineering reports or data pertaining to the Property (if not delivered
501 earlier under § 8.3);

502 ☑      **10.6.1.11.** Any and all existing documentation and reports regarding Phase I and II environmental reports,
503 letters, test results, advisories and similar documents respective to the existence or nonexistence of asbestos, PCB transformers, or
504 other toxic, hazardous or contaminated substances and/or underground storage tanks and/or radon gas. If no reports are in Seller's
505 possession or known to Seller, Seller warrants that no such reports are in Seller's possession or known to Seller;

506 ☑      **10.6.1.12.** Any *Americans with Disabilities Act* reports, studies or surveys concerning the compliance of the
507 Property with said Act;

508 ☑      **10.6.1.13.** All permits, licenses and other building or use authorizations issued by any governmental
509 authority with jurisdiction over the Property and written notice of any violation of any such permits, licenses or use authorizations,
510 if any; and

511 ☑      **10.6.1.14.** Other documents and information:
512 all surveys and site plans of the Property, all construction plans, all permits, per contracts and subcontracts for the partially completed construction at the Property, documents
513 regarding any land use and zoning restrictions for the Property, any third party reports regarding the Property, all information on Property's inclusion in Gateway Dist., Sand
    Creek Metropolitan District and any other special district, including taxes and/or fees, and all documents related to construction of the contemplated Four Points by Sheraton

514      **10.6.2. Due Diligence Documents Review and Objection.** Buyer has the right to review and object to Due
515 Diligence Documents. If the Due Diligence Documents are not supplied to Buyer or are unsatisfactory, in Buyer's sole subjective
516 discretion, Buyer may, on or before **Due Diligence Documents Objection Deadline**:

517      **10.6.2.1. Notice to Terminate.** Notify Seller in writing, pursuant to § 25.1, that this Contract is
518 terminated; or

519      **10.6.2.2. Due Diligence Documents Objection.** Deliver to Seller a written description of any
520 unsatisfactory Due Diligence Documents that Buyer requires Seller to correct.

521      **10.6.2.3. Due Diligence Documents Resolution.** If a Due Diligence Documents Objection is received by
522 Seller, on or before **Due Diligence Documents Objection Deadline** and if Buyer and Seller have not agreed in writing to a
523 settlement thereof on or before **Due Diligence Documents Resolution Deadline**, this Contract will terminate on **Due Diligence**
524 **Documents Resolution Deadline** unless Seller receives Buyer's written withdrawal of the Due Diligence Documents Objection
525 before such termination, i.e., on or before expiration of **Due Diligence Documents Resolution Deadline**.

526      **10.6.3. Zoning.** Buyer has the Right to Terminate under § 25.1, on or before **Due Diligence Documents Objection**
527 **Deadline**, based on any unsatisfactory zoning and any use restrictions imposed by any governmental agency with jurisdiction over
528 the Property, in Buyer's sole subjective discretion.

529      **10.6.4. Due Diligence – Environmental, ADA.** Buyer has the right to obtain environmental inspections of the
530 Property including Phase I and Phase II Environmental Site Assessments, as applicable. ☐ **Seller** ☑ **Buyer** will order or provide
531 ☐ **Phase I Environmental Site Assessment,** ☐ **Phase II Environmental Site Assessment** (compliant with most current version
532 of the applicable ASTM E1527 standard practices for Environmental Site Assessments) and/or _____,
533 at the expense of ☐ **Seller** ☑ **Buyer** (Environmental Inspection). In addition, Buyer, at Buyer's expense, may also conduct an
534 evaluation whether the Property complies with the *Americans with Disabilities Act* (ADA Evaluation). All such inspections and
535 evaluations must be conducted at such times as are mutually agreeable to minimize the interruption of Seller's and any Seller's
536 tenants' business uses of the Property, if any.

537      If Buyer's Phase I Environmental Site Assessment recommends a Phase II Environmental Site Assessment, the
538 **Environmental Inspection Termination Deadline** will be extended by _____ days (Extended Environmental Inspection
539 Objection Deadline) and if such Extended Environmental Inspection Objection Deadline extends beyond the **Closing Date**, the
540 **Closing Date** will be extended a like period of time. In such event, ☐ **Seller** ☑ **Buyer** must pay the cost for such Phase II
541 Environmental Site Assessment.

542      Notwithstanding Buyer's right to obtain additional environmental inspections of the Property in this § 10.6.4, Buyer has the
543 Right to Terminate under § 25.1, on or before **Environmental Inspection Termination Deadline**, or if applicable, the Extended
544 Environmental Inspection Objection Deadline, based on any unsatisfactory results of Environmental Inspection, in Buyer's sole
545 subjective discretion.

546      Buyer has the Right to Terminate under § 25.1, on or before **ADA Evaluation Termination Deadline**, based on any
547 unsatisfactory ADA Evaluation, in Buyer's sole subjective discretion.

548      ~~**10.7. Conditional Upon Sale of Property.** This Contract is conditional upon the sale and closing of that certain property~~
549 ~~owned by Buyer and commonly known as _____. Buyer has the Right to Terminate~~
550 ~~under § 25.1 effective upon Seller's receipt of Buyer's Notice to Terminate on or before **Conditional Sale Deadline** if such~~
551 ~~property is not sold and closed by such deadline. This Section is for the sole benefit of Buyer. If Seller does not receive Buyer's~~
552 ~~Notice to Terminate on or before **Conditional Sale Deadline**, Buyer waives any Right to Terminate under this provision.~~

553      **10.8. Source of Potable Water (Residential Land and Residential Improvements Only). [Intentionally Deleted]**

**Exhibit A - 0011**

Motion to Dismiss Ex. C-000011

554       **10.9.**  **Existing Leases; Modification of Existing Leases; New Leases.** Seller states that none of the Leases to be assigned
555 to the Buyer at the time of Closing contain any rent concessions, rent reductions or rent abatements except as disclosed in the
556 Lease or other writing received by Buyer. Seller will not amend, alter, modify, extend or cancel any of the Leases nor will Seller
557 enter into any new leases affecting the Property without the prior written consent of Buyer, which consent will not be unreasonably
558 withheld or delayed.

559 **11. ESTOPPEL STATEMENTS.**
560       **11.1.**  **Estoppel Statements Conditions.** Buyer has the right to review and object to any Estoppel Statements. Seller must
561 request from all tenants of the Property and if received by Seller, deliver to Buyer on or before **Estoppel Statements Deadline**,
562 statements in a form and substance reasonably acceptable to Buyer, from each occupant or tenant at the Property (Estoppel
563 Statement) attached to a copy of the Lease stating:
564           **11.1.1.**  The commencement date of the Lease and scheduled termination date of the Lease;
565           **11.1.2.**  That said Lease is in full force and effect and that there have been no subsequent modifications or
566 amendments;
567           **11.1.3.**  The amount of any advance rentals paid, rent concessions given and deposits paid to Seller;
568           **11.1.4.**  The amount of monthly (or other applicable period) rental paid to Seller;
569           **11.1.5.**  That there is no default under the terms of said Lease by landlord or occupant; and
570           **11.1.6.**  That the Lease to which the Estoppel Statement is attached is a true, correct and complete copy of the Lease
571 demising the premises it describes.
572       **11.2.**  **Seller Estoppel Statement.** In the event Seller does not receive from all tenants of the Property a completed signed
573 Estoppel Statement, Seller agrees to complete and execute an Estoppel Statement setting forth the information and documents
574 required §11.1 above and deliver the same to Buyer on or before **Estoppel Statements Deadline**.
575       **11.3.**  **Estoppel Statements Termination.** Buyer has the Right to Terminate under § 25.1, on or before **Estoppel**
576 **Statements Termination Deadline**, based on any unsatisfactory Estoppel Statement, in Buyer's sole subjective discretion, or if
577 Seller fails to deliver the Estoppel Statements on or before **Estoppel Statements Deadline**. Buyer also has the unilateral right to
578 waive any unsatisfactory Estoppel Statement.

579           **CLOSING PROVISIONS**

580 **12. CLOSING DOCUMENTS, INSTRUCTIONS AND CLOSING.**
581       **12.1.**  **Closing Documents and Closing Information.** Seller and Buyer will cooperate with the Closing Company to
582 enable the Closing Company to prepare and deliver documents required for Closing to Buyer and Seller and their designees. If
583 Buyer is obtaining a loan to purchase the Property, Buyer acknowledges Buyer's lender is required to provide the Closing
584 Company, in a timely manner, all required loan documents and financial information concerning Buyer's loan. Buyer and Seller
585 will furnish any additional information and documents required by Closing Company that will be necessary to complete this
586 transaction. Buyer and Seller will sign and complete all customary or reasonably-required documents at or before Closing.
587       **12.2.**  **Closing Instructions.** Colorado Real Estate Commission's Closing Instructions ☐ **Are** ☑ **Are Not** executed with
588 this Contract.
589       **12.3.**  **Closing.** Delivery of deed from Seller to Buyer will be at closing (Closing). Closing will be on the date specified as
590 the **Closing Date** or by mutual agreement at an earlier date. The hour and place of Closing will be as designated by
591 mutual agreement of Buyer and Seller      .
592       **12.4.**  **Disclosure of Settlement Costs.** Buyer and Seller acknowledge that costs, quality and extent of service vary
593 between different settlement service providers (e.g., attorneys, lenders, inspectors and title companies).

594 **13. TRANSFER OF TITLE.** Subject to Buyer's compliance with the terms and provisions of this Contract, including the
595 tender of any payment due at Closing, Seller, provided another deed is not selected, must execute and deliver a good and sufficient
596 special warranty deed to Buyer, at Closing. However, if the box is checked, the parties agree to use the corresponding deed
597 instead:
598 ☐ general warranty deed ☐ bargain and sale deed ☐ quit claim deed ☐ personal representative's deed ☑ special warranty deed.
599       **13.1.**  **Special Warranty Deed and General Warranty Deed Exceptions.** If title will be conveyed using a special
600 warranty deed or a general warranty deed, title will be conveyed subject to:
601           **13.1.1.**  General taxes for the year of Closing,
602           **13.1.2.**  Distribution utility easements (including cable TV),
603           **13.1.3.**  Those specifically described rights of third parties not shown by the public records of which Buyer has
604 actual knowledge and which were accepted by Buyer in accordance with § 8.3 (Off-Record Title) and § 9 (New ILC or New
605 Survey),
606           **13.1.4.**  Inclusion of the Property within any special taxing district,

**Exhibit A - 0012**

Motion to Dismiss Ex. C-000012

607        **13.1.5.** Any special assessment if the improvements were not installed as of the date of Buyer's signature hereon,
608 whether assessed prior to or after Closing and
609        **13.1.6.** Other _____.
610    **13.2.**   **Special Warranty Deed.** In addition to the requirements of § 13.1, if title will be conveyed by a special warranty
611 deed, Seller will warrant title against all persons claiming by, through or under Seller subject to those specific recorded exceptions,
612 if any, created during Seller's ownership of the Property and described by reference to recorded documents shown as Exceptions in
613 the Title Documents that are accepted by Buyer in accordance with § 8.2 (Record Title) and described in the deed by reference to
614 the specific recording information for each recorded document.
615    **13.3.**   **General Warranty Deed.** In addition to the requirements of § 13.1, if title will be conveyed by a general warranty
616 deed, Seller will warrant the title subject to those specific recorded exceptions described by reference to recorded documents
617 shown as Exceptions in the Title Documents that are accepted by Buyer in accordance with § 8.2 (Record Title) and described in
618 the deed by reference to the specific recording information for each recorded document.

619 **14.**   **PAYMENT OF LIENS AND ENCUMBRANCES.** Unless agreed to by Buyer in writing, any amounts owed on any liens
620 or encumbrances securing a monetary sum, including, but not limited to, any governmental liens for special improvements
621 installed as of the date of Buyer's signature hereon, whether assessed or not and previous years' taxes, will be paid at or before
622 Closing by Seller from the proceeds of this transaction or from any other source.

623 **15.**   **CLOSING COSTS, CLOSING FEE, ASSOCIATION FEES AND TAXES.**
624    **15.1.**   **Closing Costs.** Buyer and Seller must pay, in Good Funds, their respective closing costs and all other items required
625 to be paid at Closing, except as otherwise provided herein.
626    **15.2.**   **Closing Services Fee.** The fee for real estate closing services must be paid at Closing by ☐ **Buyer** ☐ **Seller**
627 ☑ **One-Half by Buyer and One-Half by Seller** ☐ **Other** _____
628    **15.3.**   **Status Letter and Record Change Fees.** At least fourteen days prior to **Closing Date**, Seller agrees to promptly
629 request the Association to deliver to Buyer a current Status Letter. Any fees incident to the issuance of Association's Status Letter
630 must be paid by ☐ **None** ☐ **Buyer** ☐ **Seller** ☑ **One-Half by Buyer and One-Half by Seller.** Any Record Change Fee must
631 be paid by ☐ **None** ☐ **Buyer** ☐ **Seller** ☑ **One-Half by Buyer and One-Half by Seller.**
632    **15.4.**   **Local Transfer Tax.** ☐ **The Local Transfer Tax** of _____% of the Purchase Price must be paid at Closing by
633 ☑ **None** ☐ **Buyer** ☐ **Seller** ☐ **One-Half by Buyer and One-Half by Seller.**
634    **15.5.**   **Private Transfer Fee.** Private transfer fees and other fees due to a transfer of the Property, payable at Closing, such
635 as community association fees, developer fees and foundation fees, must be paid at Closing by ☐ **None** ☐ **Buyer** ☐ **Seller**
636 ☑ **One-Half by Buyer and One-Half by Seller.** The Private Transfer fee, whether one or more, is for the following
637 association(s): _____ in the total amount of _____% of the Purchase Price or $_____.
638    **15.6.**   **Water Transfer Fees.** The Water Transfer Fees can change. The fees, as of the date of this Contract, do not exceed
639 $_____ for:
640       ☐ Water Stock/Certificates     ☐ Water District
641       ☐ Augmentation Membership   ☐ Small Domestic Water Company   ☐ _____
642 and must be paid at Closing by ☑ None ☐ **Buyer** ☐ **Seller** ☐ **One-Half by Buyer and One-Half by Seller**
643    **15.7.**   **Sales and Use Tax.** Any sales and use tax that may accrue because of this transaction must be paid when due by
644 ☐ **None** ☐ **Buyer** ☐ **Seller** ☐ **One-Half by Buyer and One-Half by Seller.**
645    **15.8.**   **FIRPTA and Colorado Withholding.**
646       **15.8.1.**   **FIRPTA.** The Internal Revenue Service (IRS) may require a substantial portion of the Seller's proceeds be
647 withheld after Closing when Seller is a foreign person. If required withholding does not occur, the Buyer could be held liable for
648 the amount of the Seller's tax, interest and penalties. If the box in this Section is checked, Seller represents that Seller ☐ **IS** a
649 foreign person for purposes of U.S. income taxation. If the box in this Section is not checked, Seller represents that Seller is not a
650 foreign person for purposes of U.S. income taxation. Seller agrees to cooperate with Buyer and Closing Company to provide any
651 reasonably requested documents to verify Seller's foreign person status. If withholding is required, Seller authorizes Closing
652 Company to withhold such amount from Seller's proceeds. Seller should inquire with Seller's tax advisor to determine if
653 withholding applies or if an exemption exists.
654       **15.8.2.**   **Colorado Withholding.** The Colorado Department of Revenue may require a portion of the Seller's
655 proceeds be withheld after Closing when Seller will not be a Colorado resident after Closing, if not otherwise exempt. Seller
656 agrees to cooperate with Buyer and Closing Company to provide any reasonably requested documents to verify Seller's status. If
657 withholding is required, Seller authorizes Closing Company to withhold such amount from Seller's proceeds. Seller should
658 inquire with Seller's tax advisor to determine if withholding applies or if an exemption exists.

659 **16.**   **PRORATIONS AND ASSOCIATION ASSESSMENTS.** The following will be prorated to the **Closing Date**, except as
660 otherwise provided:
661    **16.1.**   **Taxes.** Personal property taxes, if any, special taxing district assessments, if any, and general real estate taxes for the
662 year of Closing, based on ☑ **Taxes for the Calendar Year Immediately Preceding Closing** ☐ **Most Recent Mill Levy and**

Exhibit A-00014
Motion to Dismiss Ex. C-000013

663 **Most Recent Assessed Valuation**, adjusted by any applicable qualifying seniors property tax exemption, qualifying disabled
664 veteran exemption or ☐ **Other** _____.
665    **16.2.  Rents.** Rents based on ☐ **Rents Actually Received** ☐ **Accrued**. At Closing, Seller will transfer or credit to
666 Buyer the security deposits for all Leases assigned, or any remainder after lawful deductions and notify all tenants in writing of
667 such transfer and of the transferee's name and address. Seller must assign to Buyer all Leases in effect at Closing and Buyer must
668 assume Seller's obligations under such Leases.
669    **16.3.  Association Assessments.** Current regular Association assessments and dues (Association Assessments) paid in
670 advance will be credited to Seller at Closing. Cash reserves held out of the regular Association Assessments for deferred
671 maintenance by the Association will not be credited to Seller except as may be otherwise provided by the Governing Documents.
672 Buyer acknowledges that Buyer may be obligated to pay the Association, at Closing, an amount for reserves or working capital.
673 Any special assessment assessed prior to **Closing Date** by the Association will be the obligation of ☑ **Buyer** ☐ **Seller**. Except
674 however, any special assessment by the Association for improvements that have been installed as of the date of Buyer's signature
675 hereon, whether assessed prior to or after Closing, will be the obligation of Seller. Seller represents there are no unpaid regular or
676 special assessments against the Property except the current regular assessments and _____
677 Association Assessments are subject to change as provided in the Governing Documents.
678    **16.4.  Other Prorations.** Water and sewer charges, propane, interest on continuing loan and _____.
679    **16.5.  Final Settlement.** Unless otherwise agreed in writing, these prorations are final.

680 **17.  POSSESSION.** Possession of the Property will be delivered to Buyer on **Possession Date** at **Possession Time**, subject to
681 the Leases as set forth in § 10.6.1.7.
682    If Seller, after Closing, fails to deliver possession as specified, Seller will be subject to eviction and will be additionally liable
683 to Buyer for payment of $_____ per day (or any part of a day notwithstanding § 18.1) from **Possession Date** and
684 **Possession Time** until possession is delivered.

685 
<div align="center">

**GENERAL PROVISIONS**

</div>

686 **18.  DAY; COMPUTATION OF PERIOD OF DAYS, DEADLINE.**
687    **18.1.  Day.** As used in this Contract, the term "day" means the entire day ending at 11:59 p.m., United States Mountain
688 Time (Standard or Daylight Savings as applicable).
689    **18.2.  Computation of Period of Days, Deadline.** In computing a period of days (e.g., three days after MEC), when the
690 ending date is not specified, the first day is excluded and the last day is included. If any deadline falls on a Saturday, Sunday or
691 federal or Colorado state holiday (Holiday), such deadline ☑ **Will** ☐ **Will Not** be extended to the next day that is not a
692 Saturday, Sunday or Holiday. Should neither box be checked, the deadline will not be extended.

693 **19.  CAUSES OF LOSS, INSURANCE; DAMAGE TO INCLUSIONS AND SERVICES; CONDEMNATION; AND
694 WALK-THROUGH.** Except as otherwise provided in this Contract, the Property, Inclusions or both will be delivered in the
695 condition existing as of the date of this Contract, ordinary wear and tear excepted.
696    **19.1.  Causes of Loss, Insurance.** In the event the Property or Inclusions are damaged by fire, other perils or causes of
697 loss prior to Closing (Property Damage) in an amount of not more than ten percent of the total Purchase Price and if the repair of
698 the damage will be paid by insurance (other than the deductible to be paid by Seller), then Seller, upon receipt of the insurance
699 proceeds, will use Seller's reasonable efforts to repair the Property before **Closing Date**. Buyer has the Right to Terminate under
700 § 25.1, on or before **Closing Date**, if the Property is not repaired before **Closing Date**, or if the damage exceeds such sum. Should
701 Buyer elect to carry out this Contract despite such Property Damage, Buyer is entitled to a credit at Closing for all insurance
702 proceeds that were received by Seller (but not the Association, if any) resulting from damage to the Property and Inclusions, plus
703 the amount of any deductible provided in the insurance policy. This credit may not exceed the Purchase Price. In the event
704 Seller has not received the insurance proceeds prior to Closing, the parties may agree to extend the **Closing Date** to have the
705 Property repaired prior to Closing or, at the option of Buyer, (1) Seller must assign to Buyer the right to the proceeds at Closing, if
706 acceptable to Seller's insurance company and Buyer's lender; or (2) the parties may enter into a written agreement prepared by the
707 parties or their attorney requiring the Seller to escrow at Closing from Seller's sale proceeds the amount Seller has received and
708 will receive due to such damage, not exceeding the total Purchase Price, plus the amount of any deductible that applies to the
709 insurance claim.
710    **19.2.  Damage, Inclusions and Services.** Should any Inclusion or service (including utilities and communication
711 services), system, component or fixture of the Property (collectively Service) (e.g., heating or plumbing), fail or be damaged
712 between the date of this Contract and Closing or possession, whichever is earlier, then Seller is liable for the repair or replacement
713 of such Inclusion or Service with a unit of similar size, age and quality, or an equivalent credit, but only to the extent that the
714 maintenance or replacement of such Inclusion or Service is not the responsibility of the Association, if any, less any insurance
715 proceeds received by Buyer covering such repair or replacement. If the failed or damaged Inclusion or Service is not repaired or
716 replaced on or before Closing or possession, whichever is earlier, Buyer has the Right to Terminate under § 25.1, on or before

<div align="center">

Exhibit A - 0014

Motion to Dismiss Ex. C-000014

</div>

717 **Closing Date**, or, at the option of Buyer, Buyer is entitled to a credit at Closing for the repair or replacement of such Inclusion or
718 Service. Such credit must not exceed the Purchase Price. If Buyer receives such a credit, Seller's right for any claim against the
719 Association, if any, will survive Closing.

720     **19.3.  Condemnation.** In the event Seller receives actual notice prior to Closing that a pending condemnation action may
721 result in a taking of all or part of the Property or Inclusions, Seller must promptly notify Buyer, in writing, of such condemnation
722 action. Buyer has the Right to Terminate under § 25.1, on or before **Closing Date**, based on such condemnation action, in Buyer's
723 sole subjective discretion. Should Buyer elect to consummate this Contract despite such diminution of value to the Property and
724 Inclusions, Buyer is entitled to a credit at Closing for all condemnation proceeds awarded to Seller for the diminution in the value
725 of the Property or Inclusions but such credit will not include relocation benefits or expenses, or exceed the Purchase Price.

726     **19.4.  Walk-Through and Verification of Condition.** Buyer, upon reasonable notice, has the right to walk through the
727 Property prior to Closing to verify that the physical condition of the Property and Inclusions complies with this Contract.

728 **20.  RECOMMENDATION OF LEGAL AND TAX COUNSEL.** By signing this Contract, Buyer and Seller acknowledge
729 that the respective broker has advised that this Contract has important legal consequences and has recommended the examination
730 of title and consultation with legal and tax or other counsel before signing this Contract.

731 **21.  TIME OF ESSENCE, DEFAULT AND REMEDIES.** Time is of the essence for all dates and deadlines in this
732 Contract. This means that all dates and deadlines are strict and absolute. If any payment due, including Earnest Money, is not
733 paid, honored or tendered when due, or if any obligation is not performed timely as provided in this Contract or waived, the non-
734 defaulting party has the following remedies:

735     **21.1.  If Buyer is in Default:**

736 ☐    **21.1.1.  Specific Performance.** Seller may elect to cancel this Contract and all Earnest Money (whether or not paid
737 by Buyer) will be paid to Seller and retained by Seller. It is agreed that the Earnest Money is not a penalty and the Parties agree the
738 amount is fair and reasonable. Seller may recover such additional damages as may be proper. Alternatively, Seller may elect to
739 treat this Contract as being in full force and effect and Seller has the right to specific performance, or damages, or both.

740     **21.1.2.  Liquidated Damages, Applicable. This § 21.1.2 applies <u>unless the box in § 21.1.1. is checked</u>.** Seller
741 may cancel this Contract. All Earnest Money (whether or not paid by Buyer) will be paid to Seller and retained by Seller. It is
742 agreed that the Earnest Money specified in § 4.1 is LIQUIDATED DAMAGES and not a penalty, which amount the parties agree
743 is fair and reasonable and (except as provided in §§ 10.4, 22, 23 and 24), said payment of Earnest Money is SELLER'S ONLY
744 REMEDY for Buyer's failure to perform the obligations of this Contract. Seller expressly waives the remedies of specific
745 performance and additional damages.

746     **21.2.  If Seller is in Default:** Buyer may elect to treat this Contract as canceled, in which case all Earnest Money received
747 hereunder will be returned to Buyer and Buyer may recover such damages as may be proper. Alternatively, Buyer may elect to
748 treat this Contract as being in full force and effect and Buyer has the right to specific performance, or damages, or both.

749 **22.  LEGAL FEES, COST AND EXPENSES.** Anything to the contrary herein notwithstanding, in the event of any arbitration
750 or litigation relating to this Contract, prior to or after **Closing Date**, the arbitrator or court must award to the prevailing party all
751 reasonable costs and expenses, including attorney fees, legal fees and expenses.

752 **23.  MEDIATION.** If a dispute arises relating to this Contract (whether prior to or after Closing) and is not resolved, the parties
753 must first proceed, in good faith, to mediation. Mediation is a process in which the parties meet with an impartial person who helps
754 to resolve the dispute informally and confidentially. Mediators cannot impose binding decisions. Before any mediated settlement is
755 binding, the parties to the dispute must agree to the settlement, in writing. The parties will jointly appoint an acceptable mediator
756 and will share equally in the cost of such mediation. The obligation to mediate, unless otherwise agreed, will terminate if the entire
757 dispute is not resolved within thirty days of the date written notice requesting mediation is delivered by one party to the other at
758 that party's last known address (physical or electronic as provided in § 27). Nothing in this Section prohibits either party from
759 filing a lawsuit and recording a *lis pendens* affecting the Property, before or after the date of written notice requesting mediation.
760 This Section will not alter any date in this Contract, unless otherwise agreed.

761 **24.  EARNEST MONEY DISPUTE.** Except as otherwise provided herein, Earnest Money Holder must release the Earnest
762 Money following receipt of written mutual instructions, signed by both Buyer and Seller. In the event of any controversy regarding
763 the Earnest Money, Earnest Money Holder is not required to release the Earnest Money. Earnest Money Holder, in its sole
764 subjective discretion, has several options: (1) wait for any proceeding between Buyer and Seller; (2) interplead all parties and
765 deposit Earnest Money into a court of competent jurisdiction (Earnest Money Holder is entitled to recover court costs and
766 reasonable attorney and legal fees incurred with such action); or (3) provide notice to Buyer and Seller that unless Earnest Money
767 Holder receives a copy of the Summons and Complaint or Claim (between Buyer and Seller) containing the case number of the
768 lawsuit (Lawsuit) within one hundred twenty days of Earnest Money Holder's notice to the parties, Earnest Money Holder is
769 authorized to return the Earnest Money to Buyer. In the event Earnest Money Holder does receive a copy of the Lawsuit and has
770 not interpled the monies at the time of any Order, Earnest Money Holder must disburse the Earnest Money pursuant to the Order

Exhibit A - 0045
Motion to Dismiss Ex. C-000015

771 of the Court. The parties reaffirm the obligation of § 23 (Mediation). This Section will survive cancellation or termination of this
772 Contract.

**25. TERMINATION.**
    **25.1. Right to Terminate.** If a party has a right to terminate, as provided in this Contract (Right to Terminate), the
termination is effective upon the other party's receipt of a written notice to terminate (Notice to Terminate), provided such written
notice was received on or before the applicable deadline specified in this Contract. If the Notice to Terminate is not received on or
before the specified deadline, the party with the Right to Terminate accepts the specified matter, document or condition as
satisfactory and waives the Right to Terminate under such provision.
    **25.2. Effect of Termination.** In the event this Contract is terminated, all Earnest Money received hereunder will be
returned to Buyer and the parties are relieved of all obligations hereunder, subject to §§ 10.4, 22, 23 and 24.

**26. ENTIRE AGREEMENT, MODIFICATION, SURVIVAL; SUCCESSORS.** This Contract, its exhibits and specified
addenda, constitute the entire agreement between the parties relating to the subject hereof and any prior agreements pertaining
thereto, whether oral or written, have been merged and integrated into this Contract. No subsequent modification of any of the
terms of this Contract is valid, binding upon the parties, or enforceable unless made in writing and signed by the parties. Any right
or obligation in this Contract that, by its terms, exists or is intended to be performed after termination or Closing survives the
same. Any successor to a party receives the predecessor's benefits and obligations of this Contract.

**27. NOTICE, DELIVERY AND CHOICE OF LAW.**
    **27.1. Physical Delivery and Notice.** Any document, or notice to Buyer or Seller must be in writing, except as provided in
§ 27.2 and is effective when physically received by such party, any individual named in this Contract to receive documents or
notices for such party, Broker, or Brokerage Firm of Broker working with such party (except any notice or delivery after Closing
must be received by the party, not Broker or Brokerage Firm).
    **27.2. Electronic Notice.** As an alternative to physical delivery, any notice, may be delivered in electronic form to Buyer
or Seller, any individual named in this Contract to receive documents or notices for such party, Broker or Brokerage Firm of
Broker working with such party (except any notice or delivery after Closing must be received by the party, not Broker or
Brokerage Firm) at the electronic address of the recipient by facsimile, email or _____
    **27.3. Electronic Delivery.** Electronic Delivery of documents and notice may be delivered by: (1) email at the email
address of the recipient, (2) a link or access to a website or server provided the recipient receives the information necessary to
access the documents, or (3) facsimile at the facsimile number (Fax No.) of the recipient.
    **27.4. Choice of Law.** This Contract and all disputes arising hereunder are governed by and construed in accordance with
the laws of the State of Colorado that would be applicable to Colorado residents who sign a contract in Colorado for real property
located in Colorado.

**28. NOTICE OF ACCEPTANCE, COUNTERPARTS.** This proposal will expire unless accepted in writing, by Buyer and
Seller, as evidenced by their signatures below and the offering party receives notice of such acceptance pursuant to § 27 on or
before **Acceptance Deadline Date** and **Acceptance Deadline Time**. If accepted, this document will become a contract between
Seller and Buyer. A copy of this Contract may be executed by each party, separately and when each party has executed a copy
thereof, such copies taken together are deemed to be a full and complete contract between the parties.

**29. GOOD FAITH.** Buyer and Seller acknowledge that each party has an obligation to act in good faith including, but not
limited to, exercising the rights and obligations set forth in the provisions of **Financing Conditions and Obligations**; **Title
Insurance, Record Title and Off-Record Title; New ILC, New Survey;** and **Property Disclosure, Inspection, Indemnity,
Insurability and Due Diligence.**

---

## ADDITIONAL PROVISIONS AND ATTACHMENTS

---

**30. ADDITIONAL PROVISIONS.** (The following additional provisions have not been approved by the Colorado Real Estate
Commission.)

Additional Provisions are included as the Original Addendum attached and made a part of hereto.

Exhibit A - 0016

Motion to Dismiss Ex. C-000016

822  **31. OTHER DOCUMENTS.**
823     **31.1.** The following documents are a part of this Contract:
824        Exhibit A
825
826
827     **31.2.** The following documents have been provided but are not a part of this Contract:
828
829
830

831                              ┌─────────────────────────┐
                                 │        SIGNATURES       │
                                 └─────────────────────────┘
832

Buyer's Name:    Frisco Acquisition, LLC _____        Buyer's Name: _____

*Parmjit Kaur*        02.28.2019        *Wanda Bartola* _____
Buyer's Signature        Date             Buyer's Signature             Date

Address:    8762 Preston Trace Blvd. _____        Address: _____
            Frisco, Texas 75033 _____                 _____
Phone No.:  972-668-0327 _____        Phone No.: _____
Fax No.:    n/a _____        Fax No.: _____
Email Address: paramjitkaur251@yahoo.com        Email Address: _____

833  **[NOTE: If this offer is being countered or rejected, do not sign this document.**

Seller's Name: _____        Seller's Name: _____


Seller's Signature        Date             Seller's Signature             Date

Address: _____        Address: _____

Phone No.: _____        Phone No.: _____
Fax No.: _____        Fax No.: _____
Email Address: _____        Email Address: _____

834

835                    ┌──────────────────────────────────────────────────┐
                       │  END OF CONTRACT TO BUY AND SELL REAL ESTATE     │
                       └──────────────────────────────────────────────────┘

**32. BROKER'S ACKNOWLEDGMENTS AND COMPENSATION DISCLOSURE.**
(To be completed by Broker working with Buyer)

Broker ☐ **Does** ☐ **Does Not** acknowledge receipt of Earnest Money deposit. Broker agrees that if Brokerage Firm is the Earnest Money Holder and, except as provided in § 24, if the Earnest Money has not already been returned following receipt of a Notice to Terminate or other written notice of termination, Earnest Money Holder will release the Earnest Money as directed by the written mutual instructions. Such release of Earnest Money will be made within five days of Earnest Money Holder's receipt of the executed written mutual instructions, provided the Earnest Money check has cleared.

Although Broker is not a party to the Contract, Broker agrees to cooperate, upon request, with any mediation requested under § 23.

Broker is working with Buyer as a ☐ **Buyer's Agent** ☐ **Transaction-Broker** in this transaction. ☐ This is a **Change of Status**.

Exhibit A - 0017

☐ **Customer.** Broker has no brokerage relationship with Buyer.  See § 33 for Broker's brokerage relationship with Seller.

Brokerage Firm's compensation or commission is to be paid by ☐ **Listing Brokerage Firm** ☐ **Buyer** ☐ **Other** _____.

Brokerage Firm's Name:        _____
Brokerage Firm's License #:   _____
Broker's Name:                _____
Broker's License #:           _____

_____
Broker's Signature                                          Date

Address:         _____

Phone No.:       _____
Fax No.:         _____
Email Address:   _____

**33.   BROKER'S ACKNOWLEDGMENTS AND COMPENSATION DISCLOSURE.**
(To be completed by Broker working with Seller)

Broker ☐ **Does** ☐ **Does Not** acknowledge receipt of Earnest Money deposit. Broker agrees that if Brokerage Firm is the Earnest Money Holder and, except as provided in § 24, if the Earnest Money has not already been returned following receipt of a Notice to Terminate or other written notice of termination, Earnest Money Holder will release the Earnest Money as directed by the written mutual instructions. Such release of Earnest Money will be made within five days of Earnest Money Holder's receipt of the executed written mutual instructions, provided the Earnest Money check has cleared.

Although Broker is not a party to the Contract, Broker agrees to cooperate, upon request, with any mediation requested under § 23.

Broker is working with Seller as a ☐ **Seller's Agent** ☐ **Transaction-Broker** in this transaction. ☐ This is a **Change of Status.**

☐ **Customer.** Broker has no brokerage relationship with Seller.  See § 32 for Broker's brokerage relationship with Buyer.

Brokerage Firm's compensation or commission is to be paid by ☐ **Seller** ☐ **Buyer** ☐ **Other** _____.

Brokerage Firm's Name:        _____
Brokerage Firm's License #:   _____
Broker's Name:                _____
Broker's License #:           _____

_____
Broker's Signature                                          Date

Address:         _____

Phone No.:       _____
Fax No.:         _____
Email Address:   _____

836

Exhibit A - 0018

Motion to Dismiss Ex. C-000018

# ORIGINAL ADDENDUM
# to
# CONTRACT TO BUY AND SELL REAL ESTATE (COMMERCIAL)

**16161 E. 40th Avenue, Denver, Colorado 80329**

**30.1. MEC.** Mutual Execution of the Contract ("MEC") shall be construed for the purposes of this Contract and its deadlines as the date of last execution by Buyer or Seller, whichever occurs later.

**30.2. BANKRUPTCY.** Seller is debtor in a pending voluntary bankruptcy proceeding before the United States Bankruptcy Court for the District of Colorado, Denver Division, Case No. 18-18636-EEB. This Contract must be approved by the Bankruptcy Court and will be deemed null and void if not approved within 30 Days of MEC.

**30.3. PURCHASE PRICE.** The Purchase Price, as recited in § 4, shall specifically constitute, in addition to the Assumption Balance, payment of only (i) the following listed obligations of the Seller; and (ii) a reserve fund as stated. Should the actual cost to satisfy these obligations or said reserve's intent be less, the Purchase Price shall be reduced in kind. It is the intent that no cash be paid to Seller at Closing of this transaction.

| **Obligations Constituting Part of the Purchase Price** | | |
|---|---|---|
| Storm Drain Lien | City & County of Denver | $134.81 |
| Real Property Taxes | City & County of Denver | $101,340.66 |
| Mechanic Lien | Rio Grande Co. | $53,830.49 |
| Mechanic Lien | O'Brien Construction | $13,887.26 |
| Mechanic Lien | United Rentals | $64,466.79 |
| Mechanic Lien | Redd Iron, Inc. | $53,220.40 |
| Mechanic Lien | Metro Building Products | $4,650.48 |
| Mechanic Lien | Summit Services Group | $3,520.00 |
| Mechanic Lien | HD Supply Construction | $3,556.12 |
| Mechanic Lien | Waste Connections | $5,335.41 |
| Use Taxes | City & County of Denver | $139,393.50 |
| **TOTAL** | | **$507,802.71** |

**Reserve Fund Constituting Part of the Purchase Price**

Reserve Amount of $250,000.00 for payment of administrative expenses, trustee fee's, and attorneys' fees in Case No. 18-18636-EEB.

**30.4. CLOSING DATE.** The Closing Date will be 29 days from the date the Bankruptcy Court authorizes the specific sale contemplated by this Contract, but at least 45 days after MEC. Closing shall occur no later than 75 days after MEC or bankruptcy court approval, whichever occurs later.

**30.4.1. Extension of Closing.** Buyer shall have the right to extend the Closing Date, as determined by the terms herein, for an additional 30 days by making an additional $125,000.00 deposit to Earnest Money.

**30.3.   OTHER AGREEMENTS.**   As a part of this transaction, Abbas Consulting, Inc., a Texas Corporation contemporaneously enters into a certain Agreement for Purchase and Sale of LLC Interest with Wanda Bertoia, owner of WPB Hospitality, LLC and Alpine Hospitality, Inc. ("LLC Agreement"). Therein, Frisco Acquisition, LLC shall acquire all of Wanda Bertoia's right, title and interest in WPB in exchange for payment of $2,500,000.00. As further consideration, Wanda Bertoia and Alpine Hospitality, Inc. have agreed to release their claims against WPB Hospitality, LLC. Buyer and Seller agree that contemporaneous execution of the LLC Agreement is an integral to the overall consideration for Closing of this transaction.

EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

A parcel of land being a portion of Plot 1, Block 1, Gateway Park IV – Denver Filing No. 7, being more particularly described as follows:

COMMENCING at the northwest corner of said Plot 1;

THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 295.63 feet to the true point of beginning;

THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 396.64 feet to the northeast corner of said Plot 1;

THENCE the following three (3) course along the East line of said Plot 1:

1.  THENCE South 10 degrees 26 minutes 16 seconds West, a distance of 95.82 feet to a point of curve;
2.  THENCE along the arc of a curve to the left, having a central angle of 10 degrees 34 minutes 10 seconds, a radius of 315.00 feet and an arc length of 58.11 feet;
3.  THENCE South 00 degrees 07 minutes 54 seconds East , a distance of 307.25 feet to the southeast corner of said Plot 1;

THENCE the following four (4) courses along the South line of said Plot 1:

1.  THENCE South 89 degrees 52 minutes 06 seconds West, a distance of 100.00 feet;
2.  THENCE South 00 degrees 07 minutes 54 seconds East, a distance of 5.00 feet to a point on the North right-of-way line of 40th Avenue, as dedicated by 40th Avenue, Chamber Road – Pena Boulevard Subdivision, recorded May 6, 1997, at Reception Number 9700057406, said City and County of Denver Records;
3.  THENCE South 89 degrees 52 minutes 06 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 250.09 feet;
4.  THENCE South 89 degrees 52 minutes 04 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 23.63 feet;

THENCE North 00 degrees 07 minutes 54 seconds West, a distance of 464.23 feet to the true point of beginning, City and County of Denver, State of Colorado.

3

4819-4855-3055.1

Exhibit A - 0021

Motion to Dismiss Ex. C-000021

# EXHIBIT D

## TO SECOND AMENDED COMPLAINT

### DENVER COUNTY DISTRICT COURT, STATE OF COLORADO

### CASE NO. 19CV33523

**AGREEMENT FOR PURCHASE AND SALE**
**OF LLC INTEREST**

DATE FILED: December 16, 2019 1:45 PM
FILING ID: EB6B3B2BCF8B9
CASE NUMBER: 2019CV33523

This Agreement for Purchase and Sale of LLC Interest (this "Agreement") is made as of the _____ day of _____, 2019, by and between Wanda Bertoia, owner of WPB Hospitality, LLC, a Colorado limited liability company, ("Seller") and Frisco Acquisition, LLC, a Texas limited liability company, ("Purchaser") and Alpine Hospitality, Inc., a Colorado corporation ("Alpine")

### Background of the Agreement

The following background statements are made to aid in the understanding and interpretation of this Agreement:

A.   Seller is the sole owner and member of WPB Hospitality, LLC ("WPB").

B.   WPB has been in process on the construction of a Sheraton Four Points branded hotel located at 16161 E. 40th Ave, Denver, CO 80239 (the "Property").

C.   WPB was constructing a hotel on the Property using a loan through the federal EB-5 program, funded through a lender named American Lender Center, LLC ("ALC").

D.   The total aggregate face amount of the loan from ALC to WPB was $10,200,000. Which amount was split between two promissory notes.

E.   WPB proceeded with construction until such time as WPB's General Contractor abandoned the Property and failed to remit payments to subcontractors.

F.   At the time the General Contractor abandoned the Property, construction had proceeded to between 20% and 30% complete. The Property remains in the same condition as it was in at the time the General Contractor abandoned the Property.

G.   On October 3, 2018, WPB filed Chapter 11 bankruptcy, United States Bankruptcy Court Case Number 18-18636-EEB (the "Bankruptcy Case").

H.   Purchaser is a hotelier familiar with the Denver hotel market. Purchaser and Abbas Consulting, Inc. ("Abbas"), an affiliated creditor, have collectively purchased three proofs of claim in the Bankruptcy Case totaling $80,000.

I.   ALC filed a proof of claim in the Bankruptcy Case for $5,329,779.28.

J.   Seller's separate entity Alpine Hospitality, Inc. filed a proof of claim in the Bankruptcy Case totaling $5,784,158.53.

K.   Purchaser has submitted a contract for the purchase of the Property from WPB for $ 6,068,132.97 and is proposing, through that contract, to assume the ALC debt, and pay those lien holders that have filed proofs of claim in the Bankruptcy Case, as Purchaser deems necessary and appropriate.

L.   Purchaser desires to purchase from Seller and Seller desires to sell to Purchaser on the terms and subject to conditions of this Agreement, Seller's membership interests in WPB, presently owned by Seller.

<u>Agreement</u>

Now, therefore, in consideration of the premises, their mutual covenants and promises, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

1.   <u>Incorporation of Background Statements.</u>  The foregoing background statements are incorporated herein as if fully set forth.  All such statements are material terms of this Agreement and not merely recitals.

2.   <u>Sale of Membership Interest</u>.  Subject to the terms and conditions set forth in this Agreement and subject to Bankruptcy Court approval, unless otherwise agreed, Seller agrees to sell, assign, transfer and deliver to Purchaser, and Purchaser agrees to purchase and accept from Seller, all of Seller's rights, title and interest in WPB.

3.   <u>Withdrawal of Claims</u>.  Purchaser and Seller acknowledge that this Agreement contemplates resolution of the claims of Wanda Bertoia against WPB. Seller shall release upon Closing any and all of her claims, known or unknown, against WPB. Seller, acting in her official capacity on behalf of Alpine shall release upon Closing any and all of Alpine's claims, known or unknown, against WPB

4.   <u>Consideration</u>.  The full purchase price is Two Million, Five Hundred Thousand Dollars and 00/100 ($2,500,000.00) (the "Purchase Price"). At Closing, Purchaser shall pay to Seller the Purchase Price in the form of Two Hundred Fifty Thousand and 00/100 ($250,000) and the execution and delivery to Seller of a promissory note in the form and with the terms as provided for in **Exhibit A** for the balance of the Purchase Price.

5.   <u>Assignment of Lawsuit Claims</u>.  In further consideration of consummation of this Agreement, Purchaser shall assign to Seller all claims and interests in Denver County District Court Case No. 2018CV32991 styled as WPB Hospitality, LLC v. Kumar Construction Management Inc. et. al.

6.   <u>Taxes</u>. Each party will be responsible for its own income taxes and tax reporting resulting from this sale.

7.   <u>Seller Representation.</u> Seller represents that she is the sole owner of WPB and has not sold, hypothecated or transferred any of her ownership in WPB to third parties.

8.   <u>Seller Makes No Warranties</u>.  Seller makes no express or implied warranty in regards to this Agreement or the business assets. Seller further makes no representation or warranty as to the profitability or income expected from the Property now or in the future. Buyer hereby expressly disclaims any representations and warranties and acknowledges and agrees it is purchasing WPB as-is without warranty of any kind whatsoever.

9.     Purchaser Warranty. Purchaser represents and warrants to Seller it is a corporation duly organized, validly existing and in good standing under the State of Texas, with full power and authority to conduct its business as it is now conducted; that this Agreement and all ancillary documents to this transaction constitute legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with the terms of this Agreement and the ancillary documents; and that Purchaser has power and authority to execute and deliver this Agreement and ancillary documents and perform the obligations thereunder and has been duly authorized to do so by all necessary corporate action.

10.     Closing. Consummation of the sale of WPB shall constitute the "Closing." Unless otherwise agreed between the parties, the Closing shall be remote, conducted through the parties representative counsel, and subject to approval by the bankruptcy court.

11.     Transaction. At the Closing, the following documents shall be exchanged:

        a.     Seller shall execute and deliver to Purchaser a bill of sale and an assignment.

        b.     Purchaser shall execute and deliver a Promissory Note in the same form and with the same terms as Exhibit A.

        Each party, at any time before or after the Closing date, shall execute, acknowledge, and deliver any further deeds, assignments, conveyances, and other assurances, documents, and instruments of transfer, reasonably requested by the other and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by Purchaser for the purpose of transferring to Purchaser, or reducing to possession the business and its assets.

12.     Purchaser's Indemnification. Purchaser shall indemnify, defend, and hold Seller, its members and employees harmless against all claims, losses, expenses, and damages, including interest, penalties, and reasonable attorneys' fees through all appeals, that Seller shall incur, which are caused by Purchaser's operation or ownership of its business or its use of the business assets after Closing or by any breach of or failure by Purchaser to perform, or the untruth of any of Purchaser's representations, warranties, or agreements in this Agreement or in any certificate, exhibit, or other instrument furnished or to be furnished by Purchaser under this Agreement.

13.     Miscellaneous.

        a.     Headings. The subject headings for the sections and subsections of this Agreement are included for purposes of convenience only, and shall not affect the construction or interpretation of any of its provisions.

        b.     Modification and Waiver. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all the parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision,

whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

    c.    Counterparts. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    d.    Assignment. This Agreement shall be binding on, and shall inure to the benefit of, the parties to it and their respective heirs, legal representatives, and successors. Any assignment without the written consent of all parties shall be void.

    e.    Governing Law. This Agreement is made under, and is to be construed and enforced in accordance with the laws of the State of Colorado.

    f.    Time of the Essence. Time is of the essence, and if any payment or any other material condition is not made, tendered, or performed as provided, there shall be the following remedies:

    g.    Costs. If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled.

    h.    Entire Agreement. This Agreement constitutes the entire agreement between the parties and supersedes any prior understandings, agreements, or representations by or between the parties, written or oral, to the extent they related in any way to the subject matter hereof.

    i.    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

    j.    Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

    k.    Survival. All the terms of this Agreement either specifically identified as surviving or which create or affect rights or obligations in the future shall survive and remain in effect after termination of this Agreement.

**[Signature Page Follows]**

In witness whereof, the parties have executed this Agreement the day and year first above written.

PURCHASER:
Frisco Acquisition, LLC
a Texas limited liability company

By _Parmjit  Kaur_
Its: Managing Member

Date: 03.14.2019

SELLER:
Wanda Bertoin,
In her individual capacity as the Sole
Member of WPB Hospitatlity, LLC

By: _Wanda Bertoia_

Date: 3-14-2019

Alpine Hospitality, Inc.
a Colorado corporation

By: _Wanda Bertoia_
Its: OWNER

Date: 3-14-2019

[Signature Page]

Joyce W. Lindauer
State Bar No. 21555700
Kerry S. Alleyne
State Bar No. 24066090
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
ATTORNEYS FOR DEBTOR

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **FRISCO ACQUISITION, LLC,** | § | **CASE NO. 20-42257-btr** |
| | § | **Chapter 7** |
| Debtor. | § | |

### DECLARATION OF PARAM J. KAUR

1.      My name is Param J. Kaur.  I am over the age of 18 years, of sound mind, and am competent and otherwise qualified to make this Declaration.  I have personal knowledge of the matters stated herein and they are all true and correct.

2.      I am the Principal Member of the Debtor in this case and have sufficient knowledge of this case and the Creditors.

3.      The Debtor objects to the Proof of Claim No. 1 filed by WPB Hospitality, LLC ("WPB").  The Debtor is not responsible for any alleged damages asserted by WPB for the reason they are based on two (2) null and void instruments, a "*Contract to Buy and Sell Real Estate (Commercial)*" ("Contract") and an "*Agreement for Purchase and Sale of LLC Interest*" ("Agreement") (drafted in February and March 2019, respectively).  The reason that they are null and void is that, to be effective, each was drafted with the specific requirement that the bankruptcy court in the case of WPB Hospitality, LLC's bankruptcy was required to grant approval of each

Declaration of Param J. Kaur
Page 1

**EXHIBIT "2"**

instrument. However, the bankruptcy court in that case never did so. As a result, and despite the Debtor's desire to the contrary, both the Contract and Agreement transactions failed due to the bankruptcy court's refusal to grant its authorization for the transactions to proceed.

4.     The failure of these transactions is not due to any action of Debtor. Even in the face of the fact that the bankruptcy court refused Debtor authority to proceed with the aforementioned transactions, WPB still alleges damages for breach of contract, bad faith breach of contract, and breach of duty of good faith and fair dealing.

5.     Without approval of the aforementioned transactions, no valid or enforceable contract existed and therefore no breach of any kind could have occurred.

6.     I declare under penalty of perjury that the statements contained herein and in the Debtor's Objection are within my personal knowledge and are true and correct.

Executed this _10th_ day of February, 2021.

Param J. Kaur