IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| FRISCO ACQUISITION, LLC, | § | CASE NO. 20-42257-btr |
| | § | Chapter 7 |
| Debtor. | § | |
| | § | |

## DECLARATION OF ARTHUR LINDQUIST-KLEISSLER, ESQ.

Arthur Lindquist-Kleissler, Esq., declares as follows:

1. I am an attorney licensed to practice law in the State of Colorado, the United States District Court for the District of Colorado, the 10th Circuit Court of Appeals, the United States Supreme Court and in the United States Bankruptcy Court for the District of Colorado.

2. I have been practicing law continuously since 1979.

3. I've specialized my practice in representing creditors, trustees, and debtors in bankruptcy cases.

4. I was engaged by WPB Hospitality, LLC ("WPB" or "Debtor") to commence and pursue a chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Colorado.

5. I have continuously represented the debtor, WPB, in that bankruptcy. The bankruptcy was commenced on or about October 3, 2018.

6. The object of the WPB chapter 11 bankruptcy was to sell or refinance a hotel property that WPB had partially constructed ("the Hotel Property" or "the Project."). The general contractor that had been hired to construct the Project failed to complete construction within two years, which was required by the loan agreement with American Lending Center, LLC ("ALC"), (the EB-5 lender). This triggered a non-monetary default of the loan agreement.

7. During the course of the bankruptcy, the Debtor and the principal of the Debtor, Wanda Bertoia ("Bertoia") pursued several refinancing options to refinance the existing debt on the Project or to sell the Project.

8. Bertoia is 100% owner of WPB.

9. On or about December 20, 2018, Joyce Lindauer, Esq. ("Lindauer") filed an entry of appearance and request for notice in the WPB bankruptcy on behalf of Abbas Consulting, Inc. ("Abbas") and Frisco Acquisition, LLC ("Frisco.") (*See* Exhibit W hereto.)

10. On the same date, December 20, 2018, Lindauer also filed three (3) Notice/Assignment of certain claims in the WPB bankruptcy. (*See* Exhibits X, Y, and Z hereto.)

11. In or about January of 2019, I was approached by Lindauer, counsel for Jagmohan Dhillon ("Dhillon") who represented that he was the agent and representative of Frisco.

12. I first met Dhillon in person at the United States Bankruptcy Court before a hearing with Judge Brown on February 6, 2019.

13. At the February 6, 2019, Colorado bankruptcy court hearing, Dhillon represented that he was interested in acquiring the Hotel Property. Dhillon represented to me through Lindauer and ultimately in person, that he was an experienced hotel operator and familiar with the Denver market. He represented through Lindauer and ultimately in person, that Dhillon's company had the financial wherewithal and was willing and able to take over and complete the Project. Frisco was represented by Lindauer in the chapter 11 bankruptcy.

14. On January 3, 2019, WPB had filed a Motion to Sell the property to Right-A-Way, LLC (*See* Exhibit AA hereto.) The contract provided for a sales price of $9 million.

15. Lindauer, on behalf of Abbas and Frisco, filed an objection to WPB's Motion to Sell the property. (*See* Exhibit BB hereto.)

16. In their Objection to WPB's Motion to Sell to Right-A-Way, LLC, Lindauer on behalf of Abbas and Frisco stated: "The Creditors also have reason to believe that a creditor plan may be a better option in this case than a sale." (*Id.* at ¶ 22.)

17. On January 23, 2019, Lindauer sent me an email (attached hereto as Exhibit CC) introducing herself and making representations on behalf of her clients regarding purchasing the Hotel Property.

18. Both Lindauer and Dhillon represented to me that Frisco had the financial ability to assume the ALC indebtedness, and could close a deal to take over the ALC loan and acquire the Hotel Property.

19. They represented to me that Dhillon had an existing hotel project in the vicinity of the WPB Project.

20. They represented to me, including in their court filings and the Assignment of Statement of Lien, that Frisco was a Texas Limited Liability Company, thereby implying if not representing that it was valid and licensed to do business in its native state of Texas.

21. The contract with Bertoia, which Frisco, Lindauer and Dhillon fraudulently induced Bertoia to sign, expressly represented that Frisco was authorized to do business in Texas.

22. On February 7, 2019, Lindauer sent an email to me advising me that her clients wanted to submit a competing offer for the property. (*See* Exhibit FF hereto.)

23. Later on February 7, 2019, Lindauer's associate attorney, Jeff Veteto, Esq. ("Veteto") sent an email with competing contracts to purchase the hotel. (*See* Exhibit DD hereto.)

24. Later on February 7, 2019 at 3:07 p.m. Veteto sent an additional email advising me that Lindauer's office had filed their competing offer directly with the Colorado Bankruptcy Court. (*See* Exhibit HH hereto.)

25. Later on February 7, 2019, at 4:32 p.m., Lindauer sent me an email outlining terms for a deal and her client's financial wherewithal to close the deal in 45 days, instead of 90 days. (*See* Exhibit EE hereto.)

26. On February 8, 2019, Dhillon sent an email to Lindauer with a copy to me representing that his offer would provide Bertoia with more funds. (*See* Exhibit II hereto.)

27. On February 10, 2019, Lindauer sent an email to me confirming that her client had the financial wherewithal to close within 45 days. (*See* Exhibit JJ hereto.)

28. Later on February 10, 2019 at 3:52 p.m., Lindauer sent a follow up email representing that Dhillon's New York Lender could close very quickly. (*See* Exhibit KK hereto.)

29. On February 13, 2019, Lindauer sent me an email representing that her client was ready to close ASAP. (*See* Exhibit LL hereto.)

30. In response to an email from Lindauer on the status, I sent a response email to her on February 22, 2019, that it was my understanding that Bertoia's counsel were working on the final agreement. (*See* Exhibit MM hereto.)

31. On February 26, 2019, Lindauer sent me an email confirming that they had reached a deal with Bertoia and were ready to move forward. (*See* Exhibit NN hereto.)

32. Later on February 26, 2019 at 4:04 p.m. Lindauer sent me an email representing that she would get me a new contract to purchase the property. (*Id.*)

33. On February 27, 2019, Brett Payton, Esq. ("Payton") (Bertoia's personal legal counsel) forwarded an email chain between Payton and Lindauer, in which Lindauer stated among other things: "…Based on discussions this morning attached are the revised Contract for the Commercial Property and the Addendum to the LLC Agreement. We did not believe that we could directly modify the LLC Agreement as Jag had already delivered it to Wanda's counsel." (*See* Email Chain – Email dated February 27, 2019, at 10:42 a.m., Exhibit PP hereto.)

34. Attached to the February 27, 2019, email chain were copies of contracts and First Addendum. (*See* Exhibit QQ hereto.)

35. On February 28, 2019, Lindauer sent me an email stating: "I believe you have all the signed pieces." (*See* Exhibit RR hereto.)

36. On February 28, 2019, Lindauer sent me an email asking to move forward with the sale. Attached to the email were copies of the contracts. (*See* Exhibit SS hereto.)

37. On March 1, 2019, Veteto sent an email to me outlining terms of the contract negotiated. (*See* Exhibit UU hereto.)

38. On March 19, 2019, I forwarded an email dated March 15th from Veteto re the contracts. (*See* Exhibit VV hereto.)

39. Based on the representations of Dhillon and Lindauer, WPB and Bertoia entered into contracts with Frisco.

40. The February 28, 2019, Contract was signed by one Paramjit Kaur ("Kaur") on behalf of Frisco although all communications were made by Lindauer and/or Dhillon.

41. On March 1, 2019, WPB filed a Motion to Sell the property to SAT Broadway, LLC for $7 million. ("SAT") (*See* Exhibit TT hereto.)

42. On March 15, 2019, both Abbas and Frisco filed a Joint Objection to the sale in which they represented to the Colorado Bankruptcy Court that: "Creditors have been working for weeks on an offer to the Debtor and an offer to the equity interest holder that will produce a greater return than is being provided by SAT Broadway, LLC. The Creditors request that their offer be considered by the Court at the same time any other offer to sell the hotel property is considered."

43. Bertoia had moved for approval of an offer from SAT Broadway, LLC, to acquire the Hotel Property for $7 million. Frisco used mechanics liens purchased in December of 2018 to create standing to object to approval of this offer. (*See* Exhibit F to Bertoia Preliminary Response.)

44. SAT terminated the offer.

45. The WPB contract with Frisco was entered into on or about February 28, 2019. The contract was signed by Kaur on behalf of Frisco. Dhillon had previously represented himself to be the authorized agent of Frisco. Upon information and belief, Dhillon and Lindauer had negotiated the WPB and Bertoia contracts with Payton.

46. Pursuant to the terms of the WPB contract, Frisco was to pay WPB $6,068,132.97, which included assuming the ALC loan with an estimated balance of $5,310,330.26 and pursuant to the Original Addendum to Contract to Buy and Sell Real Estate (Commercial) pay unsecured creditors the approximate amount of $507,802.71, plus a reserve amount of $250,000 for Administrative Expenses, Trustee's Fees, and Attorney's Fees. (*See* Exhibit A to WPB Preliminary Response.)

47. On or about March 14, 2019, Bertoia and Frisco and Alpine Hospitality, Inc. ("Alpine") executed an Agreement for Purchase and Sale of LLC Interest. Alpine was an entity owned 100% by Bertoia. (*See* Exhibit B to Bertoia Preliminary Response.)

48. The contract between Frisco, Alpine and Bertoia was again executed by Kaur as managing member of Frisco. (*Id.*)

49. . The contract provided for payment to Bertoia of $2.5 million in exchange for her equity interest in WPB. (*Id.*)

50. Upon information and belief, Lindauer and Dhillon requested this deal structure.

51. At no time up to this point in time had I ever talked to or communicated with Kaur.

52. In fact, neither Lindauer or Dhillon had discussed or referenced Kaur as the authorized representative for Frisco prior to this.

53. Lindauer and Dhillon clearly represented that Dhillon was the principal of Frisco and its authorized representative.

54. Prior to the execution of the WPB and Bertoia contracts, Lindauer and Dhillon failed to disclose that Frisco was an assetless shell.

55. Prior to the execution of the WPB and Bertoia contracts, Lindauer and Dhillon failed to disclose that Frisco didn't have a bank account.

56. Prior to the execution of the WPB and Bertoia contracts, Lindauer and Dhillon failed to disclose that Frisco owned no property.

57. Prior to the execution of the WPB and Bertoia contracts, Dhillon and Lindauer failed to disclose that Frisco had never been financially capitalized.

58. Prior to the execution of the WPB and Bertoia contracts, Dhillon and Lindauer failed to disclose that Frisco had no ability to fund the purchaser's provisions of the Bertoia contract.

59. Prior to the execution of the WPB and Bertoia contracts, Dhillon and Lindauer did not disclose that Frisco had no financial wherewithal to assume the ALC loan.

60. Prior to the execution of the WPB and Bertoia contracts, Dhillon and Lindauer did not disclose that Frisco was not authorized to do business in the State of Texas.

61. The above facts which were concealed by Dhillon and Lindauer were material to WPB's and Bertoia's analysis of Frisco as a qualified buyer.

62. In fact, even as of April 12, 2019, Dhillon and Frisco made representations to the Judge in the WPB bankruptcy case (United States Bankruptcy Court, District of Colorado Case No. 18-18636 EEB) that Frisco had the financial wherewithal to pay $3.8 million into its deal with WPB and Bertoia.

63. On March 20, 2019, I filed a Motion to Sell to Frisco.

64. Attached to the Motion to Sell as Exhibit "A" was the Contract to Buy and Sell Real Estate as well as the Original Addendum. (*See* Exhibit A to Bertoia Preliminary Response.)

65. Also attached to the Motion to Sell as Exhibit "B" was the Agreement for Purchase and Sale of LLC Interest. (*See* Exhibit B to Bertoia Preliminary Response.)

66. Also attached to the Motion to Sell as Exhibit "C" was the signed Promissory Note by Frisco payable to Bertoia for $2.25 million which was signed by Kaur as Managing Member of Frisco.

67. A hearing on WPB's Motion to Sell was scheduled for April 12, 2019.

68. Upon information and belief, shortly before the hearing, Frisco proposed that the contract be restructured.

69. The purported purpose of the restructuring was to maintain title to the Hotel Property in WPB. Upon information and belief, ALC wanted the existing loan to be in the name of WPB because it was an EB-5 loan which they did not want it paid or assumed by Frisco.

70. As part of the WPB and Bertoia deals, Frisco was going to assume the ALC EB-5 loan on the project.

71. At some point after the above documents were signed, a Reformed Purchase Offer was created by Frisco and circulated to all parties. (*See* Exhibit I to Bertoia Preliminary Response.)

72. The Reformed Purchase Offer (which was not signed by any party) between Bertoia and Frisco was for a purchase of Bertoia's equity in WPB. (*See* Exhibit B to Bertoia Preliminary Response.)

73. The Reformed Purchase Offer (which was referenced by Veteto as a "Memo") was a proposal from Frisco that to my knowledge was never executed by WPB or Bertoia. In fact – there were no signature blocks on the Reformed Purchase Offer. (*See* Exhibit I to Bertoia Preliminary Response.)

74. I became concerned that ALC and Frisco were intentionally sabotaging the WPB and Bertoia purchases by using a game-plan and strategy to have ALC foreclose on the property in order to wipe out the mechanic lien creditors. A loss of the real estate would also allow for the non-payment of WPB's unsecured creditors and deprive WPB of the equity in the project.

75. Because of my concerns regarding an "end run gameplan", I sent an email to David Laird, Esq., counsel for ALC with copies to Lindauer and Veteto on April 8, 2019, to this effect. (*See* Exhibit ZZ hereto.)

76. My April 8, 2019, email was prompted by concerns that ALC and Frisco were looking to cut (foreclose) WPB and Bertoia out of the equation.

77. This concern was heightened by the fact that Judge Brown had granted ALC relief from stay on February 7, 2019, but stayed the Order subject to certain conditions until May 8, 2019 in order to allow WPB to sell the property. (*See* Order for Relief from Stay, Exhibit GG hereto.)

78. Therefore, ALC and Frisco knew that if they could stall WPB and Bertoia until May 8, 2019, that ALC could obtain relief from stay to foreclose upon the property.

79. On that same date (April 8, 2019) Laird in effect assured me that doing an end run around the bankruptcy and WPB was not the case. (*See* Exhibit BBB hereto.)

80. On April 4, 2019, ALC filed a "Supplemental Objection" to the sale to Frisco. The Supplemental Objection by ALC raised concerns that Frisco needed to provide proof that it had the ability to complete construction of the hotel. (*See* Exhibit WW hereto.)

81. On April 4, 2019, I sent an email to Veteto and Lindauer asking for their help in responding to the "Supplemental Objection" since ALC was the only one that could address the concerns raised regarding Frisco's financial wherewithal. (*See* Exhibit XX hereto.)

82. On April 8, 2019, at 2:48 p.m. I sent an email to Veteto and Lindauer indicating that ALC's counsel had advised me that Frisco was attempting to change the deal. In my email I specifically stated: "…As you have seen from the email exchanges with David Laird, David advises based upon a telephone conversation with both of you that Frisco is buying Wanda's ownership interest in WPB, BUT Frisco is **NOT** buying the hotel…." (*See* ALK Email to Veteto and Lindauer, Exhibit AAA hereto.)

83. In said email, I further asked Veteto and Lindauer: "….IF Frisco is unwilling to proceed with buying the hotel – please advise." (*Id.*)

84. On April 8, 2019, Lindauer sent an email saying interalia that the "….I think this is being structured as an equity purchase not a sale of the hotel itself. We don't need court approval to buy the equity but I do think we need approval to pay the estate money for creditors, taxes, etc." (*See* Exhibit CCC hereto.)

85. I began to suspect that Frisco was reneging on the pending contracts and was simply stalling WPB and Bertoia so that time would run out and ALC would be granted relief from the automatic stay.

86. On April 9th, 2019, I sent an email to Lindauer complaining that there was a hearing scheduled for Friday, April 12th, 2019, and I did not have the confidence that Frisco was genuine. (*See* Exhibit DDD hereto.)

87. In fact, in my April 9th email to Lindauer I specifically asked, among other things: "1. Is your client proceeding with the pending sale contract? Yes or No.) (*Id.*)

88. On April 9, 2019, Veteto sent an email in response to my inquiries to which was attached the document referenced as "Memo – Reformed Purchase Terms 4.9.19". (*See* Veteto Email, Exhibit FFF hereto.)

89. Again, the Memo – Reformed Purchase Terms 4.9.19 was exactly that – a memo – and not a contract or agreement,

90. Judge Brown determined that she did not have jurisdiction to approve the contract between Bertoia and Frisco because neither Bertoia nor Frisco were parties to the WPB bankruptcy.

91. The Bertoia contract was not conditioned on the WPB plan of reorganization.

92. As confirmed in Lindauer's Email, Bertoia's sale of her equity ownership in WPB was not subject to Bankruptcy Court approval since it was not an asset of the WPB bankruptcy estate.

93. The Bertoia contract was not conditioned on the transfer of claims from WPB to Bertoia. Those could have been waived.

94. At the May 7, 2019, hearing, Judge Brown stated:

> Okay. Let me pause you right there, because I think – I'm sure I did say at the last hearing, with this being a stock sale, it's an asset sale of interest that's not property of the estate, it belongs to Ms. Bertoia or her company, Alpine, so I cannot be involved in approving it.

(*See* Debtor's Motion for Summary Judgment at p. 18.)

95. The purported "restructuring" could have been accomplished by an agreement at closing but had the effect of delaying approval of the debtor's motion to sell property until May 7, 2019, a day before the ALC relief from stay deadline.

96. At the hearing of April 12, 2019, Frisco represented to the Court that it was ready to proceed with the WPB contract. Frisco also represented it had a loan commitment in the amount of $18 million. (*See* Exhibit J to Bertoia Preliminary Response, 20:24-21:3.)

97. A new hearing date was set on May 7, 2019, at 10:00 a.m., a day before the deadline to avoid the lender obtaining relief from stay.

98. ALC's requirements for Frisco to assume the loan were that Frisco obtain a contractor's bid and a property condition report to demonstrate that Frisco had enough capital to complete construction of the Hotel Property. By May 5, 2019, Frisco had obtained a certified structural report of the Hotel Property and a bid from its general contractor. (*See* Exhibit K to Bertoia Preliminary Response.)

99. As the May 7, 2019, date approached, Frisco's counsel became less and less responsive.

100. WPB had been advised that Frisco was finally hiring local counsel since all representation of Frisco had taken place through Veteto and Lindauer to that date.

101. WPB was advised that Curt Todd, Esq. ("Todd") was Frisco's local counsel. In preparation for the May 7th hearing, Ken Buechler, Esq. as counsel for WPB sent an email to Todd asking about Frisco's Witness and Exhibit list for the hearing.

102. In an email dated April 27, 2019, Todd stated: "I don't have any documents including the financing letter and I will likely not exchange lists of witnesses and exhibits and provide exhibits by 5/19/19 and I will likely not represent Frisco and Abbas on a going forward basis." (*See* Exhibit GGG hereto.)

103. Todd's reluctance to represent I Abbas was apparently based upon their failure to provide a retainer. A series of emails ensued, including one sent from Dhillon on April 30th to various parties, including myself referencing a wire transfer for payment.

104. Prior to the May 7th hearing, Frisco would not confirm that it was able to proceed with the transaction. (*See* Exhibit M to Bertoia Preliminary Response.)

105. Finally on May 3, 2019, Frisco's Texas counsel provided a witness and exhibit list.

106. On May 7th at 7:40 a.m. I filed a Status Report for the Debtor outlining the status of matters for the Bankruptcy Court. (*See* Exhibit III hereto.)

107. The Bankruptcy Court did not conduct an evidentiary hearing on May 7th and ordered the Debtor to file a status report on or before May 24, 2019 (*See* Exhibit LLL hereto.)

108. As the May 8, 2019, relief from stay deadline approached, Frisco ceased efforts to perform on its contract and to obtain bankruptcy court approval.

109. Prior to May 8, 2019, Frisco appeared to have abandoned the contracts.

110. The unsigned Reformed Purchase Offer did not change the fundamentals of the contract between WPB and Frisco or Bertoia and Frisco. It merely left title in WPB. The remainder of the WPB contract remained the obligation of Frisco.

111. Prior to May 8, 2019, the parties did not execute a contract modification.

112. By May 8, 2019, Frisco had appeared to have abandoned the contracts it had entered into with Bertoia and WPB.

113. On May 16, 2019, ALC received relief from stay to foreclose on the Hotel Property.

114. Prior to the ALC foreclosure sale, WPB and Bertoia remained willing and able to close the contracts with Frisco. (*See* Exhibit N to Bertoia's Preliminary Response.)

115. Frisco, however, was not willing to close. (*See* May 21, 2019, email chain between Veteto and ALK, Exhibit KKK hereto.)

116. On June 19, 2019, I filed the Debtor's Status Report outlining for the Colorado Bankruptcy Court the sequence of events by ALC and Frisco. (*See* Exhibit MMM hereto.)

117. It was discovered that ALC and Frisco had reached an agreement whereby Frisco acquired the Debtor's property directly from ALC paying ALC approximately $2 million more than the WPB debt to ALC.

118. On August 15, 2019, I filed a further Status Report with the Colorado Bankruptcy Court outlining the actions of ALC and Frisco.

119. Attached to the Status Report as Exhibit "A" was a copy of a "Release of Claims and Settlement Agreement" which was apparently dated July 18, 2019, which disclosed that the

$2 million that Frisco was going to pay to the Debtor/Bertoia was paid to ALC. (*See* Exhibit Q to Bertoia's Preliminary Response.)

120. By having ALC foreclose on the property and Frisco buying the property directly from ALC instead of the Debtor, they wiped out all of the creditors of the WPB bankruptcy, including the mechanic lien creditors as well as the unsecured creditors.

121. By having ALC foreclose on the Property and Frisco buying the Property directly from ALC instead of the Debtor, they wiped out Bertoia's equity in the Project and the Property.

122. The July 18, 2019, Release of Claims and Settlement Agreement gave Frisco the right to purchase the Hotel Property from ALC with various additional terms.

123. On September 20, 2019, Frisco and ALC entered into a Purchase and Sale Agreement for the Hotel Property. (*See* Exhibit S to Bertoia's Preliminary Response.)

124. On September 23, 2019, Frisco assigned its Purchase and Sale Agreement with ALC for the hotel to Denver Gateway, LLC. (*See* Exhibit T to Bertoia's Preliminary Response.)

125. Dhillon signed the Assignment for Frisco. His wife, Amandeep Dhillon, signed acceptance of the Assignment for Denver Gateway.

126. In its Motion for Summary Judgment, Frisco asserts that "…it is undisputed and uncontroverted that the WPB PSA was eliminated and rescinded by the parties. WPB's initial counsel, Buechler, expressly advised the bankruptcy court of this at the initial April 12, 2019, hearing." (Doc# 279, VI(A).)

127. These statements are incorrect.

128. Kenneth Buechler was not WPB's "initial counsel" as the Debtor represents in its Response to Motion for Summary Judgment. I was unable to attend the hearing and Mr. Buechler, as co-counsel was standing in for me.

129. A copy of the transcript from the April 12th, 2019, hearing is attached to Bertoia's Preliminary Response as Exhibit J.

130. At the April 12, 2019, hearing, a draft of the Reformed Purchase Offer had just been circulated. To my knowledge, no contract modification had been finalized. To my knowledge, no contract had been terminated or rescinded.

131. To this date I have not seen a notice, email, or letter from Frisco or it's counsel specifically terminating the WPB contract with Frisco.

132. In the transcript cited by debtor at 14:3, Mr. Buechler advised the Court that "I don't think we need that much tweaking of the deal. Again, structurally it may change, but fundamentally it won't." Mr. Buechler then advised the Court that he thought "drafts were exchanged yesterday." (*See* Exhibit J to Bertoia Preliminary Response at 14:3-5 and 14:14-18.)

133. To my knowledge, the Reformed Purchase **Offer** was never executed or acted upon, nor had the original WPB contract been eliminated or rescinded.

134. Again – the "Reformed Purchase Offer" was only a Memo circulated by Veteto. The Memo contained no signature blocks and was never signed in some later form to my knowledge.

135. At the April 12, 2019, hearing, Curt Todd, Esq. ("Todd") appeared as local counsel for Frisco.

136. Also at the April 12, 2019, hearing, Dhillon (referenced in the transcript as Jack Dillon) and Raj Patel also appeared physically in the court room on behalf of Frisco.

137. During the April 12th hearing, Judge Brown questioned Todd in Dhillon's presence regarding Frisco's financing capabilities for the purchase. (*See* Exhibit J to Bertoia's Preliminary Response, Transcript of April 12, 2019 Hearing at 9:12-25 and 10:1-10.)

138. Todd represented to Judge Brown that Frisco had a loan commitment for $5 Million from EXOS Commercial Finance and that additionally, Frisco was prepared to provide an additional equity infusion of $3.8 Million. (*Id.* at 9:12-24.)

139. Twice – not once – Judge Brown asked Todd if Frisco had $3.8 Million and twice it was represented that Frisco had the $3.8 Million. (*Id.* at 9:18-24.)

140. A third (3rd) time Judge Brown asked Todd to confirm that Frisco did not need any additional financing to come up with the $3.8 Million to which Todd confirmed that additional financing was **not** required. (*Id.* at 10:1-5)(emphasis added.)

141. Finally, after ALC's counsel discussed its arrangements with Frisco for part of the deal, Todd advised Judge Brown that Frisco confirmed that the numbers mentioned by ALC's counsel were correct, namely that there was going to be a new $18 Million loan, with the equity infusion by Frisco of $3.8 Million. (*Id.* at 20:24-25 and 21:1-3.)

142. All of these statements and representations were made with Dhillon physically in Judge Brown's courtroom (not telephonically.)

143. At no time during the April 12th hearing did Frisco's counsel or Frisco's representatives (Dhillon) advise Judge Brown that there was no contract or no agreement or no deal.

144. To the contrary, the clear representations made to Judge Brown by Frisco at the April 12th hearing was that there was a contract being pursued by Frisco with the Debtor and Bertoia with Frisco having significant financial wherewithal to accomplish the deal.

145. Given that Frisco was never capitalized and that it never had a bank account; the representations made by Frisco to Judge Brown at the April 12th hearing were false.

146. Clearly, Judge Brown relied upon the representations made by Frisco and Dhillon, but also WPB and Bertoia relied upon these representations as well.

147. To say that the WPB contract was not approved by the Bankruptcy Court is a "red herring" since Frisco intentionally sabotaged court approval and failed to proceed in good faith.

148. It's clear to me that Frisco used its contracts with WPB and Bertoia to stall WPB and Bertoia until ALC was able to obtain relief from stay.

149. In fact, on August 11, 2020, at a hearing on Preliminary Confirmation of Debtor's Plan before Judge Brown, Judge Brown commented on ALC's and Frisco's strategy in reneging upon the contracts with WPB and in having ALC foreclose on the property so the property could be sold direct to Frisco for $2 million more than WPB's debts with ALC. (*See* August 11, 2020, hearing transcript, Exhibit V to Bertoia's Preliminary Response, at 13:9-17.)

150. Judge Brown also commented on Frisco's abandonment of the contracts. (*Id.* at 12:16-13:8.)

151. I reserve the right to modify this Declaration upon further review of the extensive file in this matter.

**I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO THE PROVISIONS OF 28 U.S.C. § 1746 THAT THE FOREGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY INFORMATION, KNOWLEDGE AND BELIEF.**

Dated: 6-1-2022

Arthur Lindquist-Kleissler, Esq.